### Page 1

```
 1
 2        IN THE UNITED STATES DISTRICT COURT
 3            FOR THE DISTRICT OF KANSAS
 4
 5
 6  SABRINA S. OVERFIELD,
 7        Plaintiff,
 8
 9    vs.          Case No. 21-4093-JWB-KGG
10
11  STATE OF KANSAS,
12        Defendant.
13
14
15            DEPOSITION OF
16          JUDGE FRED JOHNSON,
17  taken on behalf of the Plaintiff, pursuant to
18  Notice to Take Deposition, beginning at 10:00 a.m.
19  on the 6th day of October, 2022, via web
20  conference, before Ksenija M. Zeltkalns, RPR,
21  Kansas CCR No. 1461.
22
23
24
25
```

### Page 2

```
 1            APPEARANCES
 2
 3
 4  ON BEHALF OF THE PLAINTIFF:
 5
 6    Mr. Alan V. Johnson
 7    Sloan, Eisenbarth, Glassman,
 8     McEntire & Jarboe, LLC
 9    534 South Kansas Avenue, Suite 1000
10    Topeka, Kansas  66603
11    785.357.6311
12    ajohnson@sloanlawfirm.com
13
14
15  ON BEHALF OF THE DEFENDANT:
16
17    Ms. Terelle A. Mock
18    Ms. Crystal B. Moe
19    Fisher, Patterson, Sayler & Smith, LLP
20    3550 Southwest Fifth Street
21    Topeka, Kansas  66606
22    785.232.7761
23    tmock@fpsslaw.com
24    cmoe@fpsslaw.com
25
```

### Page 3

```
 1  ALSO PRESENT:
 2
 3    Mr. Tyler Toelkes, Video Tech
 4    Ms. Sabrina Overfield
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 4

```
 1              INDEX
 2
 3
 4  Certificate ----------------------------- 46
 5
 6
 7            WITNESS
 8  ON BEHALF OF PLAINTIFF:              PAGE
 9  JUDGE FRED JOHNSON
10  Direct-Examination by Mr. Johnson     5
11  Cross-Examination by Ms. Mock        39
12  Redirect-Examination by Mr. Johnson   40
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street  6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604     Suite 101                Suite 305
785-273-3063         Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com  913-383-1131             316-201-1612

**Page 5**

1  JUDGE FRED JOHNSON,
2  Called as a witness on behalf of the Plaintiff,
3  having been duly sworn, testified as follows:
4  DIRECT-EXAMINATION
5  BY MR. JOHNSON:
6  Q. Would you state your name and home
7  address for the record, please?
8  A. My name is Fred Johnson and my home
9  address is 604 Fourth Street in Oswego, Kansas.
10  Q. And you are currently employed as a
11  district court judge of the 11th Judicial
12  District. Is that correct?
13  A. That's correct.
14  Q. When did you -- when were you appointed
15  as a district court judge?
16  A. I'll have to look up here on the ... I
17  was appointed August the 24th of 2017.
18  Q. And is my understanding correctly that
19  you have offices and hold court in both Parsons
20  and Oswego?
21  A. Correct.
22  Q. When you were first appointed as a
23  district court judge, who was the other judge in
24  Parsons?
25  A. Jeffrey Jack.

**Page 6**

1  Q. And Judge Jack retired in -- at the end
2  of 2019?
3  A. That sounds about right.
4  Q. Okay.
5  A. I honestly can't tell you.
6  Q. Okay. So at least in Labette County, you
7  and Judge Jack were the two district court judges
8  in that county. Would that be accurate?
9  A. In the county. That's correct.
10  Q. How would you describe your working
11  relationship with Judge Jack?
12  A. Well, I had known Judge Jack all through
13  my practice of law so I think it was fine. As
14  far as I know, yeah.
15  Q. Were there any times when you and he were
16  not perhaps on speaking terms or were having
17  difficulty communicating?
18  A. No, not on -- not as far as I know not on
19  nonspeaking terms. There was one incident where
20  there was an issue concerning Sabrina and he came
21  down to my office with Sabrina in regard to who
22  was going to be covering for jury trials and he,
23  in a short manner, he basically told me that
24  Sabrina was his court reporter and she was not
25  going to be helping me, so that's -- that was that

**Page 7**

1  conversation.
2  Q. And after that conversation did Sabrina
3  ever assist you?
4  A. No.
5  Q. Do you recall in January of 2020 that the
6  applicants to replace Judge Jack were interviewed
7  by the -- by a nominating committee?
8  A. Yes.
9  Q. Now, were you present in the Parsons
10  courthouse when that interview process took place?
11  A. Yes.
12  Q. And after the process took place, do you
13  recall having a conversation with Sabrina that
14  started out talking about the applicants and the
15  three lawyers who were proposed, nominated, to
16  replace Judge Jack?
17  A. Yes.
18  Q. Have you, in preparation for your
19  deposition, have you reviewed any documents?
20  A. There was -- there were a --
21  contemporaneous notes that I was asked to take
22  that day and that's the only notes I have.
23  Q. Have you ever seen Ms. Overfield's
24  statement about what occurred on January 10th,
25  2020?

**Page 8**

1  A. Not that I recall.
2  MR. JOHNSON: Tyler, would you bring up
3  Deposition Exhibit 4 so the judge can review that
4  and see if maybe he's seen it before.
5  BY MR. JOHNSON:
6  Q. Can you see that, Judge?
7  A. I can, yes.
8  Q. And in looking at that does that -- is
9  that consistent with your memory that you don't
10  believe you've ever seen this before?
11  A. That may be -- that may have been
12  attached to the complaint that Ms. Overfield filed
13  with the ethics, Judicial Ethics Board. Is that
14  what that is?
15  Q. I believe it is but I would like you to,
16  if you haven't read it recently, I would like you
17  to read the first two pages, down to where there's
18  another entry that starts January 13th and then I
19  want to ask you some questions about it to see
20  what parts you agree with and what parts you
21  disagree with. Okay?
22  A. Okay. All right. They'll have to go
23  back to the top because I can't control it. Okay.
24  There you go.
25  Q. Right. And when you want to move down,


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street    6420 W. 95th Street    800 E. 1st Street
Topeka, KS 66604    Suite 101    Suite 305
785-273-3063    Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com    913-383-1131    316-201-1612

Page 9

1  you just tell Tyler and he'll move it down for
2  you.
3     A.  Okay.  That's great.  Okay.  If you'd
4  move that up now.  Stop.  Okay.  Now move it
5  forward.  You said the first two pages?
6     Q.  Yeah.  First two and a half, yeah.  You
7  go down to the bottom of the second page and then
8  up to the top of the third page if you would,
9  please.
10    A.  Okay.
11    Q.  Actually why don't you stop at the
12 paragraph of that -- bottom of that page says in
13 conclusion.
14    A.  Okay.  I'll stop there.  Okay.  All
15 right.
16    Q.  Okay.  Let's go back to the first page,
17 now that you've had a chance to read most of this,
18 and the second paragraph begins where Ms.
19 Overfield is describing her conversation with you
20 on January 10th, 2020, about three o'clock p.m.
21    And my question is after you read -- and
22 let's just take it paragraph by paragraph.  Is
23 there anything in this paragraph that you disagree
24 with that you don't believe was said, or that you
25 have a different memory of the topics that you

Page 10

1  were talking about?
2     A.  All right.  It says I stopped in Judge
3  Johnson's office, she did.  And she asked me about
4  the three nominees, that's true.  And I did tell
5  her that I -- that I had kind of expected those
6  three and I told her yeah, that, you know, at this
7  point now it goes to the governor's office and so
8  it's political in nature.  And then she said
9  something about Sam Marsh's comment about moving
10 to the court, moving the court to Oswego.  That's
11 true.  And then she did say it wasn't feasible and
12 I told her well, no, it's feasible.  And then she
13 told me that -- I did remind her that Judge
14 Brunetti did move -- did have all of her cases, or
15 heard all of her cases for criminal and juvenile
16 in Girard and then she said no, that's not true,
17 but actually it is true.  So yeah, that's not --
18 that's not true either.
19    Q.  Now, when you get down to or when you
20 came to the topic of Judge Brunetti, were you and
21 Ms. Overfield talking in a normal tone of voice or
22 had -- she uses the term argument.  Were you in,
23 from your point of view, an argument or a
24 disagreement with her at this point?
25    A.  No.

Page 11

1     Q.  In that conversation?
2     A.  No.
3     Q.  Now, read the next paragraph down to the
4  bottom all the way down.  I want to ask you some
5  questions -- or you've already read that.  Tell me
6  if you agree or disagree with that part where she
7  describes you slamming your hand on the desk and
8  saying in an intimidating voice sit down.  We need
9  to have a talk.  Do you agree that that occurred?
10    A.  She says I was ready to conclude our
11 conversation and proceed to the clerk's office.  I
12 don't know about that.  And I -- no, I did not
13 slam my hand down on the desk and -- but I did
14 ask her to sit down.  I pointed at the chair and
15 I said let's, you know, let's talk about this.  So
16 she was a couple steps, this says she stood at the
17 door, she was a couple steps inside the office at
18 my recollection.
19    Q.  Did you --
20    A.  I don't -- I don't recall any
21 conversation about -- well, that's not the way I
22 had -- I don't think that's the way -- that's not
23 the way I recall the conversation in that she --
24 she came in.  Actually what she came in and did
25 was she said she wanted me to change my docket and

Page 12

1  I think that's in there somewhere.  She wanted me
2  to change the way I was doing my docket and I
3  said -- oh, and I just got a message that our
4  connection is unstable, by the way.
5     She asked something about ... I lost my train
6  of thought now, that message came up.  Where were
7  we at?
8        MS. MOCK:  I think you were talking about
9  her asking you to change your docket.
10       THE WITNESS:  Oh, that's what it was.
11    A.  And she came in and she said you need to
12 change your docket from the morning to the
13 afternoon and I said no, I'm -- I get here early
14 and we start our docket at 9:00.  Sometimes -- at
15 that time we were running sometimes at 8:30 and we
16 were -- we would run that as quickly as we could
17 and so I didn't want to change my docket.
18       BY MR. JOHNSON:
19    Q.  Do you recall having a discussion with
20 Ms. Overfield about your court reporter, Tammy?
21    A.  I do.  There was -- there was -- I wanted
22 to talk to her about trying to work together and I
23 asked her about, you know, is there a problem
24 between, and this is just my recollection, is
25 there -- was there a problem about with Tammy and

Page 13

1  me or, you know, what's the deal and that's --
2  that's I think how that came up.
3      Q.  Okay.  Let's go to the top of the next
4  page.  Are you with me there?  Yeah.  Starts
5  "wasn't quite," and then you see that according to
6  Ms. Overfield you talk about the criminal dockets,
7  and you told us about that.
8      A.  Yes.  That's where it is.
9      Q.  Anything else you remember about that
10 part of the discussion, that is, dealing with the
11 criminal docket?
12     A.  I think I -- I think I did tell her no,
13 that I start early and they don't get in until
14 later anyway and so -- and the reason -- the
15 reason we do that, we intentionally scheduled
16 those criminal cases because so that -- well, the
17 reality of it is is we don't have very many local
18 attorneys and so we were scheduling intentionally
19 so that the attorneys could move back and forth
20 from courtroom to courtroom.  That's -- we would
21 look on the calendar to try to make that available
22 so that we could do that, so.
23     Q.  Then if you go about three or four
24 sentences down, Ms. Overfield says Judge Johnson
25 interrupted me and he said I told you to sit down.

Page 14

1  Judge Johnson's tone was very angry and harsh and
2  threatening.  Do you see that?
3      A.  I see that.
4      Q.  And do you agree or disagree with that
5  description of your conversation?
6      A.  I disagree with it.
7      Q.  Were you angry at all during this
8  conversation?
9      A.  Well, she started raising her voice and
10 so I probably raised my voice as well.
11     Q.  And then --
12     A.  I did -- I did ask her to sit down.  I
13 didn't tell her to sit down.  I said would you
14 just sit down and -- so we can talk about it and
15 so.
16     Q.  And then the next sentence says, quote,
17 Judge Johnson then told me I was lying because I
18 sat right there on his couch with Judge Jack and
19 told him I wouldn't work for him and Tammy was --
20 has helped Judge Jack several times, end of quote.
21 Do you see that statement?
22     A.  Yeah.  I don't recall that.
23     Q.  Do you dispute her recollection that you
24 told her that she was lying?
25     A.  I do not recall telling her she was

Page 15

1  lying.  No, I don't recall telling her she was
2  lying.
3      Q.  And then the next sentence --
4      A.  Now, we did --
5      Q.  Go ahead.
6      A.  We did have the conversation that she was
7  sitting there on the sofa with Judge Jack when
8  Judge -- and we discussed that earlier, that Judge
9  Jack had come in and so forth.  I did tell her, I
10 did remind her that she was sitting right there in
11 the room when that -- when that conversation
12 occurred, so yeah.  But I didn't call her a liar.
13     Q.  And then Ms. Overfield says that you were
14 getting very angry with her and you slammed your
15 hand on the desk again.  Do you agree or disagree
16 with that?
17     A.  Disagree.  Did not slam any fists or
18 hands or whatever it is there.
19     Q.  And then you see Ms. Overfield says that
20 she told you you cannot talk to her like that,
21 like this, and you responded yes, I can.  Do you
22 remember -- do you dispute that?
23     A.  I responded back saying yes, we can talk
24 about this.  We need to talk about this and then
25 she left -- she left the room.

Page 16

1      Q.  And she goes on to say again you slammed
2  your hand on the desk and yelled:  I told you to
3  sit down and pointed to the chair in the front of
4  his desk.  Do you dispute that?
5      A.  I dispute that.
6      Q.  Okay.  Now let's go to the third page.
7  Well, let me give you a chance, is there anything,
8  after reading this does this refresh your memory?
9  I want to give you the opportunity to describe
10 what you recall about this interaction as best you
11 can.  Is there anything else you want to add to
12 your testimony?
13     A.  No, other than what you've -- well, I
14 can't -- I don't know what happened after she left
15 the room, so I don't know any of that.
16     Q.  You mentioned earlier that you made a
17 statement also about this incident on January
18 10th, 2020.  You had some notes.  When do you
19 recall you made those notes or report?
20     A.  It was that -- it was the January 10th
21 date.  I think it was right after this incident.
22 I think I called Mac Young and told him that we
23 had, you know, we'd had this conversation and he
24 told me to make some contemporaneous notes, so
25 that's what I did.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street    6420 W. 95th Street    800 E. 1st Street
Topeka, KS 66604       Suite 101              Suite 305
785-273-3063           Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com    913-383-1131           316-201-1612

Page 17

1 Q. Okay. And that was on January 10th you
2 made the notes. Correct?
3 A. Yes. That's right. Uh-huh.
4 Q. Okay. Let's go to the third page of
5 Exhibit 4, and about a fourth of the way down you
6 see it starts, she describes an incident on
7 January 13th, 2020, and let me ask you some
8 questions about that. Let me ask this. First of
9 all, did you make any notes of your interaction
10 with her on January 13th, 2020?
11 A. I think that was probably -- yes. I
12 think there was -- it was very short but I think
13 I did make some notes.
14 Q. And did you give those notes to Mac
15 Young?
16 A. Yes, I would have given them to Mac
17 Young.
18 Q. And for the record, who is Mac Young?
19 A. He is the court -- judicial district
20 court administrator.
21 Q. And as a district court judge what --
22 what is your working relationship with Mr. Young?
23 In other words what does he do for you or with
24 you?
25 A. Well, he administers the budget. He --

Page 18

1 so if -- in other words if I need to purchase
2 something and that, you know, or make changes that
3 would effect the budget, I call him, and any
4 receipts or anything has to go through him so that
5 they can keep track of the budget. He -- if I
6 need equipment or something like that, that's who
7 I contact or if I'm having -- if I'm having
8 problems with equipment, I contact him. That's
9 kind of the -- the relationship. And there's the
10 administrative part too is I guess, you know, I
11 contacted him in regard to this employment issue,
12 so -- so that goes along with it too, I suppose.
13 Q. What about the personnel in the 11th
14 Judicial District? Is Mr. Young in charge of the
15 personnel?
16 A. That's my understanding.
17 Q. When you hire or fire an administrative
18 assistant who works -- who does your work, or
19 court reporter, do you have to get Mr. Young's
20 approval or consent to do that or can you just --
21 A. Yes. They actually do the hiring, I do
22 not. And I'm sorry, I didn't mean to cut you
23 off.
24 Q. That's okay. How about the termination?
25 Can you terminate an administrative assistant or

Page 19

1 court reporter who works for you without approval
2 from Mr. Young?
3 A. That's -- my understanding is I cannot,
4 so.
5 Q. And do you know what department -- what's
6 your understanding of the department or agency
7 that Mr. -- within the state system that Mr. Young
8 is employed by?
9 A. I do not have any knowledge on that.
10 Q. Are you familiar what the Office of
11 Judicial Administrator does?
12 A. I know there is such an office but I have
13 had no contact with them -- well, I can't say no
14 contact. But I don't have any knowledge of how it
15 works or any of that. I'm sure from time to time
16 I've had contact with somebody out of that office,
17 but.
18 Q. Is it your understanding that the
19 nonjudge employees of the judicial district are
20 employees of the OJA, or the Office of Judicial
21 Administration?
22 A. That's -- that's my understanding, yes.
23 Because I think that's where they get paid
24 through.
25 Q. Okay. Now, I can't remember if I stopped

Page 20

1 you, have you read the January 13th description by
2 Ms. Sabrina of that event?
3 A. Let me look at it here real quick.
4 Q. Yeah. Why don't you go ahead and read
5 that because I want to ask some same questions
6 just like I asked before, what aspects of her
7 description you agree with and what you don't
8 agree with.
9 A. All right.
10 Q. So read all the way down to that bottom
11 of the second page and then the top of the third
12 page, if you would, please.
13 A. All right. All right. And if you'd
14 raise that I think he said there's a little bit
15 more. There you go.
16 Q. Yes, if you go down to --
17 A. To conclusion?
18 Q. Yeah.
19 A. All right. Take a look here.
20 Q. The last paragraph is Ms. Overfield's
21 conclusion but she does have some facts in there I
22 want to ask you about.
23 A. Okay. Well, most of that looks like it's
24 all stuff with Mac Young and I don't have any
25 information about that, so. Okay.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street    6420 W. 95th Street    800 E. 1st Street
Topeka, KS 66604       Suite 101              Suite 305
785-273-3063           Overland Park, KS 66212 Wichita, KS 67202
www.appinobiggs.com    913-383-1131           316-201-1612

Page 21

1　Q.　Okay. So looking at a calendar, January
2　10th was a Friday, if -- if you recall, and then
3　the 13th would have been the following Monday.
4　Are you with me?
5　A.　Okay.
6　Q.　Does that sound consistent?
7　A.　If you say so, that's -- that's fine.
8　Q.　Okay. And then Ms. Overfield alleges
9　that she is in on that Monday, January 13th, in
10　her office working with the -- her door locked and
11　you knock on the door and tell her that you want
12　the door unlocked because you need to go in Judge
13　Jack's office?
14　A.　Yeah. That's not quite right. Really --
15　really what happened was this. I was going
16　through the mail and there were two or three
17　letters from the jail. We get -- I have a stack
18　of them, here, letters from inmates in the jail
19　that were addressed to Judge Fleming who was
20　filling in. He's a -- the retired judge that was
21　filling in, and he was using Judge Jack's office
22　and so I just decided -- I just took those letters
23　down to his office or to that -- that office,
24　Judge Jack's old office, and when I opened the
25　door I about broke my nose because it was locked,

Page 22

1　so I knocked on the door because I -- it'd never
2　been locked before, and no answer.
3　　So I did not know that Sabrina was there but
4　I went to her door and knocked on her door and
5　sure enough, she was there but she didn't answer
6　right away. And then I asked her, you know, how
7　come this -- how come the judge's chambers door is
8　locked, and she said something to the effect that
9　she was afraid and that -- that she was not going
10　to unlock the door and I said okay. And I said
11　I'll just tell Mac and that was the end of that
12　-- that was the end of that conversation.
13　Q.　Did you -- what did you do with the
14　letters addressed to Judge Fleming?
15　A.　I honestly do not know. That was a long
16　time ago. I don't remember.
17　Q.　Did you then call Mr. Young after Ms.
18　Overfield would not open -- unlock her door --
19　A.　Yes.
20　Q.　-- and report that incident?
21　A.　Yes, I did.
22　Q.　And tell us about that conversation.
23　What do you recall about your conversation with
24　Mr. Young about this incident?
25　A.　I think I told him exactly what I just

Page 23

1　told you and I think that was the end of the
2　conversation. That's an assumption because I
3　honestly don't recall. I remember calling him but
4　I don't remember what the contents of the
5　conversation were.
6　Q.　And then was -- then did Mr. Young ask
7　you to make some notes of the incident? You
8　earlier testified you thought you had made some
9　notes of the second incident.
10　A.　I probably just did it because he'd asked
11　me to do it the first time.
12　Q.　Okay. Okay. And then you provided those
13　with -- to Mr. Young, correct?
14　A.　Right. I think that's all, yeah, on one
15　report, yeah.
16　　MR. JOHNSON: Okay. Tyler, if you can
17　show Judge Johnson, let's go to Exhibit 8.
18　BY MR. JOHNSON:
19　Q.　And Judge, have you ever -- do you recall
20　seeing this complaint? This particular complaint
21　was filed by Allyson Christman on behalf or for
22　Ms. Overfield. Have you ever seen this complaint
23　against you before?
24　A.　No. It's interesting.
25　Q.　Have you ever seen the complaint that Ms.

Page 24

1　Overfield herself filed against you with the
2　Commission on Judicial Conduct?
3　A.　I think isn't that what you showed me
4　earlier?
5　Q.　Yes. I believe -- yes --
6　A.　Okay.
7　Q.　-- Exhibit 4 that we had was attached to
8　-- ended up being sent to the Commission on
9　Judicial Conduct.
10　A.　Okay.
11　Q.　Both by Ms. Christman and by Ms.
12　Overfield.
13　A.　Okay.
14　Q.　That's correct.
15　A.　Okay. So I guess my answer to that then
16　is yes.
17　Q.　And if you'll look at the very -- well,
18　I'll just represent to you that Ms. Christman
19　signs this on January 15th, 2020.
20　A.　Okay.
21　Q.　And using that date as a reference point,
22　when did you first find out that a complaint had
23　been filed by Ms. Overfield against you with the
24　Commission on Judicial Conduct? In other words
25　did the commission ever notify you of that? Did

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street　　　6420 W. 95th Street　　　800 E. 1st Street
Topeka, KS 66604　　　　Suite 101　　　　　　　Suite 305
785-273-3063　　　　　Overland Park, KS 66212　Wichita, KS 67202
www.appinobiggs.com　　913-383-1131　　　　　316-201-1612

Page 25

1  Ms. Christman tell you?
2      A.  No, I did not have -- I've not -- I've
3  only had, to my knowledge, to my recollection,
4  let's put it that way, I've only had one
5  conversation with Ms. Christman.  There might have
6  been -- maybe she sent -- no.  I was going to say
7  she might have sent me some e-mails but I don't
8  recall any e-mails either.  I think -- I think
9  I've only had one in-person, at least,
10 conversation with Ms. Christman.  And that was
11 later on.
12     I would assume, I'm sure, that they would
13 have -- they being the board -- would have sent me
14 notice of that but I don't recall that.  But that
15 would be the normal, I would think, to give notice
16 of a filing.  I think usually they give notice of
17 a filing and then you send in whatever response
18 you have but you know, I'm pretty vague on that,
19 so I don't recall actually doing it.  I'm sure if
20 that happened I did, so.
21     Q.  Do you recall that around January 15th,
22 2020, a day or two before or a day or two after,
23 that Tasha Thurman also filed a complaint against
24 you with the Commission on Judicial Conduct?
25     A.  You know, I do not recall receiving any

Page 26

1  notice of that.  I just don't recall that.  But I
2  do know that when a decision was made by this,
3  they indicated that it was -- there was like three
4  complaints or something.
5      Q.  That's right.  And do you recall if the
6  third complaint filed at the same time was by
7  Terri Thurman?
8      A.  Okay.
9      Q.  And for the record who is Terri Thurman?
10     A.  Terri Thurman is now retired but she was
11 the district court clerk here in Labette County.
12     Q.  And who was Tasha Thurman or who is Tasha
13 Thurman and what's her relation -- did she work
14 for you at one time?
15     A.  She did.  She was my AA.  Actually that
16 occurred through Sabrina.  What happened was we
17 were searching for court reporters, they're very
18 rare these days, and we were wanting another court
19 reporter because Vickie Barrett had retired here
20 and we were searching and searching, and Sabrina
21 came to me and indicated that she had a person, I
22 did not know who it was at the time, but she had
23 a person that was training to be a court reporter
24 and so she told me that she had been looking at
25 her grades and everything and that she was doing

Page 27

1  great and that it would, you know, it'd be
2  probably a good -- a good thing to do and so we
3  ended up hiring, it turned out to be Tasha
4  Thurman.  We ended up hiring her as an AA for me
5  and that's -- so that's how that occurred.
6      Q.  And as you indicated, those three claims
7  were, I'm not sure they were consolidated but they
8  were considered by the Commission on Judicial
9  Conduct together.
10     A.  Okay.
11     Q.  And my question is do you remember any
12 investigator from the commission contacting you
13 and -- to discuss your reaction, your version,
14 your response to the complaints filed by Ms.
15 Overfield, Ms. Thurman and -- Ms. Tasha Thurman
16 and Ms. Terri Thurman?
17     A.  Yes.  Yes.  And I'm sorry, right now that
18 his name, I've lost his name.
19     Q.  Was it Todd Thompson?  Do you -- is
20 that --
21     A.  Yes, Todd Thompson.
22     Q.  Okay.  Todd Thompson.  And did you --
23 tell us about his -- your conversation with him.
24     A.  Okay.  Well, he came to Oswego and we --
25 he interviewed me in chambers and we discussed --

Page 28

1  so we would have discussed -- I think he just
2  asked me questions about what happened here and
3  what happened here and I just responded.  He wrote
4  that down.  To my knowledge I think he took
5  personal notes, don't believe that it was
6  recorded.  I think it was all personal notes and
7  then that was it.  He was probably there an hour.
8  That's a long time ago.  That's my best
9  recollection.
10     Q.  And was there anybody else on -- from the
11 Commission on Judicial Conduct that contacted you?
12 Any of the other members?
13     A.  No.
14     Q.  And during your conversation with Mr.
15 Thompson, did he show you or indicate to you what
16 the allegations were against you?
17     A.  Well, he indicated what they were because
18 he asked me questions about these incidents.  I
19 don't recall him showing me anything.  I think he
20 just asked me questions, but like I say, that was
21 a long time ago.
22     Q.  And so for example he wouldn't have -- he
23 didn't show you Ms. Overfield's written statement
24 that we went through in detail just a little bit
25 ago, correct?

Page 29

1    A. I do not recall that, no.
2    Q. Do you recall talking to Mr. Young about
3 the complaints filed against you with the
4 Commission on Judicial Conduct?
5    A. I'm sure I did but I don't have a
6 recollection or a time when that would have
7 occurred.
8    Q. Do you recall discussing with Judge
9 Oliver Lynch those complaints against you?
10    A. The only -- the only actual conversation
11 that it just pops up into my mind is I was at a
12 funeral in Wichita. I was gone and it was during
13 the week and I was coming back from Wichita, and
14 it would have had to have been -- well, I assume
15 it would have had to have been sometime after
16 these complaints were filed and he asked me, he'd
17 called me on the phone, we were traveling back and
18 he asked me if -- if I minded if I just moved the
19 -- my docket to Oswego and I told him no, that's
20 not a problem, and so that's the only real
21 conversation that I recall in regard to the
22 complaint.
23    MR. JOHNSON: You mentioned moving your
24 docket to Oswego. Let's take a look if we could,
25 Tyler, at Exhibit 9.

Page 30

1 BY MR. JOHNSON:
2    Q. And do you recall this Order, Judge? I
3 think you were referring to this, that on January
4 21st, 2020, Judge Lynch enters an Order saying
5 that beginning January 27th of 2020 you will be
6 sitting in Oswego for office hours and court until
7 further order. You see that?
8    A. Yeah. That's probably in relation to the
9 phone call I just talked to you about.
10    Q. Okay. Do you recall any other
11 conversation -- well, let me back up. If I
12 understand your testimony correctly, your
13 conversation with Judge Lynch occurred before he
14 entered this Order. Would that be right?
15    A. Yes, I think so. Because he -- he asked
16 me do you have any problem with moving your docket
17 to Oswego and I said no, not at all. I live
18 there. That's a convenient place for me.
19    Q. And did he explain to you the reason why
20 that he was entering this order was because of the
21 complaints that had been filed against you with
22 the Commission on Judicial Conduct?
23    A. I would assume that that was part of the
24 conversation, but that would be normal. That
25 would be normal if a complaint is filed, so, you

Page 31

1 know, that's a normal thing to do.
2    Q. Now, prior to the entry of this Order on
3 January 21st, 2020, about how much time did you
4 spend in Parsons in relationship to -- in the
5 courthouse doing business in comparison to how
6 much time you spent in Oswego?
7    A. Okay. Well, I think really most all of
8 the dockets were in Parsons at that time. I did
9 -- I did do a couple, maybe two or three Fridays
10 a week -- a month, excuse me, a month, in Oswego.
11 That's my recollection. Oh, and we always did
12 traffic court and those were on Thursdays and that
13 -- and that was always in Oswego. And that's --
14 when I say on Thursdays, it was every third
15 Thursday of the month so it was only once a month
16 unless there were special settings or something.
17 That's my recollection.
18    Q. Did you understand this Order by Judge
19 Lynch to mean that you were not to conduct any
20 business in the Parsons courthouse?
21    A. Well, I moved -- I mean, I moved my
22 docket to Oswego, so yes, I assumed that's true.
23    Q. So after this Order was entered do you
24 recall having any hearings or being in the
25 courthouse in Parsons until later this Order is

Page 32

1 rescinded?
2    A. I would have come and moved stuff out of
3 my office here in Parsons. I would have come and
4 moved files and things like that, so I'm sure that
5 -- that occurred somewhere in that -- in that time
6 frame. And I don't recall, somewhere in the COVID
7 -- is this -- COVID started right around that same
8 time didn't it, around March?
9    Q. Right. Around March of 2020.
10    A. Yeah. And then of course -- then this
11 building, I'm in the judicial center in Parsons
12 today, this building basically got shut down
13 during that COVID period so I just don't think
14 that -- I don't recall any time I came to Parsons
15 other than just to get, you know, files or
16 something like that.
17    MR. JOHNSON: Let's look at Exhibit 19.
18 Tyler, would you show the judge Exhibit 19?
19 BY MR. JOHNSON:
20    Q. And I mentioned that the earlier Order
21 that was entered in January of 2020 about a year
22 later was rescinded by Judge Lynch. He signed
23 this Order on February 10th, 2020, and stated that
24 you may schedule and hold court in either Oswego
25 or Parsons.

Page 33

1    A. February 10th of '21? I'm sorry. I
2 didn't mean --
3    Q. Yes.
4    A. Okay.
5    Q. But you see the date and then beginning
6 on March 1st, 2021, you at your discretion could
7 schedule and hold court in either courthouse.
8    A. Right.
9    Q. Am I reading that correct?
10    A. You are.
11    Q. So -- so between January 27th, 2020, and
12 March 1st, 2021 you don't recall scheduling or
13 holding court in Parsons during that year-long,
14 little bit over a year-long period. Is that
15 right?
16    A. I don't recall it. No. Matter of fact,
17 I don't think we -- when we -- when this order
18 came through I don't think we even started having
19 hearings until the end of March or 1st of April
20 because I'd already had a docket scheduled, you
21 know, my docket was out months and so we'd already
22 scheduled everything in Oswego. We just stayed
23 there.
24      Actually we pretty much stayed in Oswego
25 until recently. Well, I say recently, been about

Page 34

1 three or four months ago. The elevator went out
2 in the courthouse and so ADA, the court's on the
3 third floor and ADA issues arose and so we had to
4 move all my dockets to Parsons.
5    Q. Now, after March of 2021 when you moved
6 your docket or part of your docket to Parsons, did
7 you take any steps to advise Ms. Overfield and
8 Terri Thurman that you were going to be in the
9 Parsons courthouse?
10    A. No.
11    Q. Did you understand -- were you ever
12 directed to do that by Judge Lynch?
13    A. Not that I recall, no.
14    Q. Were you ever instructed to do that by
15 Mr. Young?
16    A. Now you're talking after -- after they
17 changed the assignment back to Parsons?
18    Q. Yes, after March 1st, 2021.
19    A. No. I mean, they said I was going to be
20 -- no. I didn't understand that.
21    Q. Now, do you recall in 2021 that Judge
22 Lynch retired and that Judge Fleming became the
23 new chief judge?
24    A. Yes.
25    Q. And it's -- and what does judge -- you

Page 35

1 mentioned Judge Fleming before, a retired judge.
2 Who is this -- what's the full name of this judge?
3    A. Her name is Lori Bolton Fleming and she
4 is the daughter-in-law of retired Robert Fleming.
5    Q. And do you recall talking with Judge Lori
6 Bolton Fleming about your working relationship
7 with Ms. Overfield and Terri Thurman? In other
8 words, that they had filed these complaints
9 against you and from their perspective they were
10 concerned about working with you. You ever
11 remember discussing that with Judge Lori Bolton
12 Fleming?
13    A. No.
14    Q. Do you recall Judge Lori Fleming ever
15 instructing or requesting you to advise Ms.
16 Overfield and Terri Thurman as to when you were
17 going to be in the Parsons courthouse so they
18 could work remotely if they chose to?
19    A. We were still -- that was COVID time
20 still. I think there was some -- and I -- I'm
21 kind of thinking it may have been through Mac
22 Young indicating that people would be working
23 sometimes from home. That was a -- those were
24 strange times and I can't really keep all of that
25 straight but I think there was something, there

Page 36

1 was something that people would be working from
2 home. And my docket, if that's the question, my
3 docket is on a Google calendar. Everybody can see
4 -- all the clerks, everybody can see my docket so
5 it's not a -- it's not a secret when I'm here and
6 when I'm not, you know.
7    Q. And how far in advance is your calendar
8 on the Google docket?
9    A. Well, I -- I've got jury trials right now
10 scheduled two years in advance so -- so that --
11 it's -- and I try to stay, well, we schedule --
12 right now, if you needed, today, if you needed two
13 hours of my time we'd be talking January. So
14 that's -- you've got this one today because we had
15 a jury trial go off, so. And actually what we do
16 is then we -- we schedule, we back these jury
17 trials up with other cases and so I've got this is
18 domestic day. I just finished some pro se
19 divorces and I've got a whole bunch of them this
20 afternoon, so.
21    Q. Do you -- so every -- if I understand
22 your testimony correctly, everybody in the court,
23 Parsons courthouse, would have access to your
24 calendar and would know where you're -- where you
25 would be, where your docket would be held for

Page 37

months in advance. Is that correct?
    A. That's correct. Actually Ms. -- Ms. -- well, Sabrina and Terri -- well, I know that Sabrina was on the Google calendar because you can see who's on there. And I know that the clerks were. I can't tell you that Terri Thurman was. I think -- but all of the other, the deputy clerks would have been. I had -- I was able to see Judge Jacks' calendar. That's how -- that's how we would -- that's how we would know if the attorneys were going to be in one courtroom versus another. We'd try to schedule it so that they could be in one and not be over booked in the other and so forth, so that's how we did it, was by looking at the Google calendar.
    Q. And would the Google calendar then be available to all the judges and court personnel in the 11th Judicial District or would it just be in Labette County?
    A. We just had it in Labette County. I don't know the ability to do it beyond that. At that time we were -- but that's -- Google is -- I'm not that techy so I don't know. I would assume if you give permission to other judges they could see the calendar as well, and I'm -- that's

Page 38

just an assumption on my part. I don't know the answer to that particularly.
    MR. JOHNSON: Okay. We've been going about an hour and I realize that we only have another hour to go but why don't we take -- I'm getting close to the end. Why don't we take a ten minute break and then we'll come back and finish up if that's okay with everybody?
    THE WITNESS: All right.
    MS. MOCK: Sure.
    THE WITNESS: All right. Thank you.
    (THEREUPON, a recess was taken.)
BY MR. JOHNSON:
    Q. Okay. I just have a few questions more, Judge, and they deal with an online Harassment Prevention Training Program that was put on by the Kansas Human Rights Commission, it was an online training. Do you recall taking that training?
    A. Yes, I think I do.
    Q. And do you recall receiving a Certificate of Completion?
    A. Well, I don't recall.
    Q. Okay. Do you recall what year you would have taken that online training?
    A. No, I'm sorry, I don't.

Page 39

    Q. Okay. Do you recall whether it was before or after Ms. Overfield and Tasha and Terri Thurman had filed complaints against you with the judicial commission?
    A. No. I think it was -- I just don't recall when it was so I can't tell you if that's when it was.
    MR. JOHNSON: Okay. That's fair. That's all the questions I have. Some of the other lawyers may or may not have questions for you.
    THE WITNESS: All right.
    MS. MOCK: I just have a couple.
CROSS-EXAMINATION
BY MS. MOCK:
    Q. Good morning, Judge.
    A. Good morning.
    Q. Are you aware that it's against policy to create a hostile working environment for employees in your building?
    A. Yes.
    Q. And were you aware of that before '19 and '20?
    A. Yes.
    Q. And same question, were you aware it's against policy to discriminate against your

Page 40

employees on the basis of their gender?
    A. Yes.
    Q. And you were aware of that as early as -- well, I guess as early as you took the bench in 2017 were you not?
    A. Sure. Yes.
    Q. Sure. And you were aware as early as you took the bench that it's against policy for you to retaliate against an employee who has made a complaint against you. Isn't that correct?
    A. Yes. That's correct.
    Q. Did you ever make any remarks to Ms. Overfield regarding her gender?
    A. No.
    Q. Have you ever made any remark for any staff member within the Parsons Judicial Center regarding their gender?
    A. No.
    Q. Or treated anyone differently because of their gender?
    A. No.
    MS. MOCK: I don't have any other questions. Thank you.
REDIRECT-EXAMINATION
BY MR. JOHNSON:

Page 41

1 Q. Judge, I have a few follow up to that
2 line. When you first became -- were appointed a
3 district court judge, what kind of training did
4 you receive about the policies that you just
5 testified about? Was it a formal training or was
6 it just things that you knew because you're a
7 judge and a lawyer?
8 A. That's -- that's basically it. Just
9 things -- it was just things that we knew. I'm
10 not aware of any -- I do not recall, is the right
11 way to phrase, anything that was sent out to us
12 when we took the bench. There was a -- there was
13 a year after I took the bench, maybe more, we had
14 a, what we call the baby judges school that we
15 took in Topeka for I think it was a two or three
16 days, but it was more focused on, you know,
17 dealing with issues on the bench.
18     MR. JOHNSON: Okay. Thank you. I have
19 no further questions.
20     THE WITNESS: All right. Thank you.
21     MS. MOCK: Hey, Judge, would you like to
22 have the transcript prepared and sent to you for
23 signature or would you want to waive signature?
24     THE WITNESS: I'll read and sign.
25     MS. MOCK: Okay. If you could send it

Page 42

1 directly to him, that would be great. And I'll
2 have an e-tran.
3     THE WITNESS: Okay.
4     (THEREUPON, the deposition concluded at
5 11:13 a.m.)
6 .
7 .
8 .
9 .
10            SIGNATURE
11 .
12     The deposition of JUDGE FRED JOHNSON was
13 taken in the matter, on the date, and at the time
14 and place set out on the title page hereof.
15 .
16     It was requested that the deposition be
17 taken by the reporter and that same be reduced to
18 typewritten form.
19 .
20     It was agreed by and between counsel and
21 the parties that the deponent will read and sign
22 the transcript of said deposition.
23 .
24 .
25 .

Page 43

1            AFFIDAVIT
2 .
3 STATE OF _____:
4 COUNTY/CITY OF _____:
5 .
6     Before me, this day, personally appeared,
7 JUDGE FRED JOHNSON, who, being duly sworn, states
8 that the foregoing transcript of his/her
9 Deposition, taken in the matter, on the date, and
10 at the time and place set out on the title page
11 hereof, constitutes a true and accurate transcript
12 of said deposition, along with the attached Errata
13 Sheet, if changes or corrections were made.
14 .
15      _____
16         JUDGE FRED JOHNSON
17 .
18     SUBSCRIBED and SWORN to before me this
19 _____ day of _____, 2022 in the
20 jurisdiction aforesaid.
21 .
22 _____        _____
23 My Commission Expires     Notary Public
24 .
25 .

Page 44

1        DEPOSITION ERRATA SHEET
2 .
3 RE:    APPINO & BIGGS REPORTING SERVICE, INC.
4 .
5 FILE NO.: 67122
6 .
7 CASE:   SABRINA S. OVERFIELD vs.
8         STATE OF KANSAS
9 .
10 DEPONENT: JUDGE FRED JOHNSON
11 .
12 DEPOSITION DATE: 10/6/2022
13 .
14 To the Reporter:
15 I have read the entire transcript of my Deposition
16 taken in the captioned matter or the same has been
17 read to me. I request that the following changes
18 be entered upon the record for the reasons
19 indicated. I have signed my name to the Errata
20 Sheet and the appropriate Certificate and
21 authorize you to attache both to the original
22 transcript.
23 .
24 .
25 .

Page 45

```
 1  PAGE:LINE FROM     TO         REASON
 2  .
 3  .
 4  .
 5  .
 6  .
 7  .
 8  .
 9  .
10  .
11  .
12  .
13  .
14  .
15  .
16  .
17  .
18  .
19  .
20  .
21  .
22  .
23  .
24  SIGNATURE:_____ DATE:_____
25          JUDGE FRED JOHNSON
```

Page 46

```
 1              CERTIFICATE
 2  STATE OF KANSAS
 3  COUNTY OF SHAWNEE
 4      I, Ksenija M. Zeltkalns, a Certified
 5  Court Reporter, Commissioned as such by
 6  the Supreme Court of the State of
 7  Kansas, and authorized to take
 8  depositions and administer oaths within
 9  said State pursuant to K.S.A 60-228,
10  certify that the foregoing was reported
11  by stenographic means, which matter was
12  held on the date, and the time and place
13  set out on the title page hereof and
14  that the foregoing constitutes a true
15  and accurate transcript of the same.
16      I further certify that I am not
17  related to any of the parties, nor am I
18  an employee of or related to any of the
19  attorneys representing the parties, and
20  I have no financial interest in the
21  outcome of this matter.
22      Given under my hand and seal this
23  21st day of October, 2022.
24  _____
25  Ksenija M. Zeltkalns, C.C.R. No. 1461
```


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612