# SABRINA S. OVERFIELD

Page 1

```
1   .
2         IN THE UNITED STATES DISTRICT COURT
3           FOR THE DISTRICT OF KANSAS
4   .
5   .
6   SABRINA S. OVERFIELD,
7        Plaintiff,
8   .
9   vs.            Case No. 5:21-CV-04093
10  .
11  STATE OF KANSAS,
12       Defendant.
13  .
14  .
15         DEPOSITION OF
16       SABRINA S. OVERFIELD
17  taken on behalf of the Defendant, pursuant to
18  Notice to Take Deposition, beginning at 9:41 a.m.
19  on the 3rd day of October, 2022, at Sloan,
20  Eisenbarth, Glassman, McEntire & Jarboe, 534 S.
21  Kansas Avenue, Suite 1000, in the City of Topeka,
22  County of Shawnee, and State of Kansas, before
23  Sandra S. Biggs, RPR, Kansas CCR No. 0716.
24  .
25  .
```

Page 2

```
1         APPEARANCES
2   .
3   .
4   ON BEHALF OF THE PLAINTIFF:
5   .
6      Mr. Alan V. Johnson
7      Sloan, Eisenbarth, Glassman
8       McEntire & Jarboe
9      534 S. Kansas Avenue
10     Suite 1000
11     Topeka, KS  66603
12  .
13  .
14  ON BEHALF OF THE DEFENDANT:
15  .
16     Ms. Terelle A. Mock
17     Ms. Crystal B. Moe
18     Fisher, Patterson, Sayler & Smith
19     3550 S.W. 6th Street
20     Topeka, KS  66606
21     785-232-7761
22     cmoe@fpsslaw.com
23     tmock@fisherpatterson.co,
24  .
25  .
```

Page 3

```
1              INDEX
2   .
3   .
4   Certificate---------------------------- 234
5   .
6   .
7              WITNESS
8   ON BEHALF OF THE DEFENDANT:            PAGE
9   SABRINA S. OVERFIELD
10  Direct-Examination by Ms. Mock         6
11  Cross-Examination by Mr. Johnson       210
12  Redirect-Examination by Ms. Mock       219
13  .
14  .
15             EXHIBITS
16  OVERFIELD DEPO EX. NO:            MARKED
17  No 1  Job application            18
18  No 2  Resignation letter         20
19  No 3  Interrogatories            53
20  No 4  OJA complaint              76
21  No 5  Map of office              77
22  No 6  Complaint by Tasha Thurman        103
23  No 7  Allyson Christman findings   129
24  No 8  Complaint filed with Kansas
25      Commission on Judicial Conduct   136
```

Page 4

```
1   No 9  1/27/20 Administrative Order   139
2   No 10  5/4/20 letter to Christman
3      from Cameron              144
4   No 11  Young report regarding Thurman
5      complaint                 148
6   No 12  Johnson's description of
7      1/10/20 incidents to Young    154
8   No 13  KHRC complaint          158
9   No 14  2/3/20 Complaint to Judicial
10     Qualifications            160
11  No 15  1/28/20 letter to Christman from
12     Shima certifying receipt of complaint  160
13  No 16  7/2/20 letter to Christman
14     from Cameron              160
15  No 17  5/4/20 Complaint to Judicial
16     Qualifications            162
17  No 18  5/4/20 letter to Johnson from
18     Cameron                   163
19  No 19  2/10/21 Administrative Order   164
20  No 20  Typewritten notes         170
21  No 21  3/9/21 e-mail string      171
22  No 22  March 2021 e-mail string      175
23  No 23  12/15/21 e-mail to Overfield
24     from Young                176
25  No 24  January & February 2021 e-mails   178
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# SABRINA S. OVERFIELD

Page 5

1 No 25  2018/2019 performance evaluation      184
2 No 26  2019/2020 performance evaluation      186
3 No 27  Rule 26 Initial Disclosures      193
4 No 28  Policy prohibiting sexual and
5       other workplace harassment      195
6 No 29  Medical bill      196
7 No 30  Handwritten notes      202
8 No 31  Picture      211
9 No 32  Complaint by Terry Thurman      217
10 .
11 .
12 .
13 .
14 .
15 .
16 .
17 .
18 .
19 .
20 .
21 .
22 .
23 .
24 .
25 .

Page 6

1       SABRINA S. OVERFIELD,
2 called as a witness on behalf of the Defendant,
3 was sworn and testified as follows:
4       DIRECT-EXAMINATION
5 BY MS. MOCK:
6    Q.  Good morning, Miss Overfield?
7    A.  Good morning.
8    Q.  My name is Terelle Mock.  I'm
9 representing the State of Kansas in the lawsuit
10 that you have filed.  I understand you're a court
11 reporter?
12    A.  Yes, ma'am.
13    Q.  I've never taken the deposition of a
14 court reporter before, but I will say I've deposed
15 a few lawyers and they're terrible witnesses.  So,
16 hopefully, court reporters are better.  But I know
17 that because you are a court reporter you probably
18 understand how these things work but just for my
19 own purposes of the record I'm going to reiterate
20 a few ground rules if you'll just indulge me.
21 Obviously, it's important that you understand the
22 question that I'm asking you here today.  If you
23 don't understand a question, I want you to let me
24 know.  Okay?
25    A.  Um-hum.  Yes, ma'am.

Page 7

1    Q.  Okay.  And if you answer my question, I'm
2 going to presume that you understood my question.
3 Fair?
4    A.  Fair.
5    Q.  All right.  Obviously, it's important
6 that you answer out loud.
7    A.  Yes, ma'am.
8    Q.  See.  Even court reporters get tripped
9 up.  Obviously, if I prompt you in answering a
10 question out loud, it's just for that purposes of
11 the record.  Okay?
12    A.  Okay.
13    Q.  And I know you understand as well, it's
14 important that we don't talk over one another.
15    A.  Very important.
16    Q.  Okay.  All right.  I'm sure we're going
17 to get along just fine.  I'll probably be the one
18 that runs afoul with that.  So if I interrupt you,
19 you just let me know.  All right?
20    A.  I sure will.
21    Q.  Okay.  Your fill name for the record,
22 please?
23    A.  Sabrina Sue Overfield.
24    Q.  Date of birth?
25    A.  January 31st, 1966.

Page 8

1    Q.  Current address?
2    A.  3958 County Road 4670, Independence,
3 Kansas, 67301.
4    Q.  What direction is that from Independence?
5    A.  North.
6    Q.  And how many miles are you from
7 Independence?
8    A.  A block.
9    Q.  Oh, okay.
10    A.  It's actually a block into county.  It's
11 not really out of city limits.
12    Q.  It's in the city limits?
13    A.  It is but it isn't.  They revamped our
14 city streets to where now we are located as a
15 county.  My former address was 2183 Valley High
16 Drive.  And due to some kind of Google Maps or
17 some situation I'm not quite sure of, they've
18 changed us to a county road.
19    Q.  I see.  Gotcha.  In any event, you're
20 very close to the City of Independence?
21    A.  Very.
22    Q.  Okay.  All right.  Let's see.  Okay.
23 Just a real brief -- can you give me a real brief
24 overview of your educational history?  You
25 graduated from high school.  Where did you

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# SABRINA S. OVERFIELD

Page 9

1 graduate from high school?
2   A.  I graduated from high school in
3 Independence, Kansas in 1984.
4   Q.  And did you go to any school after high
5 school?
6   A.  The community college there in
7 Independence for a year.
8   Q.  Okay.  And what did you do after that?
9   A.  Got married and had a child.
10   Q.  And who did you marry?
11   A.  Robert Bridwell.
12   Q.  Can you spell that last name?
13   A.  B R I D W E L L.
14   Q.  What was your maiden name?
15   A.  Siliceo, L I C E O -- I'm sorry,
16 S I L I C E O.
17   Q.  S I L I C E O.
18   A.  It's true Italian.
19   Q.  Okay.  So you married Mr.  Bridwell in
20 '85?
21   A.  Yes, ma'am.
22   Q.  And you said you had a child.  Is that
23 correct?
24   A.  Yes, ma'am.
25   Q.  What's your child's name?

Page 10

1   A.  Tyler.
2   Q.  Tyler Bridwell?
3   A.  Yes.
4   Q.  What's his date of birth?
5   A.  9/1 of '85.
6   Q.  And did you live with Mr.  Bridwell in
7 Independence then?
8   A.  Yes, ma'am.
9   Q.  And how long did you live with Mr.
10 Bridwell in Independence?
11   A.  Two years.
12   Q.  Were you then divorced?
13   A.  Yes, ma'am.
14   Q.  So divorced in '87?
15   A.  Yes.
16   Q.  When did you first start working as a
17 court reporter?
18   A.  September 21st, 1998 -- I'm sorry, 22nd.
19 September 22nd, 1998.
20   Q.  Okay.  And were you married after you
21 divorced Mr. Bridwell?
22   A.  Not until October 2nd of 1999.
23   Q.  And who did you marry on October 2nd of
24 1999?
25   A.  My current husband, Gary Overfield.

Page 11

1   Q.  Do you have any other children except for
2 Tyler?
3   A.  A stepson, Jesse.
4   Q.  Jesse Overfield?
5   A.  Yes.
6   Q.  Where does Tyler live?
7   A.  Oilton, Oklahoma, O I L T O N.
8   Q.  Is he married?
9   A.  Yes.
10   Q.  What's his wife's name?
11   A.  April.
12   Q.  Do they have any children?
13   A.  Yes.
14   Q.  What about Jesse Overfield?  Where does
15 he live?
16   A.  Madison, Wisconsin.
17   Q.  Is he married?
18   A.  Yes.
19   Q.  What's his wife's name?
20   A.  Caylin.
21   Q.  Can you spell that?
22   A.  C A Y L I N.
23   Q.  Do they have any children?
24   A.  Yes.
25   Q.  Okay.  So between '87 and 1998, were you

Page 12

1 employed during that time?
2   A.  Yes.
3   Q.  And various jobs?
4   A.  Yes.
5   Q.  Can you just kind of walk me through
6 briefly what you were employed as during that
7 period of time?
8   A.  My father is now a retired dentist, but I
9 worked for him for several years as a dental
10 assistant.  I then decided to go back to school
11 and do what I really wanted to do and that was
12 become an official court reporter.  Went to Tulsa,
13 Oklahoma and worked two jobs to pay my way through
14 school as a bartender, waitress at Outback
15 Steakhouse and also as a dental assistant.
16   Q.  How long did you live in Tulsa?
17   A.  Two and a half years.
18   Q.  Okay.  And were you hired -- what was
19 your first job as a court reporter?
20   A.  In Parsons, Kansas for the 11th Judicial
21 District.
22   Q.  How many court reporters were hired at
23 the Parsons location in the 11th Judicial District
24 at that time?
25   A.  When I started?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# SABRINA S. OVERFIELD

Page 13

1    Q.   Yes.
2    A.   There was one other court reporter.
3    Q.   What was her name?
4    A.   Vickie Barrett.
5    Q.   And I'm assuming at some point in time
6    Miss Barrett left, correct?
7    A.   2016.
8    Q.   And was anybody hired to replace her?
9    A.   Administrative assistants, but we could
10   never really get another court reporter.  We --
11   Vickie and I were also the administrative
12   assistant to our judge.  We were each assigned a
13   judge.  So when she left, I worked for both judges
14   as well as the AA.
15   Q.   So you were the AA and reporter for one
16   judge and then just the reporter for the other
17   judge.  Is that accurate?
18   A.   When he was without an administrative
19   assistant, I also was his administrative
20   assistant.  So at some times I was doing a four-
21   man job of one person.
22   Q.   Okay.  But from 1998 until 2016 --
23   A.   I was just a one-judge court reporter and
24   administrative assistant.
25   Q.   So that's one job, right, because you did

Page 14

1    it for that long, correct?  You would still say
2    that was two jobs?
3    A.   Well, considering now most judges have
4    their own personal AA, the district I transferred
5    to has an administrative assistant for all three
6    judges, so I don't have administrative assistant
7    jobs any longer.
8    Q.   Do all three judges in Montgomery County
9    also have their own court reporters?
10   A.   No, ma'am.
11   Q.   Okay.  So they all have their own AA but
12   they don't have their own court reporter?
13   A.   They have one AA that works for three
14   judges.
15   Q.   And what's the number again for
16   Montgomery County, 12th?
17   A.   14th.
18   Q.   Thank you.  14th Judicial District is
19   Montgomery County?
20   A.   Yes, ma'am.
21   Q.   Which is where you currently work?
22   A.   Yes, ma'am.
23   Q.   Okay.  So at Montgomery County, there are
24   three judges.  Is that correct?
25   A.   Until January.  And then we'll receive a

Page 15

1    fourth.
2    Q.   Okay.
3    A.   Plus the magistrate.
4    Q.   Sure.  So are you the court reporter for
5    all three of those judges?
6    A.   Yes and no.
7    Q.   Okay.  Explain it to me.
8    A.   There is also another full-time court
9    reporter.  We have elected to each take one judge
10   full time, and then the third judge we divide our
11   daily workload.
12   Q.   Okay.  So back to Labette County.  From
13   1998 until 2016, you were the AA/court reporter
14   for one judge?
15   A.   Yes, ma'am.
16   Q.   All right.  And who was that judge?
17   A.   I started with Daniel Brewster.
18   Q.   And from what time frame, year, what to
19   what, were you working for Judge Brewster?
20   A.   From when I started, but I can't give you
21   an approximate date or year from when he retired.
22   Q.   Okay.
23   A.   But the next judge I worked with was
24   Judge Jeffry Jack, and I worked with him for 14
25   years.

Page 16

1    Q.   Okay.  And you left in '21, correct?
2    A.   Yes, ma'am.
3    Q.   So can we subtract back and say that was
4    2007?
5    A.   Probably, yes.
6    Q.   Ish?
7    A.   Right.
8    Q.   Okay.  2006, 2007, somewhere in there.
9    Yeah.  Okay.  Are you going to do my math for me?
10   Okay.  So I guess Jack left before you did,
11   though?  Judge Jack left before you did?
12   A.   Yes, ma'am.
13   Q.   So that might mess up our math?
14   A.   Yes.
15   Q.   When did Judge Jack retire?
16   A.   I believe Judge Stockard started April of
17   '20.
18   Q.   So did Judge Jack retire in '20 or did he
19   retire in '19?
20   A.   '19.
21   Q.   Okay.  So, now, if we go back 16 years,
22   closer to 2003, 2004, somewhere in there?  Does
23   that sound about right?
24   A.   It would be a guess but that sounds about
25   right.



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# SABRINA S. OVERFIELD

Page 17

1  Q. Okay. So Judge Stockard took Judge
2  Jack's place?
3  A. Yes, ma'am.
4  Q. Okay. In any event, you recall in your
5  head that you worked for Judge Jack for 14 years?
6  A. Right, approximately.
7  Q. When did Judge Johnson come or when was
8  he appointed to the bench in the 11th Circuit, do
9  you recall?
10  A. Not right offhand, but I know it was
11  November, and I can't remember if it was '17 or
12  '18.
13  Q. And who did he -- there's always been two
14  judges, correct?
15  A. Yes, ma'am.
16  Q. Okay. So who -- what position did he
17  fill? Who vacated the judicial position that
18  Judge Johnson was appointed to?
19  A. Robert Fleming.
20  Q. Thank you.
21  A. One of the best I must say.
22  Q. And who was Robert Fleming's AA and court
23  reporter?
24  A. Vickie Barrett.
25  Q. Was she -- did she leave when he left?

Page 18

1  A. She left before him.
2  Q. Okay.
3  A. A year, approximately a year before he
4  left.
5  Q. When you were hired in 1998 to the 11th
6  District, who -- who hired you?
7  A. Judge Brewster, the Court Administrator
8  Clint Hurt, and also in attendance was Shaun
9  Higgins who was classified as a managing court
10  reporter. They hired me on the spot at my
11  interview.
12  Q. Okay. And did your job title at any time
13  change from 1998 until you left the court in 2001
14  (sic)?
15  A. From official court reporter?
16  Q. Yes.
17  A. No, ma'am.
18  Q. And then I understand in 2000 -- or 2021,
19  excuse me, that's what I meant a couple sentences
20  ago, in 2021, you applied for a transfer. Is that
21  correct?
22  A. Yes, ma'am.
23  MS. MOCK: Okay. I believe I have a copy
24  of your application here.
25  (THEREUPON, Overfield Deposition Exhibit

Page 19

1  No 1 was marked for identification by the
2  reporter.)
3  BY MS. MOCK:
4  Q. Okay. I'm handing you what's been marked
5  as Exhibit 1. Can you identify this document?
6  A. Yes, ma'am.
7  Q. What am I looking at here?
8  A. A job application.
9  Q. Filled out by whom?
10  A. Myself.
11  Q. For what position?
12  A. An official court reporter in the 14th
13  Judicial District.
14  Q. And this position would be in
15  Independence, correct?
16  A. Yes, ma'am.
17  Q. And it indicates here you applied on
18  December 8th, 2021. Is that correct?
19  A. Yes.
20  Q. And on the second page, it asks you have
21  you ever been fired or asked to resign from a
22  position, and you respond no. Do you see where it
23  says that?
24  A. Yes, ma'am.
25  Q. And that's correct, right?

Page 20

1  A. Yes, ma'am.
2  Q. It also asks have you ever been
3  disciplined at work, and you write no. And that's
4  correct as well, right?
5  A. Yes, ma'am.
6  Q. And the next page it asks what is your
7  desired salary, and you respond exactly what I am
8  making at the present time. Is that correct?
9  A. Yes.
10  Q. And were you, in fact, hired on at the
11  same salary that you were making?
12  A. Yes.
13  (THEREUPON, Overfield Deposition Exhibit
14  No 2 was marked for identification by the
15  reporter.)
16  BY MS. MOCK:
17  Q. Okay. I just handed you what was marked
18  as Exhibit 2. What is this document?
19  A. My official resignation letter from the
20  11th Judicial District.
21  Q. Okay. So that is dated December 6th?
22  A. Yes, ma'am.
23  Q. Okay. So your application is December
24  8th and your resignation is December 6th? Is this
25  correct or are we missing something? I mean it

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 21

1 could be perhaps something within it in the
2 electronic application that changed, but as you
3 sit here today, do you recall having accepted --
4 having applied and been hired on at the 14th
5 District before you resigned from the 11th
6 District?
7    A.  When I visited with the chief judge in
8 the 14th Judicial District, they had visited with
9 me previously about coming to work in my home
10 district.  I declined many times as you can tell
11 by my years in Parsons.  So it was really kind of
12 a verbal transition.  Yet, I had to do this for
13 the State of Kansas.
14    Q.  I see.
15    A.  I had to fill out an application before I
16 could transfer for their paperwork.  So that's
17 probably why the date is different possibly.
18    Q.  Okay.  So you'd been recruited by the
19 14th District for some time.  Is that fair?
20    A.  Many years.  Many years.
21    Q.  Many years.  Okay.  And who -- who at the
22 14th District was actively recruiting you to come
23 over there as the court reporter?
24    A.  Every judge that's ever worked there.
25    Q.  Okay.  So who was it that recruited you

Page 22

1 in December of 2021?
2    A.  Chief Judge Jeffrey Gettler.
3    Q.  Can you spell that last name?
4    A.  G E T T L E R.
5    Q.  Is he the judge that you're assigned to
6 full time?
7    A.  Yes, ma'am.
8    Q.  And then who's the judge that you support
9 on a half-time basis?
10    A.  Judge Cullins, C U L L I N S.
11    Q.  In transitioning from the 11th Circuit to
12 the 14th Circuit, did you lose out on any pay?
13    A.  No, ma'am.  Can I backtrack that a bit,
14 though?
15    Q.  Sure.
16    A.  Depends on -- my salary, no.
17 Transcription, transcripts-wise, yes.
18    Q.  Okay.  All right.  Let's talk about that.
19 So what's your current salary?
20    A.  I couldn't tell you off the top of my
21 head.  We had a raise this past year.
22    Q.  Okay.
23    A.  So without my pay stub in front of me, I
24 cannot give you an accurate figure.
25    Q.  Can you give me a ballpark figure?

Page 23

1    A.  With benefits, it's close to 80,000 a
2 year.
3    Q.  Okay.  So let's go back -- let's go back
4 to -- well, let me ask you this.  Did you do
5 anything to prepare for today's deposition?
6    A.  Just looked over all my paperwork I've
7 had for the last two and a half years.
8    Q.  Okay.  And all the paperwork you'd
9 already given to Mr. Johnson, correct?
10    A.  Yes.
11    Q.  Excuse me.  You indicated that there was
12 a different court administrator when you were
13 hired on at the 11th District, correct?
14    A.  Yes.
15    Q.  Okay.  Do you recall when Mac Young
16 became the court administrator for the 11th
17 Judicial District?
18    A.  No, ma'am.
19    Q.  Was there somebody in between the guy
20 that hired you and Mac?
21    A.  Yes.
22    Q.  Okay.  So did anything change
23 significantly when Mac Young became the court
24 administrator?
25    A.  What do you mean by change?

Page 24

1    Q.  Well, did he do things differently?
2    A.  I believe so.
3    Q.  Okay.  In what way?
4    A.  Labette County he did not frequently
5 visit much and talk to the official court
6 reporters.
7    Q.  So he didn't come to Labette County as
8 frequently as his predecessors had?
9    A.  Yes.
10    Q.  Anything else did he do differently?
11    A.  As I said, official court reporters had
12 very little communication with him.
13    Q.  Was he responsive when you communicated
14 to him?
15    A.  Not so much, no.
16    Q.  Can you give me an example?
17    A.  Within these last few years or what time
18 frame?
19    Q.  Well, while he's been at his job?
20    A.  With these last few years, when I was the
21 only court reporter and I told him something had
22 to give because I was at a breaking point, I
23 couldn't keep reporting for both court reporters
24 and the administrative assistant, I needed help,
25 could we hire an AA.  And he would just laugh me

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 25

1 off and said that's not going to happen.
2    Q.  Okay.  Did you understand that was due to
3 budget constraints?
4    A.  I'm sure it was, but yet, they needed
5 somebody else in that chair that wouldn't come and
6 go to help me.  I had a full workload where I was
7 at.
8    Q.  Okay.  Let's talk about your work after
9 you became the AA for Stockard.  Vickie Barrett
10 left sometime in 2016, 2017.  Is that correct?
11    A.  Yes.
12    Q.  Okay.  And since that time, the position
13 that she vacated has never been completely filled,
14 correct?
15    A.  Until just recently.
16    Q.  Until just recently.  But not while you
17 were there?
18    A.  No.  An AA would come and stay less than
19 a year or maybe a year, and then they would be
20 gone.
21    Q.  Okay.  And no other certified court
22 reporter had been hired to replace Miss Barrett
23 while you were still at the 11th District,
24 correct?
25    A.  We had one official court reporter come

Page 26

1 from Oklahoma that stayed a little under a year, I
2 believe.
3    Q.  And what was her name?
4    A.  Tammy Thomas I believe was her last name.
5    Q.  Okay.  So I want to kind of focus on the
6 time frame when you are working.  So we've got
7 Judge Stockard and we have Judge Johnson there
8 sometime in 2017, 2018, correct -- oh, no, my
9 apologizes, because you said that Judge Jack was
10 there until '19?
11    A.  Yes, ma'am.
12    Q.  Okay.  So let's talk about 2019.  All
13 right?
14    A.  Okay.
15    Q.  Because we know in 2019, the judicial
16 positions are occupied by Judge Jack and Judge
17 Johnson?
18    A.  Yes, ma'am.
19    Q.  Okay.  What would your typical day look
20 like in 2019?
21    A.  Each day varied.  We had criminal day on
22 Monday, juvenile day on Tuesday, Wednesday was
23 domestic day, Thursday and Friday were various
24 court hearings.
25    Q.  And that is how Judge Jack ran his

Page 27

1 docket.  Is that correct?
2    A.  Yes.
3    Q.  Did Judge Johnson run his docket the same
4 way?
5    A.  No.
6    Q.  Okay.  Who was Judge Johnson's court
7 reporter?
8    A.  He's only had Tammy Thomas for less that
9 a year, and that was in '19, into '20.  I believe
10 she left in February of 2020.
11    Q.  Okay.  So when he would have a hearing
12 the same time that Judge Jack would have a
13 hearing, what -- how would his hearings get
14 recorded or is that what would happen, they would
15 just be recorded?
16    A.  Yes.  They would be recorded.
17    Q.  Okay.  And then transcribed as necessary?
18    A.  Yes, by myself.  Or if I was overloaded,
19 we had other court reporters in the district.
20    Q.  That that work would then be assigned to?
21    A.  Yes.
22    Q.  Okay.  So for those transcriptions for
23 Judge Johnson's hearings, would you get paid extra
24 for that?
25    A.  Yes.

Page 28

1    Q.  Okay.  And how much income additionally
2 to your salary would that amount to in any given
3 month?  Can you give me a monthly income?
4    A.  It varies, ma'am.  It's feast or famine.
5 I hate to use that term, but you could make 500
6 or we could make 5,000.  I can't -- I can't give
7 you an accurate figure.
8    Q.  Would it be safe to say that while Judge
9 Johnson was without an official court reporter,
10 you made more money?
11    A.  Yes, ma'am.  But I also made more money
12 during that time that Judge Fleming -- when Vickie
13 retired in '16, I made more money working with him
14 as well.
15    Q.  Sure.
16    A.  Yes.
17    Q.  Because there was only one of you?
18    A.  Yes, ma'am.
19    Q.  Okay.  And if you were overloaded or said
20 I don't want to have anymore of these transcripts,
21 they would farm them out to other court reporters.
22 Is that right?
23    A.  But that rarely happened because I would
24 work nights and weekends to make sure our district
25 stayed -- or our location stayed up to speed.  I

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 29

1  didn't want to do that.
2    **Q.  Okay.**
3    A.  But, yes.
4    **Q.  But that was your choice?**
5    A.  Yes, ma'am.
6    **Q.  Okay.  But I think you did testify before**
7  **that if it came to a point where you were**
8  **overloaded, they would, in fact, farm those out to**
9  **other court reporters.  Is that correct?**
10    A.  Yes, ma'am.
11    **Q.  And that did happen on occasion?**
12    A.  When that happened, though, was after I
13  filed the complaint.  I would not do anymore work
14  for Judge Johnson.
15    **Q.  Okay.  So when you transcribe a hearing**
16  **or something of that ilk for Judge Johnson, you**
17  **would listen to the hearing, correct?**
18    A.  Yes.
19    **Q.  And create the record?**
20    A.  Yes.
21    **Q.  Would that involve interaction with Judge**
22  **Johnson?**
23    A.  No, ma'am.
24    **Q.  Okay.  So it wasn't a situation where you**
25  **had to give him the transcript for approval and he**

Page 30

1  **would nit-pick things and then you'd have to give**
2  **it back or anything like that?  That didn't happen?**
3    A.  No, ma'am.
4    **Q.  Okay.  So I think you indicated before**
5  **you could make as much as $5,000 a month in**
6  **additional transcription or as little as 500 a**
7  **month?**
8    A.  Yes, ma'am.
9    **Q.  Okay.  Would 2,000 or 2,500 be an**
10  **average?**
11    A.  I can't say that.
12    **Q.  All right.  Back in 2019, Monday we've**
13  **got criminal court.  Is that something -- what**
14  **time would that start?  What time would you come**
15  **to work on Monday morning?**
16    A.  8:15, 8:30.  Court starts at 9.
17    **Q.  And how long would court typically last?**
18    A.  Typically, we were done by noon.
19    **Q.  And then what would your afternoon look**
20  **like?**
21    A.  More criminal cases.  Monday?  Are we
22  still on Monday?
23    **Q.  We're still on Monday.**
24    A.  More criminal cases as well in the
25  afternoons.

Page 31

1    **Q.  So you would be in court from 9 a.m. to**
2  **noon and from 1 to --**
3    A.  1 to 4.  Hopefully 4.
4    **Q.  Were all of the days like that?**
5    A.  Typical.  Typically, yes.
6    **Q.  So you were in court from 8 -- from 9**
7  **a.m. to noon and from 1 to 4 every day of the**
8  **week?**
9    A.  Except for Tuesday.  It was juvenile day,
10  and I usually worked in court into the lunch hour.
11    **Q.  And until 4 o'clock?**
12    A.  Yes.
13    **Q.  Okay.  Were there days when you weren't**
14  **in court from 8 to noon and 1 to 4?**
15    A.  Very seldom.
16    **Q.  And after Judge Jack left, there was a**
17  **gap between Judge Jack and Judge Stockard?**
18    A.  Yes.
19    **Q.  And at that point in time, Judge Johnson**
20  **was the only judge in the 11th Judicial District?**
21    A.  Yes, but I had senior judges that came
22  and filled in during that interim --
23    **Q.  Okay.**
24    A.  -- for my docket.
25    **Q.  Okay.  So you were still on the other**

Page 32

1  **docket that whole time, correct?**
2    A.  Yes.
3    **Q.  And so you would then transcribe court**
4  **same as you did before, Monday through Friday for**
5  **the senior judge filling in on Jack's docket?**
6    A.  Yes.
7    **Q.  Did you ever work on Judge Johnson's**
8  **docket?**
9    A.  In 2020, no.  He'd an official court
10  reporter.
11    **Q.  At any point in time?**
12    A.  Yes.
13    **Q.  Can you count on your fingers how many**
14  **times you worked in Judge Johnson's court**
15  **reporter?**
16    A.  No.
17    **Q.  More than that, more than ten times?**
18    A.  No.
19    **Q.  I don't understand your answer.  Can you**
20  **estimate for me how many times that you worked in**
21  **Judge Johnson's court reporter as an official**
22  **court reporter?**
23    A.  From the time he took the bench?
24    **Q.  Yes.**
25    A.  No.



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# SABRINA S. OVERFIELD

Page 33

1    Q.  Is it less than ten or more than ten?
2    A.  I don't recall.
3    Q.  As in you don't recall ever doing it
4  or --
5    A.  I don't recall how many times.
6    Q.  So you've done it?
7    A.  Yes.
8    Q.  Okay.  More than five times?
9    A.  Yes.
10    Q.  So somewhere between five and ten times
11  you covered Judge Johnson's docket.  Would that be
12  fair?
13    A.  Yes.
14    Q.  And from 2017 until you left in December
15  of 2021?
16    A.  Yes.
17    Q.  Okay.  Did you ever work as Judge
18  Johnson's administrative assistant?
19    A.  Not for a period of time, no.
20    Q.  So were there -- were there times on
21  occasion where you would field calls for him?
22    A.  Yes.
23    Q.  Okay.  Fill in when his would be out
24  of --
25    A.  Yes.

Page 34

1    Q.  -- the office?
2    A.  Yes, ma'am.
3    Q.  Okay.  Was that a frequent occurrence?
4    A.  Yes, ma'am.
5    Q.  More frequent than you being the court
6  reporter in his courtroom, correct?
7    A.  Yes, ma'am.
8    Q.  Okay.  What was your commute from your
9  home to the Parsons courthouse?
10    A.  35 miles one way.
11    Q.  What time would you typically leave at
12  the end of the day?
13    A.  From Parsons?
14    Q.  Yes.
15    A.  Anywhere from 4:30 to 5 o'clock.
16    Q.  Who is the district administrator for the
17  14th Judicial District?
18    A.  They do not have one.
19    Q.  Oh, okay.  So who is your direct
20  supervisor?
21    A.  Judge Gettler.
22    Q.  Is that a position that they typically
23  have that they need to fill or does that judicial
24  district just run differently?
25    A.  They had one previously, but I'm not

Page 35

1  privy if they have that position open or they have
2  terminated it.  I'm not quite sure.
3    Q.  So you've worked there for what?
4    A.  Since January.
5    Q.  Almost ten months, correct?
6    A.  Yes, ma'am.
7    Q.  You like it?
8    A.  I do like it, but I love to court report.
9    Q.  Okay.  And you still get to do that,
10  correct?
11    A.  Yes, ma'am.
12    Q.  And is that something that you get to do
13  daily like you did at the 11th Judicial District?
14    A.  Yes, ma'am.
15    Q.  Okay.  Have your duties changed
16  significantly?
17    A.  Yes, ma'am.
18    Q.  Okay.  In what way?
19    A.  I have no administrative assistant
20  duties.
21    Q.  Okay.  So you have less duties?
22    A.  Less duties, yes, but I'm still catching
23  up with transcripts from the 11th Judicial
24  District, so I still have a workload of
25  transcripts.

Page 36

1    Q.  Okay.  So you still get work from the
2  11th Judicial District?
3    A.  Yes.
4    Q.  You do their overflow transcripts that
5  they've, quote, unquote, farm out?
6    A.  No, ma'am.
7    Q.  Okay.  How is that wrong?  How is my
8  statement incorrect?
9    A.  Well, if I reported a hearing and it gets
10  ordered, they send the transcript orders to me.
11    Q.  Oh, I see.  So these are for hearings
12  that you would have transcribed -- or reported at
13  the initial hearing that are now being ordered a
14  year later or what have you and you need to
15  transcribe them?
16    A.  Yes, ma'am.
17    Q.  Okay.  Fair enough.  So that will -- do
18  you get paid extra for that?
19    A.  Yes.
20    Q.  Okay.  And that will fizzle out at some
21  point in time?
22    A.  It should.
23    Q.  Okay.  So at this job you court reporter
24  for one and a half judges, correct?
25    A.  Until January, in '23.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 37

1  Q.  And at that point in time, there will be
2  a fourth judge hired?
3  A.  Yes, ma'am.
4  Q.  And so you'll have to court reporter for
5  two judges?
6  A.  Yes, ma'am.
7  Q.  So that would be similar to what you had
8  done at the 11th District where one of the judges
9  is going to have to record a hearing that you
10 later transcribe and you'll sit in and report on
11 the other hearing if there's two at the same time?
12 A.  Yes, ma'am.
13 Q.  So when that rolls around, you're going
14 to have additional income from the transcripts
15 ordered from the judge who's having to record his
16 hearings, correct?
17 A.  Yes, ma'am.
18 Q.  Okay.  In the 14th Judicial District, are
19 there any male court reporters?
20 A.  No, ma'am.
21 Q.  Are there any male AAs?
22 A.  No, ma'am.
23 Q.  In the 11th Judicial District -- Judicial
24 District, thank you, I'll get it out, have you in
25 your tenure there, was there ever a male court

Page 38

1  reporter?
2  A.  Yes.
3  Q.  Who was that?
4  A.  Shaun Higgins.
5  Q.  And that's S H A U N?
6  A.  Yes.
7  Q.  And when was he employed by the 11th
8  Judicial District?
9  A.  He was there when I started.
10 Q.  Okay.  And how long during your tenure
11 was he there?
12 A.  The whole time.
13 Q.  He was there in 2021 when you left?
14 A.  Yes.  He's still there.
15 Q.  And he is out of Pittsburg?
16 A.  Yes.
17 Q.  Okay.  Now that you've said that, I know
18 exactly who you're talking about.  All right.  So
19 in the office, okay, of the court, the clerk of
20 the court in Parsons, the entire time that you
21 worked there, was there any male employees other
22 than the judges?
23 A.  You're talking just the district court
24 clerk's office?
25 Q.  Yes, I am.

Page 39

1  A.  I don't recall any.
2  Q.  Have you ever known men to apply for
3  those positions?
4  A.  I wasn't privy to that information.
5  Q.  Okay.  So not to your knowledge?
6  A.  Not to my knowledge, correct.
7  Q.  Same question with the 14th Judicial
8  District.  Have you ever known any men to be
9  employed in the district clerk's office or the
10 district judge's offices aside from the judges?
11 A.  Yes, but he is no longer employed in the
12 clerk's office.
13 Q.  Okay.  Who is that?
14 A.  I believe his name was Lance.
15 Q.  Okay.  Do you know what job he had?
16 A.  He was a court clerk.
17 Q.  A court clerk?
18 A.  But I don't -- not the -- I don't know
19 what 1, 2 or 3, as they're -- I can't quite think
20 of what I want to say there.
21 Q.  Like their job classification?
22 A.  Yes, I'm sorry.  Their job
23 classification.  I don't know what he was.
24 Q.  All right.  Fair enough.  And you don't
25 know why he left?

Page 40

1  A.  No, ma'am.
2  Q.  Okay.  And you're unaware of any other
3  males that have applied for positions within the
4  14th Judicial District, are you?
5  A.  Correct.
6  Q.  Okay.
7  A.  Unaware.
8  Q.  All right.  Did you get along well with
9  Shaun Higgins?
10 A.  Very well.  I consider him a close
11 personal friend to this day.
12 Q.  Is Shaun somebody that you could ask for
13 help?
14 A.  Not now.  We had five court reporters in
15 the 11th Judicial District, and now they're down
16 to two.
17 Q.  All right.
18 A.  But previously, yes, I would.
19 Q.  So the reason you say not now is because
20 he's a busy man?
21 A.  He's overloaded as well.
22 Q.  Okay.  Tammy Thompson -- Thomas?
23     MR. JOHNSON:  Thurman.
24     MS. MOCK:  No, there's a Terri Thurman.
25 BY MS. MOCK:

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 41

1    Q.  I'm talking about Tammy, the one that was
2  hired to be court reporter out of Oklahoma?
3    A.  I believe it was Thomas.
4    Q.  Thomas.  Tammy is correct?
5    A.  Yes, ma'am.
6    Q.  All right.  We'll just call her Tammy.
7  Okay?
8    A.  Okay.
9    Q.  Do you recall when she came and when she
10 left?
11   A.  It was less than a year, and the date she
12 left was in January of 2020 -- or, I'm sorry,
13 February of 2020.
14   Q.  Do you know why she left?
15   A.  No, ma'am.
16   Q.  Did she ever complain to you about
17 anything?
18   A.  No, ma'am.
19   Q.  Did you guys get along okay?
20   A.  Yes.
21   Q.  Did she ask you for help?
22   A.  Yes.
23   Q.  Did you help her?
24   A.  Of course.
25   Q.  Who else was in the Parsons courthouse

Page 42

1  clerk's office in March of -- excuse me, January
2  of 2020?
3    A.  That works there in January of 2020?
4    Q.  Yes.
5    A.  Our head clerk was Terri Thurman, Teri
6  Meador, excuse me, M E A D O R, Tisha Lemmons.
7    Q.  Can you spell the first name there?
8    A.  Tisha?
9    Q.  Oh, it's Tisha?
10   A.  T I S H A.
11   Q.  Lemmons?
12   A.  L E M M O N S.  And Myra, M Y R A,
13 Freeman.
14   Q.  So there's two Terri's here?
15   A.  Yes.
16   Q.  And I understand that Teri Meador goes by
17 the name Jinx.  Is that correct?
18   A.  Yes.
19   Q.  Does everybody call her Jinx?
20   A.  Most everyone.
21   Q.  You did not?
22   A.  Most of the time I did.
23   Q.  Okay.  Is there a particular reason why
24 you wouldn't call her Jinx?
25   A.  No.

Page 43

1    Q.  Okay.  J I N X?
2    A.  Yes.
3    Q.  All right.  Just so if -- today's
4  purposes, if we can refer to her as Jinx and the
5  other Terri as Terri, I think it will be easier to
6  clear up.  Fair enough?
7    A.  That's the reason we called her Jinx.
8    Q.  Yeah, it would get confusing.  All right.
9  You know, before January of 2020, was there any
10 internal conflict within that office?
11   A.  The clerk's office?
12   Q.  Yeah, and the judges.  I mean was there
13 conflict within the office? Because you're all
14 back in the same area, correct?
15   A.  Pretty much.  The back hallway was the
16 judges and court reporters, and the front office
17 was the district court clerk.  We had a hallway.
18 It was wonderful when I first started.
19   Q.  Okay.
20   A.  Hardly any conflicts whatsoever.  As time
21 progressed, though, judges changed, clerks
22 changed.  The dynamics changed.
23   Q.  So were there conflicts?
24   A.  Yes.
25   Q.  Typically, in let's say '18 and '19, who

Page 44

1  -- who did those conflicts arise between?
2    A.  Judge Johnson, the clerks.  Judge Johnson
3  and Judge Jack.
4    Q.  Okay.  So when you say Judge Johnson and
5  the clerks, who in particular?
6    A.  The head clerk, Terri Thurman, and Judge
7  Johnson.
8    Q.  Okay.  So there was conflicts between
9  Terri Thurman and Judge Johnson and Judge Jack and
10 Judge Johnson?
11   A.  Yes.
12   Q.  Okay.  That's it?  No more -- you weren't
13 involved in any of these conflicts?
14   A.  I was to the extent with Judge Jack and
15 Judge Johnson.  There was no communication between
16 the two of them.  And it was very frustrating and
17 very hard to work as a team.  When Judge Fleming
18 was there and Judge Jack or Judge Brewster and
19 Vickie Barrett as the other court reporter, it
20 flowed and we had communication, and we covered
21 for each other and it was a great dynamic and
22 worked really well.
23   Q.  Okay.  So Judge Johnson comes in and was
24 there an attempt to work with him?
25   A.  Yes, very much so.



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# SABRINA S. OVERFIELD

Page 45

1    Q.  Okay.  Well, what happened?
2    A.  He didn't want to work with us.
3    Q.  Okay.  Us meaning you and?
4    A.  The clerks, the judge, the county
5  attorney, anybody.
6    Q.  Can you draw or sketch out a floor plan
7  of your office, like where the clerks are, where
8  the judge's hallway is, where your office is,
9  Judge Jack's office and Judge Johnson's office?
10   A.  Clerks, hallway, long hallway, their
11 office, Judge Johnson, his court reporter, my
12 office, Judge Jack.
13   Q.  Are those doors?
14   A.  Yeah, yes.
15   Q.  Okay.  Do -- can you draw the squares
16 where the --
17   A.  Doors.
18   Q.  -- doors are and where the walls are?
19   A.  In between the judges and court
20 reporters, there's a little breezeway I would say,
21 like a little closet that you can go into their
22 office.  Does that make sense to you?
23   Q.  Sure.  Can I see that for a sec?
24   A.  Yes, ma'am.
25   Q.  Okay.  Can you label who was in where?

Page 46

1    A.  Um-hum.  And this would be his court
2  reporter, my offices and Jack.
3    Q.  Okay.  So is there a door between your
4  office and Judge Jack's office?
5    A.  Yes.  That's like the little hallway,
6  breezeway, closet.
7    Q.  And there's actually a door that opens
8  and shuts there?
9    A.  Yes, ma'am.
10   Q.  Correct?
11   A.  Yes, ma'am.
12   Q.  And locks, correct?
13   A.  Yes, ma'am.
14   Q.  Okay.  And then you have an exterior door
15 into the hallway?
16   A.  Yes, ma'am.
17   Q.  That also opens and closes and locks?
18   A.  Yes, ma'am.
19   Q.  And Judge Jack has an exterior door into
20 the hallway that also opens, closes and locks?
21   A.  Yes, ma'am.
22   Q.  Okay.  And there's no door in between
23 Judge Johnson's court reporter's office and your
24 court reporter's office, correct?
25   A.  Correct.

Page 47

1    Q.  Okay.  You and Terri Thurman are pretty
2  good friends.  Is that correct?
3    A.  Yes.
4    Q.  Are you guys friends that hang out
5  outside of work?
6    A.  Yes.
7    Q.  Does she live in the Independence area as
8  well?
9    A.  No.
10   Q.  Where does she live?
11   A.  Erie, Kansas.
12   Q.  Okay.  And was she there the entire time
13 that you were there --
14   A.  Yes.
15   Q.  -- at the 11th Judicial District?
16   A.  Yes.
17   Q.  Okay.  And she was the court -- the head
18 court clerk, correct, the district court clerk?
19   A.  The first two years, no.
20   Q.  Okay.  So she got that position, what,
21 2000?
22   A.  I believe so.
23   Q.  All right.  And then Jinx, what's her --
24 what's her job title.  Let's say January of 2020,
25 what was Jinx's job title?

Page 48

1    A.  I don't know her classification, but she
2  was a court clerk.
3    Q.  Tisha Lemmons?
4    A.  Same thing.
5    Q.  And Myra Freeman?
6    A.  Same thing.
7    Q.  And they were all supervised by Terri?
8    A.  Yes.
9    Q.  So there's two courthouses within the
10 11th Judicial District?
11   A.  Yes.
12   Q.  Sorry.  One in Parsons and one in Oswego?
13   A.  Yes.
14   Q.  The one in -- have you ever worked out of
15 Oswego?
16   A.  Yes.
17   Q.  Okay.  On what -- what would bring you to
18 Oswego?
19   A.  Whenever my judge had a case there that
20 we were hearing in Oswego, I would go with him.
21 And we would go -- Judge Fleming went twice a
22 month and Judge Jack would go twice a month.  I
23 don't remember the given day, I believe it was a
24 Friday, at one time we would do court there.
25   Q.  So that was typical for both the judges

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## SABRINA S. OVERFIELD

Page 49

1 that you worked for, you would go to Oswego two
2 Fridays a month?
3     A.  Yes, ma'am.
4     Q.  All right.  And other than that, did any
5 other -- did the other judges hold court in Oswego
6 as well?
7     A.  If they had a case they were assigned to
8 and it was an Oswego case, I believe they would.
9     Q.  All right.  What were conflicts that
10 Terri had with Judge Johnson to the extent you
11 know?
12     A.  The communication that he had with
13 everyone.  When she would try and visit with him
14 about the judicial courthouse procedures and
15 policies, he would put a wall up and want it his
16 way.
17     Q.  Okay.  And I think you said Judge Jack
18 experienced these same problems, correct?
19     A.  Yes.
20     Q.  So did Judge Johnson speak to and put
21 walls up to Judge Jack like he did with Terri?
22     A.  Yes.
23     Q.  After January 10th, 2020, we were talking
24 about times in which maybe you covered court for
25 Judge Johnson, correct?

Page 50

1     A.  Yes.
2     Q.  All of those would have occurred before
3 January of 2020, correct?
4     A.  Yes, ma'am.
5     Q.  After the events of January of 2020 and
6 your complaint, you never worked with him again,
7 correct?
8     A.  Correct.
9     Q.  Prior -- and then you also indicated that
10 you would work for him as an AA from time to
11 time?
12     A.  Yes, ma'am.
13     Q.  And that also would have preceded January
14 of 2020, correct?
15     A.  Yes, ma'am.
16     Q.  Okay.  So there were no occasions after
17 the events of January 10th and 13th and after the
18 complaint in which you had to work with or for
19 Judge Johnson, correct?
20     A.  No.  Judge Stockard a few times requested
21 me to contact him via e-mail for court
22 proceedings.
23     Q.  Okay.
24     A.  So I would.
25     Q.  And you did that?

Page 51

1     A.  Yes, ma'am.
2     Q.  Okay.  Was that a couple times?
3     A.  More than a couple.
4     Q.  Less than five?
5     A.  Yes.
6     Q.  Judge Stockard started in April of 2020.
7 Is that correct?
8     A.  Yes, ma'am.
9     Q.  And was he aware of your complaint
10 against Judge Johnson?
11     A.  I can't answer that.
12     Q.  Did you tell him?
13     A.  No, ma'am.
14     Q.  Okay.  And he never talked to you about
15 it?
16     A.  No, ma'am.
17     Q.  And you never talked to him about it?
18     A.  No, ma'am.
19     Q.  Did you ever ask not to have to
20 communicate with Judge Johnson?
21     A.  Not with him.
22     Q.  Not with Judge Stockard?
23     A.  No, ma'am.
24     Q.  You never told Judge Stockard, listen,
25 I've a complaint with Judge Johnson.  I don't want

Page 52

1 to have to communicate with him?
2     A.  No, ma'am.
3     Q.  Is there a reason you didn't do that?
4     A.  I just didn't feel that it involved Judge
5 Stockard.  And if he needed me to contact Judge
6 Johnson work related, I was going to do it.
7     Q.  And you could have, correct?  I mean you
8 could have informed Judge Stockard about your
9 complaint and request not to have any
10 communication with Judge Johnson, correct?
11     A.  I could have.
12     Q.  Does Judge Stockard strike you as the
13 kind of person that would say I don't really care.
14 You're going to do it anyway?
15     A.  Not at all.
16     Q.  Okay.  He would have said, don't worry
17 about it.  I'll take care of it?
18     A.  Probably.
19     Q.  Okay.  Were there times when Judge
20 Johnson prior to January 2020 asked you for help
21 and you said no?
22     A.  No.
23     Q.  Do you remember filling out some
24 Interrogatories?
25     A.  Yes.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

# SABRINA S. OVERFIELD

Page 53

1    MR. JOHNSON:  Terelle, are you going to
2  mark this as an exhibit?
3    MS. MOCK:  I don't know yet.
4    MR. JOHNSON:  Can I look at it?
5    MS. MOCK:  Yeah.  I'm going to put these
6  two together.  Okay.
7    (THEREUPON, Overfield Deposition Exhibit
8  No 3 was marked for identification by the
9  reporter.)
10    MR. JOHNSON:  So is this all one?
11    MS. MOCK:  Yeah, I'm going to make it
12  one.
13    MR. JOHNSON:  Okay.
14    MS. MOCK:  I think it's easier that way.
15  BY MS. MOCK:
16    Q.  I'm hand you what's been marked Exhibit
17  No. 3.  If you'll flip to the very last page of
18  Exhibit No. 3, is that your signature?
19    A.  Yes, ma'am.
20    Q.  All right.  I would like you to go to
21  page 3, and on No. 5, we requested that you
22  describe each incident of alleged hostile work
23  environment by the defendant about which you are
24  complaining or making this lawsuit.  Did you
25  understand that was the question?

Page 54

1    A.  I believe I did.
2    Q.  Okay.  And the events that you describe
3  occurred on January 10th and January 13th.  Is
4  that correct?
5    A.  Yes, ma'am.
6    Q.  Okay.  I just want to be clear.  These
7  are the only two events that we're talking about
8  here in your lawsuit.  Is that correct?
9    A.  Yes, ma'am.
10    Q.  Your not complaining about any other
11  instances or interactions that you had with Judge
12  Johnson or anybody else affiliated with the 11th
13  Judicial District.  Is that correct?
14    A.  Correct.
15    Q.  Okay.  We'll probably come back to those.
16  I'm going to set them aside for right now.  So
17  prior to January 10th, had you had any interaction
18  with Judge Johnson that was uncomfortable?
19    A.  No.
20    Q.  Did you have any interaction with him of
21  which you complained to Terri about?
22    A.  No.
23    Q.  Okay.  And to be clear, you've not
24  complaining about anybody else within the 11th
25  Judicial District creating a hostile work

Page 55

1  environment for you other than Judge Johnson.  Is
2  that correct?
3    A.  Correct.
4    MS. MOCK:  Okay.  We've been going a
5  little --
6    MR. JOHNSON:  I was just going to suggest
7  let's take a break before you get into that.
8    MS. MOCK:  Yeah.
9    (THEREUPON, a recess was taken.)
10  BY MS. MOCK:
11    Q.  Okay.  So January 10th, 2020.  Okay.  So
12  at this point in time, we -- the governor and
13  there's a judicial selection committee, correct?
14    A.  Yes, ma'am.
15    Q.  That is interviewing applicants to fill
16  Judge Jack's position.  Is that correct?
17    A.  Yes.
18    Q.  And the -- I understand there was
19  interviews being held at the Parsons courthouse on
20  January 10th, 2020?
21    A.  Yes.
22    Q.  And that was a Friday?
23    A.  Yes.
24    Q.  What was your involvement with the
25  interviews?

Page 56

1    A.  I was allowed to sit in and listen to
2  them.
3    Q.  Okay.  And did you do that?
4    A.  Yes.
5    Q.  How many candidates interviewed?
6    A.  I believe nine.
7    Q.  All on Friday or was that spread out
8  through the week?
9    A.  All on Friday.
10    Q.  And did you sit in on all nine
11  interviews?
12    A.  I did.
13    Q.  And who invited you into that room?
14    A.  I believe Terri Thurman told me I was
15  welcome and then a few on the panel.
16    Q.  Is it something you requested?
17    A.  No.
18    Q.  You didn't request to be present for
19  those interviews?
20    A.  No.
21    Q.  So Terri just out of the blue said you're
22  welcome to sit in?
23    A.  Yes.
24    Q.  And you sat in on all nine interviews?
25    A.  Yes.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com
6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131
800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 57

1  Q.  So no court that day?
2  A.  No, ma'am.
3  Q.  Okay.  And at the conclusion of these
4  interviews, I'm going to go back to my -- let's go
5  back to your drawing here.
6  A.  Okay.
7  Q.  Okay.  Where were the interviews held?
8  A.  Okay.  With this hallway, this is Judge
9  Jack's office.  There's a back doorway right here.
10  Our courtroom is right here.  They were held in
11  Judge Jack's and my courtroom.
12  Q.  Okay.
13  A.  And then before you get to the clerk's
14  office, Judge Johnson's -- there's a bathroom here
15  on that side, and then right across is his
16  courtroom, a door that goes into his courtroom.
17  Q.  Do the two courtrooms share a wall?
18  A.  No, ma'am.
19  Q.  What's in between them?
20  A.  The long hallway.  There's a long hallway
21  here, too.
22  Q.  What's in this space?  Is there a
23  kitchenette there and a bathroom?
24  A.  Oh, I'm sorry.  Jury room.
25  Q.  It's a jury room?

Page 58

1  A.  Yes, with two -- men's bathroom, women's
2  bathroom and the jury room.  Oh, sorry.  There's
3  an exhibit closet on this side that was Vickie's
4  closet and then an exhibit closet here that was my
5  closet on the same side that the jury room is.
6  Q.  Do all of the -- like does the jury room
7  have a doorway that opens to this hallway over
8  here?
9  A.  Yes.
10  Q.  And do these closets have doors that open
11  up to that hallway?
12  A.  Yes.
13  Q.  And does Johnson's courtroom butt up
14  against this clerk over here, the clerk's room
15  over here?
16  A.  I don't think we call it butt up.  But
17  one other thing, here's his courtroom and his door
18  sits like -- I'm a terrible artist.  I'm sorry,
19  Terelle.
20  Q.  That's okay.  We're going to work through
21  this.
22  A.  Okay.  His -- like here's the bathroom.
23  And you go up a step and then his door is right
24  here to go into the courtroom.  Across from that
25  door is a cell, like where they had inmates stay

Page 59

1  when they were in custody, and it butts up against
2  the clerk's office.
3  Q.  Okay.
4  A.  I'm sorry.
5  Q.  No, you're fine.  Give me a second here.
6  (THEREUPON, a discussion was had off the
7  record.)
8  BY MS. MOCK:
9  Q.  Okay.  I started this again just to kind
10  of try to clean it up a little bit, but I want
11  your help over here on this other side of the
12  hallway.  Okay.  First of all, I've got the clerks
13  here.  Is that correct?
14  A.  Yes.
15  Q.  Okay.  And then I've got this long
16  hallway here?
17  A.  Yes.
18  Q.  And there's a cell, holding cell for
19  inmates?
20  A.  Very small, yes.
21  Q.  Okay.  We've got Johnson's courtroom?
22  A.  Yes.
23  Q.  We have the jury room?
24  A.  Yes.
25  Q.  Two closets, men's and women's rooms are

Page 60

1  in there somewhere, correct?
2  A.  Yes.
3  Q.  Okay.  And is there a door to the closet
4  and door to the jury room and then the bathrooms
5  are off of the jury room?
6  A.  Yes.
7  Q.  All right.  So I'm going to put a door to
8  this closet, a door to this closet and a door to
9  the jury room.  Okay?
10  A.  Yes.
11  Q.  There used to be a swingy thing we did
12  but -- all right.  And then we've got Jack's
13  courtroom?
14  A.  Yes.
15  Q.  All right.  So then we have Jack's
16  chambers?
17  A.  Yes.
18  Q.  All right.  Now, if I recall correctly
19  from my visit to this courtroom, you open this
20  door and his desk is kind of like right over here.
21  Is that correct?
22  A.  No.
23  Q.  It's on this side?
24  A.  No.  If this is a door, his desk is right
25  there.  That's a couch.


TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com
6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131
800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 61

1   Q. Does his desk face this way?
2   A. Yes.
3   Q. Is that accurate?
4   A. Yes.
5   Q. Okay. And would the wall to -- could we
6   make this the wall for his?
7   A. Yes.
8   Q. All right. I'm going to put this here.
9   And then there's a door right here and a little
10  hallway into your office. Is that correct?
11  A. Correct.
12  Q. Okay. So I'm going to put a door here
13  and a little hallway. And then I'm going to make
14  another line here and you have a door, too,
15  correct?
16  A. Correct.
17  Q. Right here and right here. And we'll
18  call this Sabrina's office. Okay?
19  A. Okay.
20  Q. And then there's a door here and we'll
21  call this -- what do you want to call this,
22  Johnson's AA's office or court reporter's -- court
23  reporter 2?
24  A. Yes.
25  Q. CR 2?

Page 62

1   A. Yes.
2   Q. All right. And then -- well, I probably
3   could have come a little bit farther here, but
4   we'll say that goes here and there's a door here,
5   correct, that goes into Judge Johnson's office.
6   Is that correct?
7   A. Okay. Oh, right. So this is like that
8   little breezeway hallway thing between our
9   offices?
10  Q. Yes.
11  A. Yes, correct.
12  Q. All right. And then Judge Johnson's
13  chambers is here, and his door is maybe right
14  here. Does that sound about right?
15  A. Correct.
16  Q. Door. And his desk sits about like this.
17  Is that correct?
18  A. It's over further but --
19  Q. This way?
20  A. Yes, ma'am.
21  Q. And his chair is back here?
22  A. Yes.
23  Q. And he's got two chairs right here and
24  right here, correct?
25  A. As I recall it, yes.

Page 63

1   Q. All right. Is that a fair description of
2   that office space?
3   A. It is.
4   MR. JOHNSON: Good job.
5   MS. MOCK: Well, missed my calling,
6   right?
7   MR. JOHNSON: Uh-huh.
8   BY MS. MOCK:
9   Q. All right. Okay. So on January 10th,
10  you indicated the interviews occurred in Jack's
11  courtroom?
12  A. Yes.
13  Q. And there's a door from Jack's courtroom
14  into the hallway but I think you said was right
15  across from his doorway into his chambers. Is
16  that correct?
17  A. Yes.
18  Q. Okay. I'm going make that doorway right
19  here. Does that look about right?
20  A. When you come out of his office, though,
21  there's like a little step, like a little
22  entryway.
23  Q. Okay.
24  A. And the courtroom is entered like this
25  way. Right.

Page 64

1   Q. Okay. So I'm going to put some steps
2   here. We're going walk in and we're going to go
3   this way?
4   A. That's it, correct.
5   Q. Okay. All right. I drew a little arrow
6   there. Okay. So you leave this courtroom, walk
7   up these steps and come down this hallway and have
8   a conversation with Judge Jack -- or Judge
9   Johnson, is that correct, on the 10th?
10  A. No.
11  Q. No?
12  A. The interviews had been long over and I
13  was in my office, and I left my office to go up
14  the hallway into the clerk's office.
15  Q. Okay. What -- how long did the
16  interviews last that day?
17  A. I'm thinking 1:30 or 2. They broke for
18  lunch and had a couple after lunch.
19  Q. And this is a Friday?
20  A. Yes.
21  Q. So you were in your office. Is that
22  correct?
23  A. Yes.
24  Q. And where were you headed?
25  A. To the clerk's office.


5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 65

1   Q. Okay. And what made you stop at Judge
2  Johnson's door?
3   A. We made eye contact and I just wanted to
4  see what he thought of the three nominating that
5  were going up to Judge -- or to Governor Kelly.
6   Q. Okay. So by what time did this occur do
7  you suppose in the afternoon?
8   A. That I walked up to the clerk's office to
9  do business?
10   Q. Well, that you started your conversation
11  with Judge Johnson.
12   A. Approximately 3 o'clock.
13   Q. So by 3 o'clock, you already knew who the
14  three selected were?
15   A. Yes.
16   Q. Okay. And who did you get that
17  information from?
18   A. I believe Terri as well.
19   Q. All right.
20   A. No, I'm sorry. The county attorney,
21  Stephen Jones who was one of the selected nine.
22   Q. He was on the judicial selection
23  committee?
24   A. No. He was one of the names that could
25  possibly go up to the...

Page 66

1   Q. He was an applicant?
2   A. Thank you.
3   Q. No problem.
4   A. Applicant. He was an applicant.
5   Q. All right. And was he one of the three?
6   A. No, ma'am.
7   Q. All right. So he had learned who the
8  three were and called you and told you. Is that
9  how that happened?
10   A. Yes.
11   Q. That's correct?
12   A. Yes.
13   Q. And -- okay. So you are walking down the
14  hallway to the clerk's office, and was Judge
15  Johnson sitting at his desk?
16   A. Yes.
17   Q. And you two made eye contact?
18   A. Yes.
19   Q. And you stopped at his door?
20   A. Yes.
21   Q. Did you enter his office?
22   A. No, ma'am.
23   Q. So you stopped at his door and what
24  happened next?
25   A. I just asked him what he thought of the

Page 67

1  three applicants going up.
2   Q. Okay. And what did he say?
3   A. He knew those were the three that would
4  go up.
5   Q. All right. What happened next?
6   A. I told him that I wasn't sure and I was
7  rather surprised.
8   Q. And why were you surprised?
9   A. Those just weren't the three that I had
10  chose in my mind to go up.
11   Q. So you didn't think those were the three
12  best applicants based upon your experience in the
13  interview room?
14   A. No, not necessarily. Just those were not
15  the three that I thought that would be chosen.
16   Q. And I'm asking why? Why weren't they?
17   A. I guess I -- I felt there was another one
18  possibly that in my eyes I probably would have
19  sent up.
20   Q. And who was that?
21   A. Nathan Coleman.
22   Q. And he was the district attorney --
23   A. No.
24   Q. -- that called you? Okay. So you
25  thought that Nathan Coleman should have been

Page 68

1  recommended to Governor Kelly as one of the three
2  options?
3   A. I think so.
4   Q. Any other reason that you disagreed with
5  the three selected by the nominating commission?
6   A. I didn't disagree. I just felt like
7  there were a lot of good applicants, and I wish it
8  could have been just more than three for Governor
9  Kelly to choose from.
10   Q. Oh, okay. You said to Judge Johnson that
11  you were surprised?
12   A. Yes.
13   Q. Okay. And what surprised you about the
14  three selected?
15   A. I just thought it was a rather hard
16  process after sitting through all nine of them for
17  them to come down to the three they did.
18   Q. I get that. But you knew that going in,
19  correct? I mean you knew they were going to
20  whittle it down to three?
21   A. Yes.
22   Q. You were aware that's how the process
23  worked?
24   A. Yes.
25   Q. So that didn't surprise you?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 69

1 A. No.
2 **Q. So what surprised you?**
3 A. Well, as I've said, Nathan Coleman I felt
4 with his qualifications would have been an
5 excellent name to go up and also the County
6 Attorney Stephen Jones' name to go up.
7 **Q. Did anybody on the nominating commission**
8 **ask you for your input or opinion?**
9 A. Before the process, yes.
10 **Q. Before the interviews?**
11 A. Yes.
12 **Q. Okay. Who asked you for your opinion?**
13 A. Not necessarily my opinion but my
14 thoughts.
15 **Q. Are those different?**
16 A. Sometimes.
17 **Q. Can you explain to me the difference?**
18 A. Well, I guess not really, but my thoughts
19 on who -- why they put their name in, if I had
20 any input that way, and my opinion on who I
21 thought would be a good judge.
22 **Q. Okay. So who asked you for your**
23 **thoughts?**
24 A. Sara Beezley.
25 **Q. Okay. Sara Beezley was on the nominating**

Page 70

1 **commission?**
2 A. Yes.
3 **Q. Did anybody else on the nominating**
4 **commission ask you for your input, thought or**
5 **opinion?**
6 A. Not that I recall at this moment, no.
7 **Q. And who is Sara Beezley?**
8 A. She's an attorney out of Girard, Kansas.
9 **Q. What kind of law does she practice?**
10 A. Domestic, criminal, civil, some probate.
11 **Q. Is she part of a law firm or a practice?**
12 A. She has her own practice.
13 **Q. Solo practitioner?**
14 A. No. She has Sarah Mills, an associate
15 with her.
16 **Q. Are you friends with Miss Beezley?**
17 A. Yes.
18 **Q. How long have you been friends?**
19 A. We were work associates, and then I think
20 we became friends over the years. She's known me
21 for 25 years.
22 **Q. Okay. And so when you were -- when your**
23 **opinion I guess was solicited by Sara Beezley,**
24 **what did you -- what did you tell her prior to**
25 **the interviews?**

Page 71

1 A. That's been too long ago.
2 **Q. You can't remember?**
3 A. No.
4 **Q. You didn't give her any names?**
5 A. No.
6 **Q. You didn't tell her that you thought Mr.**
7 **Coleman should be selected?**
8 A. No.
9 **Q. And who was the other one?**
10 A. Stephen Jones.
11 **Q. Jones.**
12 A. He was the previous prior county attorney
13 in Labette.
14 **Q. District attorney?**
15 A. County attorney.
16 **Q. Did you tell her -- so you didn't name**
17 **any one nominee or applicant?**
18 A. No.
19 **Q. Did you speak to anybody else on the**
20 **nominating commission?**
21 A. Not that I recall.
22 **Q. Okay. So back to your communication with**
23 **Judge Johnson, you indicate you were surprised,**
24 **and if I can restate your testimony and correct me**
25 **if I'm wrong, but you were surprised because Mr.**

Page 72

1 **Coleman and Mr. Jones were not two of the three --**
2 **were not of the three selected to be nominated to**
3 **Governor Kelly. Is that correct?**
4 A. Correct.
5 **Q. And other than your opinion, I guess, did**
6 **you have any reason -- I mean what else led you**
7 **to believe that they would be that caused you**
8 **surprise?**
9 A. I was going by my personal opinion, and I
10 had worked with the applicants.
11 **Q. All of them, all nine?**
12 A. No. No. No.
13 **Q. Who were the three that went up to the**
14 **governor?**
15 A. Stockard, Marsh and I can't recall the
16 third one now.
17 **Q. Had you worked with those three?**
18 A. I'd worked with Stockard and Marsh
19 heavily, both of them.
20 **Q. Did you agree that they were qualified**
21 **applicants that should have been recommended?**
22 A. Yes.
23 **Q. And the third one you can't recall?**
24 A. No, I can't.
25 **Q. Had you -- do you recall also having**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## SABRINA S. OVERFIELD

Page 73

1  worked with the third one or was that somebody
2  that you'd never worked with before?
3      A.  If I can't recall who it was, I can't
4  answer that.
5      Q.  Okay.  All right.  So you stop at his
6  office, you were surprised, he's not surprised and
7  then where does the conversation go from there?
8      A.  We talk a little bit about the names that
9  are chosen, and I made a comment about Judge Marsh
10 had made a comment during his interview he wanted
11 to move all court down to Oswego.  And I made the
12 comment that's just not feasible.  Knowing how
13 that courthouse and my experience with it, that's
14 going to be difficult.  And then he got irritated
15 and one thing led to another.
16     Q.  I want you to take me through it.
17     A.  He got irritated with me stating that
18 because I was stating my opinion.  And he went
19 into saying that it is feasible.  I do it down
20 there, and I said, well, not all the time.  And
21 he said, yes, I do a lot down there.  And then we
22 talked about Judge Brunetti.  He said she does all
23 her court.  She's moved it.  And I said, no, she
24 hasn't move it all.  I sat with her at Judge
25 Jack's retirement party.  And it wasn't a loud

Page 74

1  screaming match.  We were talking in a normal
2  tone.  And then about that time he slams his fist
3  on his table.  I felt like he was going to break
4  his hand as hard as it was.  And he said sit
5  down, we need to have a talk.  And his face got
6  really red.  And I can't tell you word for word
7  verbatim what he said, but it was very violent and
8  horrific in my eyes to where I was just stunned
9  that a district court judge was talking to me like
10 this, treating me like this, and all I was trying
11 to do was communicate with him like a normal human
12 being.  And he kept hitting his fist on his desk
13 and telling me to sit down, telling me I was a
14 liar, I was a terrible court reporter, I didn't
15 know what I was doing and I was lazy.  And then
16 he -- and I'd try and interject at times I don't
17 know what you're talking about.  And how I would
18 never fill in for him.  And Tammy, his court
19 reporter, had worked for my judge all the time,
20 and that was not the truth.  She hadn't.  She had
21 a couple of times.  When I took my mom to cancer
22 treatment, she had filled in for me, but she did
23 not work for me all the time.  And I tried to
24 carry on a conversation with him in a normal tone
25 and he kept -- it just escalated and kept

Page 75

1  escalating and to the point where I just said -- I
2  was getting fearful for what he was going to do
3  and get up and come after me.  I'm five three.
4  He's six foot two and a pretty good sized guy.
5  And he had done it previously, and I'd witnessed
6  it, to the Court Clerk Terri Thurman.  It happened
7  to her in our jury room, and it was ugly,
8  horrendous, awful and I know what it did to her.
9  And I just said I think we're done here.  And I
10 was walking up the hallway in tears, shaking,
11 hyperventilating, and she saw me and she was at
12 the end of the hallway waiting on me because she
13 could hear.  And the other two clerks could as
14 well.  And as I'm walking up the hallway, he says
15 get back here.  I'm not done with you yet.  Well,
16 I was done.
17     Q.  Did he -- how long did this interaction
18 last?
19     A.  Probably 15 minutes.
20     Q.  Did he -- was he seated at his desk the
21 entire time?
22     A.  To the very end.
23     Q.  So yes?
24     A.  Yes.
25     Q.  Okay.  Okay.  I want to make sure.  He

Page 76

1  was seated at his desk the entire time?
2      A.  Yes, except when he did his fist he would
3  stand up.
4      Q.  Okay.
5      A.  Kind of rise.
6      Q.  Did he ever move from behind his desk?
7      A.  No.
8      Q.  And he never came to a full standing
9  position?
10     A.  No.  Until I left.  And when I said we're
11 done here and I started walking, I know he was
12 getting up.
13     Q.  But you couldn't see him?
14     A.  As I was leaving, I could see him stand
15 up, so I left.
16     Q.  Okay.  Did he follow you down the
17 hallway?
18     A.  No.
19     Q.  Did he say anything else to you after get
20 back here.  I'm not done with you yet?
21     A.  That's the last I heard.
22     Q.  Okay.
23         (THEREUPON, Overfield Deposition Exhibit
24 No 4 was marked for identification by the
25 reporter.)


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# SABRINA S. OVERFIELD

Page 77

1  BY MS. MOCK:
2      Q.  All right.  I just handed you what has
3  been marked as Exhibit 4.  Do you recognize that
4  document?
5      A.  Yes.
6          (THEREUPON, Overfield Deposition Exhibit
7  No 5 was marked for identification by the
8  reporter.)
9  BY MS. MOCK:
10     Q.  Okay.  I'm also marking Exhibit 5, this
11  map of the office that I drew.  Do you recognize
12  this document?
13     A.  Yes.
14     Q.  Okay.  And is this a clear and fairly
15  accurate description of the office space in
16  Parsons?
17     A.  Yes.
18     Q.  Is there anything about this description
19  or layout of the office space that's incorrect?
20     A.  No.
21     Q.  Okay.  Let's go back to Exhibit 4.  What
22  is Exhibit 4?
23     A.  My complaint.
24     Q.  Your complaint to whom?
25     A.  To OJA.

Page 78

1      Q.  And when did you prepare this complaint?
2      A.  Half of it was prepared January 10th and
3  11th.  The rest was the evening of January 13th.
4      Q.  All right.  After you left Judge
5  Johnson's doorway -- and let me just go back, I
6  guess.  This conversation, you never left the
7  doorway, correct?
8      A.  Correct.
9      Q.  So you never went into his office?
10     A.  No.
11     Q.  So for the entirety of the conversation,
12  he was behind his desk and you were in the
13  doorway.  Is that correct?
14     A.  Correct.
15     Q.  All right.  So after you left his
16  doorway, you talk to Terri, correct?
17     A.  Correct.
18     Q.  And then what did you do?
19     A.  I was very upset and I -- he and I were
20  the only ones in the back hallway, so I did not
21  want to walk down the back hallway.  And she told
22  me there is a door from the clerk's office that
23  leads into our kitchen and to the outside that we
24  didn't put on there.
25     Q.  Okay.

Page 79

1      A.  I'm sorry.
2      Q.  That's okay.  Let's figure it out.
3      A.  Okay.  I'm sorry.
4      Q.  So where on Exhibit 5 is the kitchen?
5      A.  So here's the cell holding cell.
6      Q.  Right.
7      A.  Okay.  There's a little hallway.  The
8  girl's bathroom right here past Judge Johnson,
9  there's a bathroom across from that.  And then
10  there's a hallway here, goes into a kitchen.  And
11  then if you go straight out the hallway, you go
12  straight out the back door.
13     Q.  All right.  So there's a door here?
14     A.  That's a bathroom.
15     Q.  That's a women's bathroom?
16     A.  The clerks used it but it's for whoever
17  -- yes, because the judges each had their own
18  private bathroom.  So, yeah.
19     Q.  Okay.
20     A.  Let's say women's.
21     Q.  And here is a kitchenette?
22     A.  Yes.
23     Q.  And is there a hallway here like this?
24     A.  Yes.  Whoop.
25     Q.  No?

Page 80

1      A.  Okay.  So the -- where you drew the
2  bathroom?
3      Q.  Um-hum.
4      A.  You go a little -- probably four, five
5  steps and that's where the hallway is.  Four or
6  five steps from the bathroom and then here's the
7  hallway from -- and the kitchen you enter -- it's
8  behind the women's bathroom, but you have to enter
9  it through that hallway.  You can't go into it
10  from the women's bathroom.
11     Q.  And there's a door here into the kitchen?
12     A.  Yes, ma'am.
13     Q.  And then there's an exterior door here?
14     A.  Yes, that leads outside.
15     Q.  Okay.  I've labeled that exterior door.
16  Is that correct?
17     A.  Correct.
18     Q.  All right.  Okay.  So you were up here in
19  the clerk's office talking to Terri, and you left
20  through this front exterior door?
21     A.  Yes.
22     Q.  Is there also an exterior door in the
23  back here?
24     A.  Yes, where I would enter and exit every
25  morning.


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# SABRINA S. OVERFIELD

Page 81

1    Q.  Does it go into this hallway?
2    A.  Yes.
3    Q.  I'm going to call that the back exterior
4 door.  Okay.  Is that correct?
5    A.  Correct.
6    Q.  Were there things in your office that she
7 collected for you?
8    A.  No.
9    Q.  Did you leave things in your office?
10    A.  No.
11    Q.  You had everything on you?
12    A.  No.
13    Q.  So how did you get your purse and your
14 keys?
15    A.  I exited through that exterior door.
16    Q.  Okay.
17    A.  I walked around the entire building to
18 this back door.
19    Q.  Okay.
20    A.  She watched me come in the back door and
21 stood at the end of the clerk's hallway as I
22 gathered my things and went back out the back door
23 here.
24    Q.  All right.  So you exited through the
25 front exterior door?

Page 82

1    A.  That's -- sorry.
2    Q.  Sorry.  I called it the front exterior
3 door and you called it the back exterior door?
4    A.  Yes, that's the back entrance for the
5 ladies.  Our front entrance is through the clerk's
6 office.
7    Q.  What's this one down here at the end of
8 the hallway?
9    A.  That's a side entrance where the judges
10 and the court reporters entered.
11    Q.  All right.  I'm going scratch out back
12 and write in side?
13    A.  Okay.
14    Q.  Is this correctly labeled the side
15 exterior door?
16    A.  Yes.
17    Q.  Okay.  And I'm going to call this the
18 back.  Is this correctly labeled the back exterior
19 door?
20    A.  Correct.
21    Q.  All right.  So you walked out the back
22 exterior door, walked around the building to the
23 side exterior door, came inside, went to your
24 office, collected your things and left?
25    A.  Yes.

Page 83

1    Q.  Do you know what time you got into your
2 car?
3    A.  No.
4    Q.  Did -- what did you do when are you got
5 into your car?
6    A.  Left.
7    Q.  Did you call Mac Young?
8    A.  I did once I got off the property.
9    Q.  Okay.
10    A.  A block away.  I stopped and called him.
11    Q.  So you pulled over.  Do you recall where
12 you pulled over?
13    A.  Yes.
14    Q.  Where was it?
15    A.  It was actually two blocks away at an
16 empty parking lot.
17    Q.  All right.  So you pulled over and you
18 called Mac Young?
19    A.  Yes.
20    Q.  Did you do that on Terri Thurman's
21 advice?
22    A.  Yes.
23    Q.  What did you tell Mr. Young?
24    A.  I told him that an incident had happened
25 with Judge Johnson, and he told me to write it and

Page 84

1 send it to him.  And I told him that I would not
2 be coming back to work because I felt like now
3 there was a hostile working environment, once
4 again, because I had witnessed it happen to Terri
5 and nothing was done and something needed to be
6 done because it couldn't keep happening to the
7 women in our office.
8    Q.  Okay.  So it hadn't -- you hadn't had a
9 hostile work environment before but Terri had.  Is
10 that what you're saying?
11    A.  Yes.  But it also made the whole office
12 very hostile once Judge Johnson had done the same
13 thing to Terri.
14    Q.  Okay.  Well, let's go back and talk about
15 that.  So you keep referring to you'd observed
16 this before.  So what are you talking about?
17    A.  Nine or ten months before Judge Johnson
18 and I had our incident, there was a budget meeting
19 that was in the jury room.  And in attendance were
20 Terri Thurman, Mac Young, Judge Jack and Judge
21 Johnson.  I was in my office.  This happened over
22 a noon hour and I usually ate in my office or
23 worked.  And I happened to be there and the door
24 was open to the jury room.  The meeting was
25 halfway over I'm guessing, and I start hearing the

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 85

1 noise of the hand, the fist noise and screaming
2 and yelling. I couldn't make it all out, but some
3 of it I could. And about five minutes into it,
4 Judge Jack exits the jury room and comes into my
5 office shaking his head in disbelief, and I said
6 what is going on. He says I don't know. It had
7 nothing to -- nothing to concern me, so I left.
8 I said, well, that's just awful whatever's
9 happening, Judge, and that was it.
10    Q. Did he say anything?
11    A. No. He exited my office and went back to
12 his office.
13    Q. Did he walk through your office to get to
14 his office?
15    A. He walked out my front door.
16    Q. So he came in and talked to you, walked
17 out your front door and went back to his office?
18    A. Yes.
19    Q. All right. Okay. What did you hear.
20 You said you heard a fist noise?
21    A. Well, I heard the tormenting and, you
22 know, noise like someone was doing this
23 (indicating).
24    Q. Okay. So you heard a noise that you
25 believed was his fist hitting the table. Is that

Page 86

1 correct?
2    A. Yes.
3    Q. His being Judge Johnson's?
4    A. Yes.
5    Q. But you couldn't see anything?
6    A. No.
7    Q. And then you heard you said screaming?
8    A. Yes, him yelling.
9    Q. Yelling?
10    A. Yes.
11    Q. What was he yelling?
12    A. I could make out you're lazy, you don't
13 belong here and that's all that sticks in my head
14 right now.
15    Q. Okay. Did you make a complaint to
16 anybody regarding this event?
17    A. I did not.
18    Q. Did Miss Thurman make a complaint
19 regarding this event?
20    A. Yes, she did.
21    Q. So this would have occurred sometime in
22 2019?
23    A. Yes, ma'am.
24    Q. Spring of 2019?
25    A. June or July, I believe. Yeah, possibly

Page 87

1 spring.
2    Q. What do you know about Miss Thurman's
3 complaint?
4    A. Mac Young was our court administrator,
5 and he sat in and witnessed this incident with
6 Judge Johnson. Terri completely changed once that
7 happened to her.
8    Q. Okay. I understand. But my question to
9 you is what do you know about her complaint
10 regarding this incident? To whom did she
11 complain, what form did she make the complaint?
12 That's my question.
13    A. She made a written complaint to Mac.
14    Q. Okay.
15       MS. MOCK: Can you give me 12 -- no.
16 Hold that. Let's see here.
17 BY MS. MOCK:
18    Q. Okay. Do you know what, if anything,
19 became of Miss Thurman's complaint?
20    A. Nothing became of it.
21    Q. You're unaware of anything that became of
22 Miss Thurman's complaint. Is that correct?
23    A. Yes.
24    Q. Okay. Could something have happened that
25 you're just not aware of?

Page 88

1    A. I guess I'm confused. Are you talking
2 about when she made the complaint to Mac after it
3 happened when he told her to write out a
4 complaint?
5    Q. Okay. So Mac tells her to write out a
6 complaint?
7    A. Yes.
8    Q. Okay. Which she does?
9    A. Yes.
10    Q. And did she hear back from Mac?
11    A. No.
12    Q. Okay. And did anybody ever ask you any
13 questions about that incident?
14    A. No.
15    Q. Do you know whether or not Terri talked
16 to anybody with HR with OJA about that incident?
17    A. She did not.
18    Q. Did she ever complain to HR about the
19 incident?
20    A. Terri had asked Mac about what had
21 happened with her complaint, and he kept telling
22 her he was taking care of it. He was taking care
23 of it.
24    Q. Okay. And do you have any other
25 information about that?



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 89

1    A.  No.
2    Q.  Okay.  All right.  So you testified
3  earlier that your hostile work complaint is based
4  upon two incidents, one occurring on January 10th
5  and one occurring on January 13th?
6    A.  Yes.
7    Q.  Is that still correct?
8    A.  Yes.
9    Q.  So you're not complaining that you were
10  enduring a hostile work environment prior to
11  January 10th?
12    A.  No.
13    Q.  Is that a correct statement -- that was a
14  bad question, and I'll try to rephrase that for
15  you.  Is it correct that you -- your complaint of
16  a hostile work environment is limited to January
17  10th and January 13th?
18    A.  Yes, ma'am.
19    Q.  Okay.  All right.  So you submit Exhibit
20  4.  Is that 4?  Is that your complaint in front
21  of you?
22    A.  Yes.
23    Q.  And on the third page of Exhibit 4, it
24  starts a new paragraph that's dated January 13th,
25  2020.  Is that correct?

Page 90

1    A.  Correct.
2    Q.  All right.  So this first piece of this,
3  did you e-mail this first piece to Mac prior to
4  January 13th, 2020?
5    A.  No.
6    Q.  All right.  So before you could e-mail
7  him your recollection of January 10th of 2020,
8  January 13th of 2020 occurred?
9    A.  Yes.
10    Q.  Okay.  All right.  Okay.  And you've
11  reviewed this statement before, correct?
12    A.  Many times.
13    Q.  Many times.  Is there anything in this
14  statement you would like to change or revise?
15    A.  No.
16    Q.  It remains accurate today?
17    A.  Yes.
18    Q.  Is this the most accurate version of
19  those events that occurred on January 10th?
20    A.  Yes.
21    Q.  All right.  You indicated in here that he
22  verbally abused you.  How did he verbally abuse
23  you?
24    A.  Telling me I'm lazy, I'm a terrible court
25  reporter and I don't know what I'm doing.

Page 91

1    Q.  Did he say anything else that you
2  consider to be verbal abuse?
3    A.  Not that I can recall.
4    Q.  Okay.  You say he intimidated you.  Is
5  that in his voice level, in fist?
6    A.  Yes.
7    Q.  Okay.  Did anything else he say or do
8  intimidate you?
9    A.  He was just so angry.
10    Q.  Okay.
11    A.  Like he could blow at any moment.
12    Q.  Had you ever observed him lose physical
13  control before?
14    A.  The incident with Terri Thurman.
15    Q.  But you didn't observe that, correct?
16    A.  Correct.
17    Q.  Had you ever observed him hit anyone?
18    A.  No.
19    Q.  Had you ever observed him physically
20  threaten anyone?
21    A.  No.
22    Q.  And he didn't do that to you, here,
23  correct?  I mean he remained behind his desk,
24  correct?
25    A.  Well, until I was leaving and then he was

Page 92

1  getting ready to get up and come follow me.
2    Q.  But he didn't follow you, correct?
3    A.  Well, I think that's because he knew the
4  clerks were up there.
5    Q.  Okay.  That may be true.  But he didn't
6  leave his office, correct?
7    A.  Not then, no.
8    Q.  Well, did he ever?
9    A.  On the 13th he did.
10    Q.  Okay.  And we'll get to that.  We'll get
11  to that.  So threatened.  How did he threaten you?
12    A.  By telling me I told you to sit down in
13  that chair right now.
14    Q.  And he --
15    A.  I was a pawn --
16    Q.  Okay.
17    A.  -- to do what he said.
18    Q.  And from your description, he told you to
19  sit down I think four --
20    A.  He demanded.
21    Q.  Four different times?
22    A.  Yes, he demanded I sit down.
23    Q.  And you never did?
24    A.  No, ma'am.
25    Q.  And did he do anything physically



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 93

1 threatening to you when you refused to sit down?
2    A. Well, just the intimidation and the
3 slamming of his fists and getting even madder and
4 raising his voice even more was pretty threatening
5 and intimidating enough for me not to want to sit
6 down.
7    Q. Okay. That's fair. But he never came
8 from behind his desk, correct?
9    A. Correct.
10    Q. Okay. And you indicate browbeating. And
11 I'm assuming this is the same behavior that you've
12 previously described?
13    A. Yes.
14    Q. All right. And just so we're clear,
15 you've never seen him physically assault anyone?
16    A. No.
17    Q. And the only other incident where he
18 raised his voice and slammed his fist was nine to
19 ten months prior to with Miss Thurman. Is that
20 correct?
21    A. That I witness, yes.
22    Q. Did you hear something else?
23    A. Yes.
24    Q. Okay. What else are you aware of?
25    A. Well, in the county attorney's office,

Page 94

1 the office manager, he did the same thing to her
2 in the law library during a jury trial.
3    Q. Who was this?
4    A. Darci Wiford.
5    Q. D?
6    A. D A R C I, W I F O R D.
7    Q. Okay. And she is the county attorney's
8 office manager?
9    A. Yes.
10    Q. County attorney was who?
11    A. Stephen Jones.
12    Q. And, excuse me, this interaction you
13 heard about from whom?
14    A. Stephen, Terri. I think that's it.
15    Q. Did either one -- did Stephen or Terri
16 witness the incident?
17    A. Stephen did.
18    Q. Okay. So Stephen tells you that he was
19 with Darci in the law library?
20    A. He walked in when Judge Johnson was
21 attacking, was the word that he described it,
22 Darci.
23    Q. Verbally I'm assuming?
24    A. Verbally.
25    Q. Did he tell you how he was, quote,

Page 95

1 unquote, attacking Darci?
2    A. No.
3    Q. So you don't know what the conversation
4 was about?
5    A. It was about -- there was a jury trial
6 commencing, and I believe the witness or the
7 victims and the alternate juror were in the same
8 location. And Judge Johnson was not happy with
9 that.
10    Q. You understand why he wasn't happy with
11 that?
12    A. No.
13    Q. Were the witnesses sequestered?
14    A. They actually were separated. Our law
15 library has a smaller room in it, and the
16 alternate juror was in the smaller room and the
17 victims were in the larger room.
18    Q. So it was the alternate juror and the
19 victim?
20    A. I believe so.
21    Q. So in order for the alternate juror to
22 get out of the room they were in, would he or she
23 have to walk through where the victims were?
24    A. No.
25    Q. Okay. Did Steve -- Stephen?

Page 96

1    A. Stephen.
2    Q. Stephen describe the encounter to you in
3 any other detail that you haven't provided me here
4 today?
5    A. Not that I recall.
6    Q. Did Terri -- Terri wasn't present, was
7 she?
8    A. No.
9    Q. Okay. Did Terri get her information from
10 Stephen or from Darci?
11    A. I'm not sure.
12    Q. Have you ever spoken to Darci about this
13 incident?
14    A. No.
15    Q. Are you aware if whether or not Darci
16 made any complaint about the incident?
17    A. No.
18    Q. When did this incident happen?
19    A. I don't know the time frame.
20    Q. Prior to his incident with Terri?
21    A. I believe it was after.
22    Q. Before or after January 2020?
23    A. I believe it was before.
24    Q. All right. Any other incidents that
25 you're aware of involving Judge Johnson?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 97

1    A.  Yes.
2    **Q.  Okay.  What else?**
3    A.  He had an AA between -- before Tammy
4  Thomas, his court reporter.  Her name was Tasha,
5  T A S H A, Thurman.
6    **Q.  This is Terri's daughter, correct?**
7    A.  Yes.
8    **Q.  Okay.  What happened with Tasha?**
9    A.  Well, that was a daily occurrence.
10    **Q.  What was?**
11    A.  His intimidation, his threatening
12  behavior, his demeanor towards Tasha.  I never
13  witnessed them personally.  I witnessed them --
14  the aftermath.
15    **Q.  So you never heard or observed any of**
16  **these incidents?**
17    A.  I heard, but I couldn't hear word for
18  word what was being said.
19    **Q.  What did you hear?**
20    A.  Him, Judge Johnson, telling her that she
21  needed to do a better job, threatening her.  She
22  was also hired as the AA but also to become a
23  court reporter, and he was giving a year -- giving
24  her a year to finish that program.  That's
25  impossible unless you're a genius to finish in a

Page 98

1  year a court reporter program.  And that put a lot
2  of stress on her.  And he would belittle her in
3  the courtroom and torment her and ask her weekly
4  how are you coming, how are you doing.  And it
5  was just added stress because the court reporting
6  program is hard enough as it is.
7    **Q.  So there was an agreement at the**
8  **beginning of her hiring?**
9    A.  Yes.
10    **Q.  That she was hired with the understanding**
11  **that she would finish the program within a year?**
12    A.  Yes.
13    **Q.  Okay.  So she knew that going in,**
14  **correct?**
15    A.  I believe so.
16    **Q.  Okay.  So you heard him tell her she**
17  **needed to do a better job and you heard him ask**
18  **her where she was within the program?**
19    A.  Yes.
20    **Q.  And you heard him belittle her in the**
21  **courtroom?**
22    A.  No, I did not.
23    **Q.  You did not hear that?**
24    A.  I saw the aftermath when I'd go into her
25  office and she'd be crying and I'd ask her what

Page 99

1  was going.
2    **Q.  So you observed her crying?**
3    A.  I observed her crying.  I observed her
4  just a basket case.
5    **Q.  And she would tell you things he said?**
6    A.  Yes.
7    **Q.  What did she tell you that he said**
8  **specifically?**
9    A.  When I would try and teach her things, he
10  would tell her the same thing.  Don't listen to
11  her.  She doesn't know what she's doing.  She's a
12  terrible employee.  She's a terrible court
13  reporter, the same old gist.
14    **Q.  So he would tell Tasha not to listen to**
15  **you, Sabrina?**
16    A.  Yes.
17    **Q.  Because you were bad at your job?**
18    A.  Yes.
19    **Q.  What else did he tell her?**
20    A.  He told her how she should act, not to
21  call people sweetie, not to be nice to them, to
22  answer the phone in a certain way.  Just -- he
23  wanted her to have direction his way, not my way
24  or the clerk's way, his way.
25    **Q.  And she was his AA?**

Page 100

1    A.  His AA.
2    **Q.  So she's answering his phone, correct?**
3    A.  Yes.
4    **Q.  And he wants her to answer his phone in a**
5  **certain way?**
6    A.  Yes.
7    **Q.  And that's belittling?**
8    A.  The way he told her.
9    **Q.  Okay.  But this is what is belittling in**
10  **your opinion.  Is that correct?**
11    A.  Well, he'd write it out and then go in
12  and talk to her and then leave her the sheet of
13  paper and it --
14    **Q.  I'm assuming he was doing this because**
15  **she wasn't doing it his way?**
16    A.  Well, she was doing a good, professional
17  job.
18    **Q.  That might be, but she wasn't doing it**
19  **the way he wanted her to do it.  Is that correct?**
20    A.  No, it's not correct.
21    **Q.  Okay.  So she's doing it just how he**
22  **wants her to do it and he's still writing her down**
23  **and telling her how to do it?**
24    A.  Yes.
25    **Q.  And you observed this?**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 101

1  A.  I observed the aftermath.
2  Q.  Okay.  So this is what she's telling you?
3  A.  Yes.
4  Q.  So she's telling you, no, I'm doing it
5  just how he wants me to do it and he keeps
6  telling me how he wants me to do it?
7  A.  She's doing as she's directed.
8  Q.  By him?
9  A.  By him.  And then he'd come in and tell
10  her that's not what I told you to do.
11  Q.  Oh.
12  A.  And change the tune on her.
13  Q.  Okay.  So he -- can you give me an
14  example?
15  A.  It had to do with their forms.  They
16  didn't use the same forms we used.  He made up
17  some of his own.  And Tasha would do as directed,
18  and he didn't like that.
19  Q.  Any other example?
20  A.  I don't know.  My memory doesn't serve me
21  really well right now, but there was a time that
22  she had called about a jury trial, an attorney on
23  her personal cell phone, because she had his
24  personal cell phone in her phone.  And so she was
25  calling about this jury trial, and he wasn't happy

Page 102

1  that she handled it that way.
2  Q.  He was unhappy that she reached out to
3  this attorney on her personal cell phone?
4  A.  Yes.
5  Q.  He would have preferred she use the
6  court's phone to call the attorney?
7  A.  I don't know that.
8  Q.  Oh, okay.
9  A.  I don't know that.
10  Q.  You don't know why he was unhappy?
11  A.  Right, I don't, do not know.
12  Q.  Okay.  Anything else?
13  A.  Not that I can think of at the moment.
14  Q.  And when was Tasha Thurman employed with
15  the 11th Judicial District?
16  A.  It was before Tammy so 2018 or 2019, I
17  believe.
18  Q.  And did she ever report a complaint?
19  A.  Not at the time she was working there,
20  no.
21  Q.  Do you recall when she complained?
22  A.  I believe after I filed my complaint.
23  Q.  So she worked for him sometime in 2018,
24  something like that?
25  A.  I'm not quite sure of the year.

Page 103

1  Q.  Okay.
2  MS. MOCK:  Can I have Exhibit 12?
3  (THEREUPON, Overfield Deposition Exhibit
4  No 6 was marked for identification by the
5  reporter.)
6  BY MS. MOCK:
7  Q.  Have you ever seen Exhibit 6 before?
8  MR. JOHNSON:  Object to form.  You mean
9  Exhibit 12 -- no, 6.
10  MS. MOCK:  No.  It's 12 in my notebook.
11  I'm sorry for that confusion.
12  BY MS. MOCK:
13  Q.  But it's marked Exhibit No.  6.  Is that
14  correct?
15  A.  Yes.
16  Q.  Have you ever seen what's marked Exhibit
17  6 before?
18  A.  Yes.
19  Q.  What is it?
20  A.  Tasha's complaint.
21  Q.  Okay.  So it indicates at the very -- the
22  first page that she was hired in December of '17.
23  Is that correct?
24  A.  Yes.
25  Q.  All right.  And she says she's hired with

Page 104

1  zero experience in anything.  That's what she says
2  in the first paragraph, correct.  It says before I
3  begin, I would like to point I had zero
4  training in the court system, behavior patterns,
5  expectations, et cetera?
6  A.  Correct.
7  Q.  So I guess would it be -- would it be an
8  error for me to assume that there weren't
9  qualified applicants or do you have any knowledge
10  about that?
11  A.  I don't have any knowledge about that.
12  Q.  Okay.  And I think that -- let's see.
13  She was eventually terminated, correct?
14  A.  Correct.
15  Q.  And to your knowledge, was terminated in
16  the end of -- in December of 2018 or do you know?
17  A.  I can't remember the year or date.
18  Q.  Did she work there for a whole year?
19  A.  I believe she did.
20  Q.  Okay.  And during that year, she did not
21  finish her court reporter program.  Is that
22  correct?
23  A.  That's correct.
24  Q.  Do you understand that that's the reason
25  why she was terminated?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 105

1    A.  I didn't know honestly why she was
2  terminated.
3    Q.  Okay.  Nobody told you?
4    A.  Nobody told me.
5    Q.  All right.  Okay.  So but in any event,
6  we know that she was employed during 2018 and did
7  not complain about her interactions with Judge
8  Johnson until you complained which would have been
9  in May of 2020.  Is that when you filed your KHRC
10  complaint?
11    A.  I believe so.
12    Q.  And when you filed your KHRC EEOC
13  complaint, did you ask Miss Thurman to write a
14  complaint?
15    A.  No, I did not.
16    Q.  How did her complaint come to you?
17    A.  I believe Terri showed me.
18    Q.  Do you know why she decided at that point
19  in time to file a complaint or to write out her
20  complaints?
21    A.  No, I did not.
22    Q.  Do you know if Terri asked her to do so?
23    A.  No, I do not.
24    Q.  Any other instances with Judge Johnson
25  other than you've explained to me what happened

Page 106

1  with Miss -- to your knowledge what happened to
2  Miss -- with Miss Thurman, Tasha, Terri and Darci
3  Wiford, any other instances?
4    A.  Those are the only ones I'm aware of at
5  the present time.
6    Q.  All right.  So back to Exhibit 4.  Am I
7  correct that the part that's dated January 10th
8  you wrote on either January 10th or January 11th.
9  Is that correct?
10    A.  That's correct.
11    Q.  Did you change or alter it at any time
12  after January 11th?
13    A.  No.
14    Q.  All right.  So then let's go to January
15  13th.  So January 13th, it says you arrived at
16  9:30 a.m.?
17    A.  Yes.
18    Q.  Is it typical for you to arrive at 9:30
19  a.m.?
20    A.  No.
21    Q.  Why did you arrive at 9:30 a.m.?
22    A.  I was still shook up from what had
23  happened the Friday before.
24    Q.  Did you talk to anybody else over the
25  weekend about what happened?

Page 107

1    A.  Yes, I did.
2    Q.  Who did you talk to?
3    A.  My husband, my parents, Terri Thurman,
4  Sara Beezley and Sarah Mills.
5    Q.  And you talked to them on the phone?
6    A.  Yes.
7    Q.  When did you talk to Sara Beezley?
8    A.  Saturday -- or, excuse me, Friday of the
9  incident, of the Friday incident, after that had
10  happened, Sarah Mills had called me to schedule a
11  case.  I had to call her back.  So when I
12  finished my phone call up with Mac Young on Friday
13  the 10th, I called Sarah Mills.  I was still
14  really shook up.  Sarah Mills asked me what was
15  wrong, what had happened.  I told her.  She told
16  Sara Beezley.  Sara Beezley called me at home to
17  check on my Friday evening.
18    Q.  And did you tell Sara Beezley what you
19  told me here today?
20    A.  About the incident --
21    Q.  Yes.
22    A.  -- that happened on Friday?
23    Q.  Yes.
24    A.  I didn't go into detail, no.
25    Q.  Okay.  What did you tell her?

Page 108

1    A.  I just told her that Judge Johnson had
2  threatened and bullied me at work and I had left
3  early and I was very upset.
4    Q.  What did Sara Beezley say?
5    A.  She was just concerned for me.
6    Q.  What did she say?
7    A.  I do not recall.
8    Q.  Did she tell you to do anything?
9    A.  No.
10    Q.  Did you talk to her again that weekend?
11    A.  No.
12    Q.  Was there something else that she said
13  that you recalled?
14    A.  She was just concerned for me and making
15  sure that I was okay, but she did not tell me to
16  do anything.  But I did say I was ready to quit
17  because I didn't want to be treated like that.  I
18  didn't deserve to be treated like that, and she
19  said, Sabrina, you do not want to do that.  You
20  do not want to quit.
21    Q.  Did she say why?
22    A.  No.
23    Q.  She didn't explain that statement at all?
24    A.  Just that we all love you at the
25  courthouse, you're a great court reporter, we



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 109

1  don't want you to quit.
2      Q.  Okay.  Anything else in that
3  conversation?
4      A.  Not that I recall.
5      Q.  All right.  And you say you talked to
6  your husband and your parents?
7      A.  Yes.
8      Q.  Did you talk to anybody else?
9      A.  Terri Thurman.
10     Q.  Okay.  And when did you talk to Terri?
11     A.  She called me each day to check on me.
12 And I told them like I told Mac on Friday when I
13 talked to him, I'm not returning to work because,
14 now, it's a hostile working environment for me.
15 Something has to be done.  I will not return to
16 work until something is.  He told me I'd have to
17 take vacation time if I did that.  And I said
18 this was not vacation.  And so I had decided I
19 would take vacation on Monday and just figure it
20 out later.  Because I didn't sleep all weekend.
21 It just kept going over in my head.  And Terri
22 convinced me to come back to work because she
23 said, Sabrina, he's not done any incident like
24 that with me again.  He'll just ignore you.  Come
25 back to work on Monday and I'll be there.  So

Page 110

1  that's why I decided to go back on Monday.
2      Q.  Okay.  So you go back but you come in
3  late?
4      A.  Right.
5      Q.  Correct?
6      A.  But there's many times I worked late,
7  too.
8      Q.  Sure.  Sure.  And so are you saying you
9  came in late because of what happened on the 10th?
10     A.  Yes, ma'am.
11     Q.  All right.  Okay.  So you go to your
12 office.  And if we look at Exhibit 5, you lock
13 doors.  What doors did you lock?
14     A.  I locked my door and only my door.
15     Q.  You locked this door?
16     A.  Yes.
17     Q.  Okay.  I'm going to circle it.  Okay?
18     A.  Okay.
19     Q.  Okay.  So I've circled on Exhibit 5 the
20 door that you locked.
21     A.  Yes.
22     Q.  Is that correct?
23     A.  Yes.
24     Q.  Did you lock the door between your office
25 and Judge Jack's office?

Page 111

1      A.  No.
2      Q.  Did you lock Judge Jack's door?
3      A.  No.
4      Q.  No?
5      A.  Not at that time.
6      Q.  Okay.  Did there come a time on Friday
7  that you locked Judge Jack's door?
8      A.  This was Monday.
9      Q.  Excuse me, Monday?
10     A.  Yes.
11     Q.  When did you lock Judge Jack's door?
12     A.  When I came back from lunch.
13     Q.  Okay.  I'm going to circle Judge Jack's
14 door.  Okay?
15     A.  Okay.
16     Q.  Did I correctly circle Judge Jack's door?
17     A.  Yes.
18     Q.  All right.  So you locked Judge Jack's
19 door after you came back from lunch?
20     A.  Yes.
21     Q.  All right.  And it would have been Judge
22 Jack's door that Judge Johnson wanted to get into,
23 correct?
24     A.  That's what he said.
25     Q.  Well, did he knock on your door?

Page 112

1      A.  Yes.
2      Q.  Okay.  What door did he knock on first?
3      A.  I believe Judge Jack's.
4      Q.  Okay.  All right.  So you hear him knock
5  on -- did you hear him knock an Judge Jack's door?
6      A.  It was very faint.
7      Q.  Okay.
8      A.  At first I thought I was hearing things.
9      Q.  Okay.  What happens next?
10     A.  I was on the phone with Sara Beezley.
11 She had called to set a case.
12     Q.  Okay.
13     A.  And so I was giving her dates.  And then
14 I hear another loud knock.  And now I know I'm
15 hearing the knock, and it's him knocking on my
16 door, Judge Johnson.
17     Q.  All right.  So Judge Johnson knocked on
18 your door next?
19     A.  Yes.
20     Q.  And then what happened?
21     A.  He tells me to unlock this door.  Why is
22 the door locked?  And I said I'm working in here
23 and I'm on the phone.  He said get this door
24 unlocked right now.  I need in Judge Jack's
25 office.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604                 Suite 101                    Suite 305
785-273-3063               Overland Park, KS 66212        Wichita, KS 67202
www.appinobiggs.com           913-383-1131                 316-201-1612

## SABRINA S. OVERFIELD

Page 113

1    Q.  So when he's saying this door unlocked is
2  it the door to your office he wants unlocked or
3  the door to Judge Jack's office that he wants
4  unlocked?
5    A.  I didn't know.
6    Q.  You didn't know.  It could have been
7  Judge Jack's office?
8    A.  Could have.
9    Q.  Okay.  So have you heard that he wanted
10  in Judge Jack -- I mean at this point in time,
11  Judge Jack's office is empty, correct?
12    A.  Correct.
13    Q.  And the senior judges that come in and do
14  his docket utilize that office.  Is that correct?
15    A.  Correct.
16    Q.  Okay.  So I understand that Judge Jack
17  wanted in -- excuse me, Judge Johnson wanted in
18  that back office so that he could leave something
19  for a visiting judge.  Does that make sense to
20  you?
21    A.  No.
22    Q.  Why not?
23    A.  Because he never knew when a senior judge
24  would be there and when they didn't.  I was the
25  one who communicated with the senior judge.

Page 114

1    Q.  Okay.  But the Friday before, you all had
2  had this interaction, correct?
3    A.  Correct.
4    Q.  So it might make sense that he didn't
5  want to interact with you, correct?
6    A.  Correct.
7    Q.  Okay.  So maybe he just is going to leave
8  something for the visiting judge.  Does that make
9  sense?
10    A.  No.
11    Q.  Why not?
12    A.  Because he had no communication with any
13  of the visiting senior judges when they were
14  there.  I communicated with them all, they did the
15  work with me, and he did not communicate with
16  them.
17    Q.  Okay.  All right.  So he wants you to
18  unlock the door.  You say no?
19    A.  Yes.
20    Q.  Right?
21    A.  Yes.
22    Q.  Okay.  Then what happens?
23    A.  Sara Beezley says, Sabrina, do not unlock
24  that door.  After what you've told me that
25  happened on Friday with him tormenting you and

Page 115

1  threatening you, I want you to get your stuff and
2  leave.  So Terri hears this from down the hallway
3  and she's watching from the clerk's office and she
4  knows -- I call her on our intercom system and
5  said he's wanting in here.  There's nothing back
6  here.  You know there's nothing back there.  He
7  just wants to finish what he started.  I'm
8  leaving, and she told me you need to and I call
9  Mac.  So I did.
10    Q.  Okay.  So you hang up the phone with Sara
11  and then Terri calls?
12    A.  No.  Terri, I call her on my intercom and
13  tell her I'm leaving for I don't know how long.
14    Q.  Okay.  So you hung up with Sara?
15    A.  Yes.
16    Q.  Okay.  You hung up with Sara and you buzz
17  Terri and tell Terri I'm leaving?
18    A.  Yes.
19    Q.  Okay.  And I think in this statement it
20  says something that Judge Johnson says -- he says
21  unlock this door.  I need in Judge Jack's office,
22  correct?
23    A.  Correct.
24    Q.  Okay.  So by him saying that, does it
25  make sense to you that he wants in Judge Jack's

Page 116

1  office, not your office?
2    A.  No, it doesn't make sense.
3    Q.  I mean that's what he's telling you,
4  correct?
5    A.  Yes.
6    Q.  He's wanting you to unlock Judge Jack's
7  office.  Is that correct?
8    A.  Yes.
9    Q.  Okay.  And the door between Judge Jack's
10  office and your office right here?
11    A.  Yes.
12    Q.  This have a lock?
13    A.  No.
14    Q.  No?
15    A.  No.
16    Q.  Are you certain?
17    A.  It doesn't work.
18    Q.  Okay.  So if I went there and looked and
19  tried it and locked it, you're saying it doesn't
20  work?
21    A.  It didn't at the time.
22    Q.  Okay.  All right.  All right.  So he says
23  -- I guess, well, you don't unlock -- did you tell
24  him no or did you just not talk to him?
25    A.  I don't think I told him no.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 117

1   Q.   So you just didn't respond?
2   A.   Probably not.
3   Q.   All right.  So you didn't answer him and
4   you didn't unlock the door, correct?
5   A.   Correct.
6   Q.   And he leaves and says I'll just call
7   Mac?
8   A.   Yes.
9   Q.   All right.  Okay.  So and then you leave,
10  correct?
11  A.   Yes.
12  Q.   And then you call -- and Mac called you.
13  Is that correct?
14  A.   I called Mac.
15  Q.   You called Mac.  And what did you say?
16  A.   I just told him it happened again.  First
17  -- okay.  I had called him during the noon hour
18  and told him I was going to file a complaint.
19  And I had a witness in the car with me as I was
20  going back inside from lunch, but I called him
21  outside.  And so I'd just recently just talked to
22  him within a 30-minute interval.  So when I call
23  him right back, he goes what now?  You know, that
24  was his response to me.  What now?
25  Q.   All right.  You said you talked to him at

Page 118

1   your noon hour?
2   A.   Yes.
3   Q.   And you had a witness in the car?
4   A.   Yes.
5   Q.   Who was your witness?
6   A.   Tasha Thurman.
7   Q.   Tasha?
8   A.   Yes.
9   Q.   And you needed a witness to call him
10  because why?
11  A.   I just felt it necessary.
12  Q.   And you called him on Monday on your
13  lunch hour to tell him what?
14  A.   That I'd finished my complaint from
15  Friday.  How did he want me to send it to him.
16  Q.   Okay.  And what did he say?
17  A.   He told me scan it or e-mail it -- no,
18  better yet, e-mail it.  I said I was also filing
19  with OJA.
20  Q.   Okay.
21  A.   Silence.  And then he's like.  Okay, real
22  abrupt.  And then I said I did come to work
23  today, so I will not be taking vacation.  And I
24  said but I am working behind a locked, closed door
25  during this conversation.

Page 119

1   Q.   Okay.
2   A.   So he knew it.
3   Q.   And did he say anything?
4   A.   No.
5   Q.   All right.  And so then you come back
6   from lunch, the interaction with Judge Jack
7   occurs.  And to be clear, on Monday the 13th, did
8   you ever see Judge Jack?
9   A.   Judge Johnson?
10  Q.   Judge Johnson.
11  A.   No, I stayed clear of the hallway.  I
12  stayed in my office behind my closed, locked door.
13  Q.   All right.  So you never saw him?
14  A.   No.
15  Q.   And the only interaction you had with him
16  was him knocking on the door asking to be let into
17  Judge Jack's office, correct?
18  A.   Correct.
19  Q.   Okay.  And then you leave immediately
20  after that?
21  A.   Yes.
22  Q.   And you call Mac Young?
23  A.   Yes.
24  Q.   And he answers what now?
25  A.   Yes.

Page 120

1   Q.   And what did you say?
2   A.   I told him it happened again with him.
3   Q.   Did you have a witness this time?
4   A.   No.
5   Q.   Okay.  And I'm assuming you said
6   something more than it happened again?
7   A.   I said I'm leaving and I'm going to work
8   from home doing transcripts and I'll work in other
9   districts, but I can't come back here and work in
10  this situation.
11  Q.   And what did he say?
12  A.   He told me that I needed to unlock my
13  door.  I told him I'm not going back in there.  I
14  said I told you I'm going home.  And he says,
15  well, you need to unlock your door.  I said I'm
16  not going back in there and we had that two or
17  three times.  And he says, well, who has a key?
18  And I said Terri might.  She probably does, and
19  that was that.
20  Q.   So when you left your office, what door
21  did you exit out of?
22  A.   My front door.
23  Q.   So and then you locked it behind you?
24  A.   No.
25  Q.   So it was unlocked?



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 121

1    A. Yes.

2    Q. Did you unlock Judge Jack's door?

3    A. No.

4    Q. So it remained locked?

5    A. Yes.

6    Q. After you left the office?

7    A. Yes.

8    Q. All right. Did he tell you that you

9  needed to go back to work?

10    A. No.

11    Q. Okay. All right.

12       MS. MOCK: Okay. Can we go off the

13  record?

14       (THEREUPON, a recess was taken.)

15       BY MS. MOCK:

16    Q. All right. So back on the record after

17  lunch. Okay. I think we made it through January

18  10th. And then January 13th you were just

19  finishing up, I believe, with your phone call to

20  Mac, the second phone call. You told him what

21  happened. You said you weren't coming in to which

22  he didn't respond I guess one way or the other,

23  correct?

24    A. Correct.

25    Q. Okay. So you then go back to Exhibit 4,

Page 122

1  correct, and you finish and you type up the

2  incident that occurred on January 13th. Is that

3  correct?

4    A. Correct.

5    Q. Did you do that on the eve of January

6  13th -- or on the evening?

7    A. Correct.

8    Q. Okay. And then did you e-mail this to

9  Mac?

10    A. Yes. And all the district judges as

11  well.

12    Q. Okay. And when did you do that?

13    A. The next day.

14    Q. On the 14th?

15    A. Yes.

16    Q. All right. So and you did not go to work

17  on the 14th, correct?

18    A. Correct.

19    Q. Okay. When was the next time you went

20  into the office?

21    A. I believe I started working from home

22  then. Can I check my notes real quick?

23    Q. Sure.

24    A. I have some notes. So on the 14th which

25  was Tuesday January 14th of '20, I started working

Page 123

1  from home.

2    Q. And was that by agreement with Mac?

3    A. Yes.

4    Q. Okay. So how do you transcribe a hearing

5  from home. Everything is recorded and you just...

6    A. A hearing from home?

7    Q. Well, I mean so at the time, you're -- I

8  guess you're without a judge. Is that correct?

9    A. Correct.

10    Q. So you are just doing purely

11  transcription duties?

12    A. For the first couple of days, yes, and

13  then I started working in the district I'm now

14  permanently working in, the 14th, covering days

15  there.

16    Q. Okay. And when did you start doing that?

17    A. Probably the following week. I did a

18  couple of days the following week in Montgomery

19  County, but then I had senior judges coming. I

20  met a senior judge in Oswego. I worked in Oswego

21  with him, because at the time, they had not

22  figured out a schedule, OJA, Allyson Christman and

23  Chief Judge Lynch. This was before they

24  transferred Johnson to Oswego.

25    Q. All right. So you submit your complaint

Page 124

1  on the 14th and then do you -- when's the next

2  communication you received from OJA?

3    A. The 14th.

4    Q. Okay. So they respond right away?

5    A. Yes.

6    Q. And what do they say?

7    A. Allyson Christman contacted me that day

8  to schedule a phone interview for the next

9  following morning at 8 a.m.

10    Q. Okay. And Allyson Christman is -- who do

11  you understand her to be?

12    A. The chief personnel of HR for OJA for the

13  State of Kansas.

14    Q. Okay. So she reaches out to you the day

15  of your complaint to schedule an interview the

16  following morning?

17    A. Yes.

18    Q. Did that occur?

19    A. Yes.

20    Q. Okay. Talk to me about that interview.

21    A. Well, it lasted for quite sometime. She

22  wanted to know what had happened. I believe that

23  was a -- you know, I gave her a little background

24  of myself, and it was very emotional for me

25  because both incidents have just happened, so I



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 125

1  know I cried quite a bit during that conversation.
2  And I hadn't had much -- not much sleep at all
3  between -- this was Wednesday.  From Friday when
4  the first incident happened to the Wednesday, I
5  hadn't been sleeping or eating.  And I'm trying to
6  read my notes real quick and see if that was the
7  conversation she told me that -- oh, yes, it was,
8  the first conversation when we talked, that the
9  complaint against Judge Johnson would go through
10  someone else.  And it was just mainly talking
11  about what Mac had or had not done.
12      Q.  Okay.  And did you -- did you come to
13  understand the complaint against Judge Johnson and
14  the different procedure that it had to go through?
15      A.  Yes.
16      Q.  What's your understanding?
17      A.  That it had to go through a Judicial Qual
18  committee.
19      Q.  Okay.  And you understand Ally made that
20  complaint on your behalf, correct?
21      A.  No.
22      Q.  Okay.
23      A.  She could not clarify that she had sent
24  that on to them.
25      Q.  Oh, she couldn't?

Page 126

1      A.  That's what she informed me.
2      Q.  Have you come to know that she did, in
3  fact, do that?
4      A.  Not directly from her, no.
5      Q.  But you do know that she did it?
6      A.  I ended up filing myself --
7      Q.  Okay.
8      A.  -- with them as well.
9      Q.  Okay.  Okay.  So Ally calls you on the
10  15th.  You have a long interview conversation with
11  her, and then what happened next?
12      A.  And then she said she'd be hearing from
13  -- hearing from her later which the next day,
14  though, I called her back because I had had a jury
15  trial coming up and I was having a senior judge,
16  Judge Sanders from Wichita, come cover it with me.
17  And they had worked out a plea.  So I needed to
18  get that plea taken so we could get that off the
19  jury trial calendar.  And I called Allyson to see
20  if she couldn't work out the situation for me to
21  where Judge Sanders and myself and the attorneys
22  and the defendant could go to Oswego rather than
23  Parsons.  So I had a conversation with her the
24  next day about that.
25      Q.  Okay.

Page 127

1      A.  And it was worked out.
2      Q.  So the judge, both attorneys and you all
3  went to Oswego for the plea?
4      A.  Yeah.
5      Q.  Per your request so you didn't have to
6  interact with Judge Johnson?
7      A.  Right.
8      Q.  Okay.
9      A.  Yeah.  She had to run it by our
10  administrative judge, Judge Lynch, yes.  And they
11  kept playing phone call -- phone tag on the phone.
12  So she phoned me after five and we talked a little
13  bit, and she said it would be fine we do that.  I
14  get it set up.  And she asked me again if I still
15  would not come to work with Johnson there, and I
16  reiterated to her as long as there was no safety
17  plan in place and I was not assured and
18  comfortable he would leave me alone, then, no, I
19  was not comfortable coming back to work there.
20      Q.  And that was a communication that you had
21  on the 15th?
22      A.  16th.
23      Q.  16th.  Are these notes that you took
24  contemporaneous?
25      A.  Yes.

Page 128

1      MS. MOCK:  Okay.  I want a copy of those.
2      MR. JOHNSON:  Sure.
3      MS. MOCK:  Can we do that right now?
4      MR. JOHNSON:  Um-hum.
5      THE WITNESS:  It's here, here and here,
6  sir.
7      MR. JOHNSON:  All right.
8      MS. MOCK:  Thank you.  Might as well make
9  three copies.
10      MR. JOHNSON:  Yeah.
11      THE WITNESS:  And I hope you can read my
12  handwriting.
13      (THEREUPON, a recess was taken.)
14  BY MS. MOCK:
15      Q.  Okay.  Let's keep going.  So the
16  conversation you had with her on the 16th was in
17  regard to she asked you again if you would come
18  back to Parsons and you said no, correct?
19      A.  Correct.
20      Q.  Okay.  And then what happened after that?
21      A.  That was the last phone call I ever had
22  from her.
23      Q.  Okay.  So and you never spoke to her
24  again or did you reach out to her?
25      A.  No.  Then I received my letter from her

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                   Suite 305
785-273-3063            Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com         913-383-1131             316-201-1612

Page 129

1  about her findings.
2       MS. MOCK:  Okay.  Let's see.  Let's find
3  that letter.
4       (THEREUPON, a discussion was had off the
5  record; WHEREUPON, Overfield Deposition Exhibit
6  No 7 was marked for identification by the
7  reporter.)
8       BY MS. MOCK:
9       **Q.  Okay.  Exhibit No. 7, is this the letter**
10  **from Ally that you were talking about regarding**
11  **her findings?**
12       A.  Yes.
13       **Q.  Okay.  And this is dated February 3rd,**
14  **2020?**
15       A.  Yes.
16       **Q.  And this addressed complaints that you**
17  **had about how Mr. Young handled the situation.  Is**
18  **that correct?**
19       A.  Yes.
20       **Q.  What were your complaints about how Mac**
21  **Young handled the situation?**
22       A.  Well, just lack of handling the
23  situation.
24       **Q.  What did you expect him to do that he did**
25  **not do?**

Page 130

1       A.  He is stationed in Pittsburg.  He didn't
2  come over to Parsons to speak with us.  It was
3  all via phone.
4       **Q.  At what point in time would he have had**
5  **opportunity to come to Parsons?**
6       A.  Well, that Monday morning --
7       **Q.  Okay.**
8       A.  -- after the Friday incident.
9       **Q.  Okay.  So didn't come -- he wasn't in**
10  **Parsons on Monday morning?**
11       A.  Correct.
12       **Q.  Is there anything else that he did or**
13  **didn't do that you found -- or that you had issue**
14  **with?**
15       A.  A couple of days later after the fact of
16  me leaving work that Monday morning, he had sent
17  me an e-mail that told me that it wasn't
18  appropriate for me to have my doors locked, that a
19  judge can go anywhere he wants.
20       **Q.  Okay.  Okay.**
21       A.  And I didn't feel that was appropriate.
22       **Q.  So in this Exhibit No. 7 on the**
23  **conclusion, it states taking all the information I**
24  **have in front of me, I find no failure to take**
25  **appropriate action on the part of Mr. Young in**

Page 131

1  **this situation.  If Mrs. Overfield believes my**
2  **decision is in error, she may submit additional**
3  **information supporting her claims.  The new**
4  **information should be received by my office no**
5  **latter than 5 p.m. on Friday, February 7th, 2020**
6  **and may be submitted via e-mail.  Did you do that?**
7       A.  Did I submit her additional information?
8       **Q.  Yes.**
9       A.  No.
10       **Q.  Did you disagree with her findings?**
11       A.  I did.
12       **Q.  Okay.  But you didn't take any action to**
13  **appeal those findings?**
14       A.  No.
15       **Q.  And you're not stating here today that**
16  **Mr. Young discriminated against you because of**
17  **your gender or your age, are you?**
18       A.  Well, yes, I am.
19       **Q.  Okay.  How did he do that?**
20       A.  Well, as I stated previously, things have
21  been really different since he's became the court
22  administrator.
23       **Q.  Okay.**
24       A.  Court reporters are a -- in my
25  impression, court reporters are a thorn in his

Page 132

1  side.
2       **Q.  Okay.**
3       A.  And I can name an example.
4       **Q.  Okay.**
5       A.  When the reporter, Vickie Barrett, left,
6  our county supplied our court reporting machines
7  for us and our equipment.  Mine was now over ten
8  years old.  I needed a new machine, but I had --
9  with Tasha Thurman coming on as a court reporting
10  student, I told Judge Jack and I believe he
11  relayed to Judge Johnson I would bypass my new
12  machine for another year so they could get Tasha
13  on board to become a court reporting student.  So
14  the next year I was supposed to be receiving a new
15  machine and software.  That time came around and
16  Mac says, well, we're not going to do that for
17  you.  We don't do that for anybody.  I said,
18  well, that's not true.  Judge Fleming and Judge
19  Jack had purchased our equipment previously.  And
20  then when they wouldn't get a new machine, I
21  needed my old machine serviced because it had been
22  awhile.  And Vickie's machine was somehow down in
23  Oswego because Tammy had borrowed that machine
24  while she was there for the short year she was
25  there.  And I kept asking for that back.  And Mac

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street         6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063              Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

## SABRINA S. OVERFIELD

Page 133

1  said, yes, I need to get that back to you,
2  Sabrina. I need to get that. I just don't know
3  where it is. Well, come to find out, Judge
4  Johnson's new AA, Myra Freeman, is now in court
5  reporting school, and he had full knowledge that
6  she was using that machine to go to school but
7  would not tell me, divulge that information to me.
8      Q.  And what about that has to do with your
9  gender?
10     A.  Not necessarily my gender but my age as
11  well, because I feel like he and Judge Johnson
12  wanted me pushed out.
13     Q.  Did he make any comments to you about
14  your age?
15     A.  No.
16     Q.  Did he make any comments to you about
17  retirement?
18     A.  We talked about retirement, yes.
19     Q.  You and Mac did?
20     A.  Yes.
21     Q.  In what context?
22     A.  Asking me when I would retire or if I had
23  any inkling when I would.
24     Q.  Okay.
25     A.  And vice versa. I would ask him.

Page 134

1      Q.  All right. Any other examples of how he
2  discriminated against you based upon your age or
3  gender?
4      A.  I can't think of anything right now.
5      Q.  Did you allege to Ally that you thought
6  he had discriminated against you in his handling
7  of this complaint against Judge Johnson based upon
8  your age or gender?
9      A.  I did not.
10     Q.  Do you believe he mishandled this
11  complaint that you filed because of your age or
12  your gender?
13     A.  I do.
14     Q.  In what way?
15     A.  I feel like he didn't take it seriously
16  enough.
17     Q.  How do you get to your age or your
18  gender?
19     A.  Well, I'm a woman, and I feel like any
20  time I approached him with anything to deal with
21  my profession, like I said, he bypassed it. Now,
22  let's go a little further about the machine. When
23  we get a new chief judge right before I resigned
24  and transferred, I called again to see about a --
25  excuse me, Judge Fleming asked with extra COVID

Page 135

1  money if I would like a new machine and I said,
2  yes, I would. She says, well, we've done that
3  with Shaun Higgins already, so you're entitled to
4  one, too. So I thought that had something to do
5  with, oh, they've already purchased Shaun one but
6  not myself.
7      Q.  And do you know like how long Shaun had
8  had the new machine?
9      A.  No, I do not.
10     Q.  Do you know anything about Shaun
11  requesting that machine or anything about how it
12  came to be that he got a new machine?
13     A.  No, I do not.
14     Q.  Okay. Any other males that you believe
15  are treated differently or more favorably than
16  yourself by Mr. Young?
17     A.  Shaun's our only other male court
18  reporter, so, no.
19     Q.  Okay. Anybody younger than you that you
20  feel has been treated better, differently than you
21  by Mr. Young?
22     A.  No.
23     MS. MOCK:  All right. I'm going to
24  double sticker it since I did it wrong.
25     (THEREUPON, Overfield Deposition Exhibit

Page 136

1  No 8 was marked for identification by the
2  reporter.)
3  BY MS. MOCK:
4      Q.  All right. I'm going to hand you what's
5  been marked as Exhibit No. 8. Have you ever seen
6  this document before?
7      A.  Actually, I don't recall seeing it, no.
8      Q.  Do you recognize this document for what
9  it is? I mean can you describe it?
10     A.  Yes.
11     Q.  What is it?
12     A.  It's a complaint to the Kansas Commission
13  of Judicial Conduct.
14     Q.  Okay. And the person making the
15  complaint is?
16     A.  Allyson Christman.
17     Q.  And the complaint is made against whom?
18     A.  Honorable Frank W. Johnson.
19     Q.  Okay. In the statement of facts, it
20  states on Tuesday January 14th, 2020, the Office
21  of Judicial Administration was copied on a
22  complaint e-mailed to the Honorable Oliver Kent
23  Lynch from court reporter Sabrina Overfield,
24  attached to e-mail submission. The complaint is
25  being forwarded to pursuant to Kansas Court

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

Page 137

1  Personnel Rules 9.3.c. the complainant has been
2  notified.  The issue has been referred to the
3  Commission on Judicial Conduct.  Did I read that
4  correct?
5      A.  Yes.
6      Q.  Did she notify you that the complaint
7  would be referred to the Commission on Judicial
8  Conduct?
9      A.  No.
10     Q.  Did Mac Young do that?
11     A.  No.
12     Q.  But you were aware of how the process was
13 handled, correct?  I believe in your prior
14 testimony you said when Ally talked to you on the
15 15th, she let you know that Judicial
16 Qualifications is who would be investigating Judge
17 -- any complaint against Judge Johnson.  Is that
18 correct?
19     A.  Correct.  But she said she could not
20 verify that she forwarded it on.
21     Q.  Okay.  All right.  If you -- if you go --
22 let's see.  Next page it's dated January 15th,
23 2020.  Do you see that?
24     A.  Yes.
25     Q.  And signed by Ally Christman?

Page 138

1      A.  Yes.
2      Q.  And then if you go to the last page, this
3  is a copy of the e-mail submitting the complaint.
4  Do you see that?
5      A.  Yes.
6      Q.  Okay.  On January 15th, 2020?
7      A.  Yes.
8      Q.  Do you have any reason to believe this
9  complaint wasn't submitted as evidenced by Exhibit
10 8?
11     A.  Can you say that again?
12     Q.  Yeah.  Do you have any reason to believe
13 the complaint wasn't admitted as evidenced by
14 Exhibit No. 8?
15     A.  No.
16     Q.  Okay.  And I think in the e-mail, we
17 don't have -- I didn't print out all the
18 attachments, but it does show that there are four
19 different attachments, correct?
20     A.  Yes.
21     Q.  Okay.  And I think in the body of the
22 e-mail, it says I'm forwarding the complaint,
23 which would be Exhibit No. 4 that we've talked
24 about here today, correct?
25     A.  Correct.

Page 139

1      Q.  With the appropriate commission form.
2  I've always attached documents compiled by the
3  district court administrator prior to receiving
4  the written complaint.  One is a statement from
5  Judge Johnson.  One is a statement from the Clerk
6  of the Court Terri Thurman.  Please advise if you
7  need anything else from me.  Okay.  Do you see
8  that?
9      A.  Yes.
10     Q.  Okay.  So Miss Christman submitted a
11 complaint herself to the Commission on Judicial
12 Conduct the day after she received your complaint,
13 correct?
14     A.  Correct.
15         (THEREUPON, Overfield Deposition Exhibit
16 No 9 was marked for identification by the
17 reporter.)
18 BY MS. MOCK:
19     Q.  Okay.  Exhibit 9, do you recognize this
20 document?
21     A.  Yes.
22     Q.  What is this document?
23     A.  It's an Administrative Order signed by
24 our Chief Judge Kent Lynch.
25     Q.  And this orders that Judge Johnson will

Page 140

1  be sitting in Oswego?
2      A.  Correct.
3      Q.  Beginning January 27th, 2020?
4      A.  Correct.
5      Q.  So within 12 days, 13 days of submitting
6  your complaint, Judge Johnson's transferred out of
7  the courthouse in which you worked.  Is that
8  correct?
9      A.  Correct.
10     Q.  Okay.  Do you take issue with this
11 action?
12     A.  No.
13     Q.  Okay.  And so your -- you weren't in the
14 same building with him?
15     A.  No.
16     Q.  Okay.  Did he come to Parsons from time
17 to time?
18     A.  Yes.
19     Q.  Okay.  Were you notified when he would be
20 coming to Parsons?
21     A.  No.
22     Q.  Not always?
23     A.  Not always.
24     Q.  Were you sometimes?
25     A.  No.



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 141

1  Q.  You were never notified?
2  A.  No.
3  Q.  Okay.  How often did he come to Parsons?
4  A.  Seldom.
5  Q.  Okay.  What would happen when he came to
6  Parsons?
7  A.  We would find out about it beforehand.
8  Somehow we would get word.
9  Q.  Oh, so you did know?
10  A.  By a calendar.
11  Q.  Okay.
12  A.  Or wind from the jail.  Somehow we would
13  get wind that he would be there, but it wasn't
14  notified by him personally or his AA.
15  Q.  Okay.  And his AA is who?
16  A.  Myra Freeman.
17  Q.  Who used to be a court clerk then.  Is
18  that correct?
19  A.  Correct.
20  Q.  Okay.  All right.  And so what would
21  happen when he came to Parsons?
22  A.  Terri and I were instructed to leave the
23  building and work from home.
24  Q.  And who instructed you of that?
25  A.  Our chief judge.

Page 142

1  Q.  Okay.  So Judge Lynch talked to you
2  personally?
3  A.  Yes.
4  Q.  When did this conversation occur?
5  A.  I don't remember the date.
6  Q.  Like before this order took place, after
7  this order took place?
8  A.  I believe it was after, but I can't
9  remember for sure.
10  Q.  Right around the same time?
11  A.  Probably.
12  Q.  Okay.  And did he call you?
13  A.  I met him in his office.
14  Q.  Okay.
15  A.  In Columbus.
16  Q.  Okay.  Did he ask you to come and speak
17  with him?
18  A.  Yes, he did.
19  Q.  Okay.  And so you drove over to Columbus?
20  A.  Yes.
21  Q.  And what was discussed at the meeting?
22  A.  That -- just what we just reiterated,
23  that he would be sitting in Oswego most of the
24  time, and Terri and I would be given a heads-up if
25  he was to be back in Parsons.  And we would work

Page 143

1  from home or go to Oswego, but there was no place
2  for us to work in Oswego.  We had no office
3  there.
4  Q.  Did you talk about anything else during
5  that meeting?
6  A.  Not that I can recall.
7  Q.  It was a pretty short meeting then?
8  A.  It was pretty short.
9  Q.  Okay.  Do you remember -- did you take
10  any notes after that meeting?
11  A.  No, I did not.
12  Q.  Okay.  So when was the first time he came
13  to Parsons after he was ordered to Oswego?
14  A.  I don't recall the exact date.
15  Q.  Months?
16  A.  No, it wasn't months.  Maybe a week.
17  Q.  Okay.  And you caught wind of it?
18  A.  Yes.
19  Q.  I guess.
20  A.  Yes.
21  Q.  And went home?
22  A.  Yes.
23  Q.  Was there ever a time when you didn't
24  catch wind of it and were confronted with Judge
25  Johnson?

Page 144

1  A.  No.
2  Q.  Did you call Judge Lynch and say, listen,
3  he showed up and nobody told us?
4  A.  I believe we, Terri and I as in we, sent
5  an e-mail to Mac and cc'd Judge Lynch on it to
6  let him know that that was occurring.
7  Q.  Okay.  Was there a response to that?
8  A.  Yes.
9  Q.  What was the response?
10  A.  Mac said he would take care of it and
11  make Judge Johnson aware that he needs to let us
12  know either through himself via e-mail or his AA
13  contacting us.
14  Q.  Did that happen?
15  A.  Never.
16  Q.  Okay.  All right.  But in any event, you
17  were able to avoid him?
18  A.  Yes.
19  Q.  Correct?
20  A.  Correct.
21  Q.  Okay.
22  (THEREUPON, Overfield Deposition Exhibit
23  No 10 was marked for identification by the
24  reporter.)
25  BY MS. MOCK:

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# SABRINA S. OVERFIELD

Page 145

1    Q.   Okay.  I have handed you what has been
2   marked Exhibit 10.  Have you ever seen this
3   document or one like this before?
4    A.   Yes.
5    Q.   Was a letter like this sent to you
6   directly as well?
7    A.   E-mailed.
8    Q.   E-mailed to you?
9    A.   Yes.
10    Q.   Okay.  I was thinking I saw something in
11   your production that indicated you received copies
12   of these same letters?
13    A.   Yes.
14    Q.   Did somebody from the Commission on
15   Judicial Conduct contact you regarding the
16   investigation?
17    A.   Elaborate a little more, please.
18    Q.   Sure.  So this -- we can agree there was
19   a complaint that was submitted to the Commission
20   on Judicial Conduct, correct?
21    A.   Correct.
22    Q.   And according to this e-mail -- or this
23   letter at least, that complaint was reviewed
24   extensively.  And I'm wondering if there was an
25   investigator or somebody that reached out to you

Page 146

1   regarding this complaint?
2    A.   Yes.
3    Q.   Okay.  Who reached out to you?
4    A.   A gentleman named Todd Thompson via
5   telephone.
6    Q.   Okay.  So Todd Thompson is an attorney in
7   Lawrence, correct?
8    A.   Correct.
9    Q.   Okay.  So he was hired by the Commission
10   on Judicial Conduct to conduct an investigation
11   into the complaint that was filed on your behalf
12   by Miss Christman, correct?
13    A.   Correct.
14    Q.   Okay.  And he called you via phone?
15    A.   Correct.
16    Q.   And did he ask you questions?
17    A.   Correct.
18    Q.   Did you tell him your story?
19    A.   Yes.
20    Q.   Did he -- was he thorough in your
21   opinion?
22    A.   Yes.
23    Q.   Okay.  Do you know whether or not he
24   talked to other people?
25    A.   I don't know.

Page 147

1    Q.   Did anybody that you work with tell you,
2   hey, I got a call from Todd Thompson?
3    A.   No.
4    Q.   Okay.  Did he call you more than one
5   time?
6    A.   No.
7    Q.   How long did the conversation last?
8    A.   30 minutes.
9    Q.   Did you keep any notes of that
10   conversation?
11    A.   No.
12    Q.   Do you know when that conversation
13   occurred?
14    A.   No.
15    Q.   Okay.  During that conversation, did he
16   explain to you the process or anything of that
17   nature?
18    A.   I don't recall that.
19    Q.   Okay.  In any event, Exhibit 10 tells us
20   that the commission met on April 3rd, 2020 and
21   considered your complaint and concluded that your
22   complaint contained issues that are personnel
23   matters which should be handled administratively
24   and did not contains facts establishing reasonable
25   cause to support a finding that his actions

Page 148

1   violated the judicial code.  Did I read that
2   correctly?
3    A.   You did.
4    Q.   Okay.  Now, are you aware that Miss
5   Christman sought reconsideration of that order?
6    A.   Not at all.
7    Q.   Okay.  Did anybody from Judicial
8   Qualifications ever call you again?
9    A.   No.
10    Q.   Okay.  All right.  So let's see.  Let's
11   look at 4.
12     (THEREUPON, Overfield Deposition Exhibit
13   No 11 was marked for identification by the
14   reporter.)
15   BY MS. MOCK:
16    Q.   All right.  I'm going to hand you what's
17   been marked Exhibit No. 11.  Have you ever seen
18   this document before?
19    A.   Yes.
20    Q.   This is a report drafted by Mac Young
21   regarding a complaint he received by Terri Thurman
22   after your -- after your complaint.  Take your
23   time to familiarize yourself with this document.
24   Did you have a chance to look at this document?
25    A.   I did.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

Page 149

1    Q.  So this document summarizes interviews
2  Mac had with other people in your office.  Is that
3  correct?
4    A.  It is.
5    Q.  Okay.  This document surprise you?
6    A.  Very much so.
7    Q.  In this document, Myra Freeman indicates
8  that you would make fun of Tammy and keep notes
9  about her time and attendance.  Is that true?
10   A.  No.
11   Q.  Did you ever keep notes about her time
12  and attendance?
13   A.  I did keep notes, yes.
14   Q.  Did you keep notes about other people's
15  time and attendance?
16   A.  No.
17   Q.  Why did you keep notes about Tammy's time
18  and attendance?
19   A.  It wasn't necessarily time and attendance
20  but, yet, she worked for the State of Kansas.
21  Judge Johnson was letting her go to Oklahoma to
22  deliver transcripts on Kansas time.  This I know
23  for a fact.  She'd only worked there three months
24  and she took a two week vacation, and she wanted
25  to know how to document her vacation on her

Page 150

1  timesheet because she asked me how to do that.
2  And she didn't have vacation time saved up that
3  much for two weeks, so I didn't know why she was
4  asking me that.  And then her station was to be
5  in Parsons.  One Friday, the phone was ringing off
6  the wall and I'm going to get that because someone
7  needs to answer their phone.  And I went up front
8  and asked the girl where Tammy was, and they
9  said, oh, Judge Johnson let her work in Oswego
10  where it was quiet so she could get transcripts
11  done.  My comment was, well, I'd love to have
12  quiet time, too, to do my transcripts done but our
13  station's here.  So those were the kind of notes
14  that I would took and when she would leave early
15  and I would still be there working.
16   Q.  You'd note that?
17   A.  Yes.
18   Q.  Do you still have those?
19   A.  No.
20   Q.  Did you destroy them?
21   A.  They weren't really notes.  They were on
22  one sheet of paper of days that I documented.
23   Q.  So what happened to them?
24   A.  I believe in my move -- they were sent
25  with Todd Thompson because it wasn't a notebook.

Page 151

1  It was just in my mind the days of this occurring,
2  and I'd written like summer of 2020.
3    Q.  They were sent with Todd Thompson?
4    A.  The little sheet of paper.  I sent the
5  little sheet of paper that I documented.  She took
6  a two week vacation here and she asked me how to
7  do the time on her timesheet.  And I was thinking
8  how could that be possible because she's taken
9  time before.  She should have already knew how to
10  record it and how she has all this time built up
11  when she hasn't even been here a year.
12   Q.  What other information did you send to
13  Todd Thompson?
14   A.  Not anything really.  I didn't document
15  anything.
16   Q.  So Todd Thompson is the interviewer from
17  Judicial Qualifications, right?
18   A.  Right.
19   Q.  And you sent him the notes that you took
20  about Terri.  Is that what you said?
21   A.  Tammy.
22   Q.  Tammy?
23   A.  Tammy.  The note you just asked me about
24  here --
25   Q.  Yeah.

Page 152

1    A.  -- it was just like on one sheet of
2  paper.
3    Q.  Uh-huh.  And you gave that Todd Thompson?
4    A.  Because he asked for it.  He said I heard
5  you had a notebook.  No, I have no notebook.
6    Q.  Okay.  Did you keep notes on Judge
7  Johnson's whereabouts?
8    A.  No.
9    Q.  Okay.  This goes on to state that Myra
10  believes Sabrina can't be trusted.  Said that
11  Sabrina has stated she purposely leaves her
12  telephone mailbox full so others can't leave a
13  message regarding court business.  Is that true?
14   A.  No, that's not true.
15   Q.  Myra believes Terri Thurman has treated
16  her harshly at times.  She cites finger pointing
17  and describes it as menacing.  Have you ever
18  observed Terri finger point at her subordinates?
19   A.  Never.
20   Q.  Have you ever observed her raise her
21  voice to her subordinates?
22   A.  No.
23   Q.  Myra feels that she is mistreat at times
24  and that Terri can be intimidating with finger
25  pointing and banging finger on hand or desk.  Have

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com
6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131
800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# SABRINA S. OVERFIELD

Page 153

1  you ever observed that conduct from Terri?
2      A.  No.
3      Q.  Myra also said that the incident
4  involving Sabrina was exaggerated and that what
5  she heard and/or witnessed did not involve
6  pounding on tables or doors.  Did you ever talk to
7  Myra about what happened?
8      A.  Never.
9      Q.  On the second page here, a little over
10 halfway down, it says my last contact was with
11 Teri Meador.  She describes the incidents as
12 upsetting, not knowing what's going on when the
13 judicial center was shuttered.  Her personal
14 opinion is that Sabrina didn't get what she wanted
15 when Judge Stockard was selected.  She states that
16 she remembers hearing Sabrina, quote, screaming,
17 end quote, and that she could not really hear
18 Judge Johnson's voice when that incident occurred.
19 And you earlier stated you didn't raise your voice
20 at all.  Is that right?
21     A.  No.  I was standing at the doorway which
22 goes into the clerk's office, so they can hear me
23 talking.  That wasn't screaming.
24     Q.  Okay.  But you didn't ever raise your
25 voice above what we're talking here today?

Page 154

1      A.  No.
2      Q.  Teri Meador, which I think we talked
3  about earlier, is Jinx, right?
4      A.  Yes.
5      Q.  Says that when Sabrina is at work she
6  does very little.  She's always in the county
7  attorney's office socializing, shopping online and
8  that she's gone a lot, not a very good work ethic.
9  Did I read that correctly?
10     A.  You did.
11     Q.  Did she ever express that opinion?
12     A.  I'm sorry?
13     Q.  Has she ever expressed that opinion to
14 you?
15     A.  No.
16     Q.  Teri stated that Sabrina has a nickname
17 for most people and referred to Judge Jack as
18 Judge Jackass.  Is that correct?
19     A.  I did say that, yes.
20        (THEREUPON, Overfield Deposition Exhibit
21 No 12 was marked for identification by the
22 reporter.)
23     BY MS. MOCK:
24     Q.  I'm handing you what's been marked as
25 Exhibit No. 12.  Have you seen this document

Page 155

1  before?
2      A.  Never.
3      Q.  I'll give you a chance to look at it.
4  Have you had a chance to review Exhibit No. 12?
5      A.  I did.
6      Q.  Okay.  And this is the first time you've
7  seen this document.  Is that correct?
8      A.  It is.
9      Q.  And what is this document?
10     A.  Judge Jack -- or, excuse me, Judge
11 Johnson's, I guess, description of incidents that
12 happened on January 10th.
13     Q.  Okay.  All right.  And he goes through
14 and talks about some of the conversations that you
15 guys had I guess that you disagreed about during
16 this conversation.  Is that correct?  And I'm not
17 asking you if his description of these
18 conversations is correct or not, but I'm wondering
19 are these the topics that you recall having
20 discussion about?
21     A.  Some of them.
22     Q.  Okay.  Is there anything in here that you
23 think is just out of left field that wasn't even
24 talked about that day?
25     A.  Yes.

Page 156

1      Q.  Okay.  Point me to that.
2      A.  I did not tell him to change his docket.
3  I was making just a statement like trying to
4  communicate with him about how dockets used to be
5  and how they ran and how easier it was.  I did
6  not tell him.  I was saying -- I was suggesting
7  to him.  Because I'd seen how things ran in the
8  past and I experienced it.  Let's go back to a
9  more controlled setting.  I didn't tell him.  The
10 whole conversation about how Judge Jack had gone
11 down to his office and said I was his court
12 reporter and I wasn't going to help with any cases
13 never happened.
14     Q.  Okay.
15     A.  And the part about working in the
16 courtroom for two and a half years and I never
17 helped him, that never happened because Tammy was
18 not there two and a half years.  She was there
19 maybe a year.  And I never told him -- I never
20 even talked to him that I had a vested interest in
21 this.  I never said anything to him about it.  He
22 sat clear on the other side of the room.  I was
23 on the other side of the courtroom.  I never
24 talked to him.
25     Q.  You mean his comment about you having a

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

# SABRINA S. OVERFIELD

Page 157

1 vested interest in who gets the job as judge. Is
2 that what you're referencing at the bottom of the
3 first page?
4     A.  Right.  I never said that.  And how he
5 could tell me that I couldn't be in there, I never
6 had any conversation whatsoever with him about the
7 whole nominating process.  The first conversation
8 I had with him about any of that day was when I
9 stopped at his door.  And this January 8th or 9th,
10 Tammy showing him several messages of phone calls
11 that I'd taken for her, I did that all the time.
12 I don't know what that had to do with any of this
13 from January 10th.  I did it all the time.  And I
14 never had a notebook, I mean, of either one of
15 them.
16     Q.  Okay.  So he says here that he heard from
17 several sources who either have heard or observed
18 Sabrina calling around to the courts to see where
19 Tammy and I are?
20     A.  I never did that.
21     Q.  You never did that?
22     A.  If I would call down to Oswego, that's
23 the only courthouse I would call to see if Tammy
24 and Judge Johnson were there because we had no
25 communications with them.  If someone was needing

Page 158

1 them to first appear somebody or my judge, Judge
2 Stockard, was needing to talk to him about
3 something -- well, this was beforehand he's
4 assuming.  So I would never call down there and
5 ask for them or any other courthouse.  I never did
6 that.
7     Q.  After Ally's investigation and after
8 talking to Todd Thompson -- well, let me just ask
9 you this.  When was the first time you sought out
10 counsel in relation to your employment with
11 District 11?
12     A.  When I started thinking about it really
13 was when we received the notice on May 4th, 2020
14 that they were dismissing the complaint.
15     Q.  Okay.  It was after that that you first
16 sought out representation?
17     A.  Seriously thought out.
18     Q.  Okay.
19         (THEREUPON, Overfield Deposition Exhibit
20 No 13 was marked for identification by the
21 reporter.)
22     BY MS. MOCK:
23     Q.  All right.  Exhibit No. 13, do you
24 recognize this exhibit?
25     A.  Yes.

Page 159

1     Q.  Is this something that you did or that
2 your attorney did?
3     A.  I did.
4     Q.  So you submitted the complaint with the
5 Kansas Human Rights Commission?
6     A.  Yes.
7     Q.  And you responded to their investigative
8 questionnaire?
9     A.  Yes.
10     Q.  Was Mr. Johnson your attorney at that
11 time?
12     A.  I can't recall.  I believe so, yes.  Yes.
13     Q.  And did you file a complaint with the
14 Commission on Judicial Conduct?
15     A.  Repeat that, please.
16     Q.  Did you file a complaint with the
17 Commission on Judicial Conduct?
18     A.  Did I also file the complaint with
19 Judicial Conduct?
20     Q.  Yes.
21     A.  Yes.
22     Q.  Do we have a copy of that?
23     MS. MOE:  Huh-uh.
24     MS. MOCK:  I've never seen it.
25     MR. JOHNSON:  It should have been in our

Page 160

1 initial disclosures.
2     MS. MOCK:  Well, I'm not saying it
3 wasn't.  Let me go off for a second.
4         (THEREUPON, a discussion was had off the
5 record; WHEREUPON, Overfield Deposition Exhibit
6 No 14 was marked for identification by the
7 reporter.)
8     BY MS. MOCK:
9     Q.  Okay.  14.  14 is your complaint to
10 Judicial Qualifications.  Is that correct?
11     A.  Correct.
12     Q.  And the last page is your signature.  Is
13 that correct?
14     A.  Correct.
15     Q.  And the date which was?
16     A.  2/3 of '20.
17     MS. MOCK:  Okay.  And then I'm going to
18 do two more here.
19         (THEREUPON, Overfield Deposition Exhibit
20 No 15 and No 16 were marked for identification by
21 the reporter.)
22     BY MS. MOCK:
23     Q.  Okay.  Exhibit 15, now, this is a letter
24 from Doug Shima to Ally, right, certifying receipt
25 of her complaint that she filed on your behalf,

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## SABRINA S. OVERFIELD

Page 161

1  correct?
2      A.  Correct.
3      Q.  And on -- I think attached to that he has
4  kind of a chart of how these investigations and
5  things work.  Did you receive a similar letter and
6  chart from Mr. Shima in response to your
7  complaint?
8      A.  I received the letter, but I did not
9  receive this.
10      Q.  And, you know, I could be wrong and maybe
11  that wasn't part of it.  It was just the next
12  page in that.  So I can't verify for certain that
13  that -- but you did receive a letter from Mr.
14  Shima?
15      A.  Yes.
16      Q.  All right.  And then Exhibit -- let's
17  see.  What's this one right here.  Exhibit 10,
18  now, that is a letter dated -- what's the date on
19  that one?
20      A.  May 4th.
21      Q.  Okay.  And this is to Ally indicating
22  that they basically didn't find a violation of
23  judicial code in response to your complaint.  Is
24  that correct?
25      A.  Correct.

Page 162

1          (THEREUPON, Overfield Deposition Exhibit
2  No 17 was marked for identification by the
3  reporter.)
4      BY MS. MOCK:
5      Q.  Okay.  And then I'm going to hand you
6  Exhibit 17, and that's a letter to you.  Is that
7  correct?
8      A.  Correct.
9      Q.  And also dated May 4th?
10      A.  Correct.
11      Q.  I'm wondering if these complaint numbers
12  -- are these complaint numbers the same?  Let me
13  see here.  These two.
14      A.  No.
15      Q.  22.  Okay.  All right.  Okay.  I just
16  wanted to verify that.  So they did treat them as
17  separate complaints, because the letter to you is
18  complaint No. 2225, correct?
19      A.  Correct.
20      Q.  And the letter to Ally is complaint 2205?
21      A.  Correct.
22      Q.  Okay.  All right.  And then Exhibit No.
23  16, I don't believe you've seen this letter
24  before, but this is a July 2nd letter from the
25  Commission to Ally regarding complaint No.  2205.

Page 163

1  Do you see that?
2      A.  Yes.
3      Q.  An it says the Commission met June 5th
4  and considered your reconsideration request.  Is
5  that right?
6      A.  Yes.
7      Q.  And basically decided to reaffirm their
8  earlier decision finding no violation of judicial
9  conduct.  Is that correct?
10      A.  Correct.
11          (THEREUPON, Overfield Deposition Exhibit
12  No 18 was marked for identification by the
13  reporter.)
14      BY MS. MOCK:
15      Q.  All right.  Exhibit 18, so this has
16  complaints -- four different complaints against
17  Judge Johnson?
18      A.  Correct.
19      Q.  2205, 2206, 2207 and 2225.  And again,
20  all of these were reviewed, and no finding of
21  violation of the code of judicial conduct,
22  correct?
23      A.  Correct.
24      Q.  All right.  I want to go back to Exhibit
25  No. 13.  On page 5, you state I do know of one

Page 164

1  other woman who has been a victim of Judge Fred
2  Johnson's violent abusive behavior, but she will
3  not come forward due to retaliation with the
4  position she holds in the court system.  Who are
5  you referencing there?
6      A.  That's Darci Wiford.
7      Q.  Okay.  Who you've already told me about,
8  correct?
9      A.  Correct.
10      Q.  All right.
11          (THEREUPON, Overfield Deposition Exhibit
12  No 19 was marked for identification by the
13  reporter.)
14      BY MS. MOCK:
15      Q.  All right.  I'm handing you what's been
16  marked Exhibit No. 19.  Have you seen this
17  document before?
18      A.  Yes.
19      Q.  And what is this document?
20      A.  It's an administrative order signed by
21  Chief Judge Lynch.
22      Q.  Doing what?
23      A.  Rescinding the administrative order of
24  having Fred Johnson work in Oswego.
25          MS. MOCK:  Here, Alan.  I have an extra



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 165

1 copy of that one?
2    MR. JOHNSON:  19.  Thank you.
3    MS. MOCK:  Yes, 19.
4    BY MS. MOCK:
5    **Q.  Did you have conversations with Judge**
6 **Lynch prior to his issuance of this order?**
7    A.  Yes.
8    **Q.  Talk to me about those conversations.**
9    A.  I believe it was just one conversation
10 letting Terri and I know that he didn't have
11 authority to do that, to -- the first one he did.
12 He didn't have authority to do that, so he would
13 be coming back to Parsons.
14    **Q.  Okay.  And this one is dated February**
15 **10th, 2021 beginning March 1, 2021, correct?**
16    A.  Correct.
17    **Q.  Did he tell you how he came to that**
18 **conclusion that he didn't have that authority?**
19    A.  No, he did not.
20    **Q.  All right.  Did he indicate to you any**
21 **other steps that would occur or -- with regard to**
22 **you and interacting with Judge Johnson?**
23    A.  That we could still work from home due to
24 we were also in a pandemic as well, but we could
25 work from home when we would know that he would be

Page 166

1 in Parsons.
2    **Q.  And was that like a set schedule, like he**
3 **was going to be in Oswego on these days of the**
4 **week and Parsons on these days of the week?**
5    A.  Yes.
6    **Q.  Okay.  And what was that set schedule?**
7    A.  I don't recall it now, Terelle --
8    **Q.  Okay.**
9    A.  -- off the top of my head.
10    **Q.  Did the schedule deviate from that or was**
11 **it pretty consistent?**
12    A.  It deviated quite often.
13    **Q.  Okay.  Was there a time then where you**
14 **were forced to interact with Judge Johnson?**
15    A.  No.
16    **Q.  You were still made aware somehow some**
17 **way that he was coming and able to leave?**
18    A.  Yes.
19    **Q.  All right.**
20    A.  Or we were already scheduled to work from
21 home.
22    **Q.  Or you were already scheduled work from**
23 **home.  There was quite a bit of working from home**
24 **after March 2020, correct?**
25    A.  Correct.

Page 167

1    **Q.  Okay.  We all got really good at that,**
2 **didn't we?**
3    A.  Yes.
4    **Q.  All right.  And so did this really alter**
5 **your working environment at all, this being**
6 **Exhibit 19?**
7    A.  It did, yes.
8    **Q.  How?**
9    A.  To the point where we weren't sure if he
10 was just going to show up and Terri and I not be
11 aware of that.  So it made for a very tense
12 situation when we were in the office.
13    **Q.  Okay.  But that never happened?**
14    A.  No.
15    **Q.  All right.  And ultimately then in**
16 **December, you elect to transfer over to the 14th**
17 **Judicial District, correct?**
18    A.  I did.
19    **Q.  Did anything happen between February of**
20 **2021 and December of 2021 that caused you to seek**
21 **out the other position?**
22    A.  Constantly.
23    **Q.  What?**
24    A.  I've mentioned a few with Mac about the
25 machine.  There were meetings that were being

Page 168

1 held.  They would have staff meetings and Terri
2 set those up.  The first couple were just with
3 clerks.  And then it was the judges were involved,
4 so the AA court reporter and the other AA should
5 be involved.  Judge Johnson started taking upon
6 himself when Terri would not send out the Zoom
7 meeting link due to either we weren't going to
8 have a staff meeting or she wasn't prepared yet
9 for one, he would start sending out the Zoom link
10 and leaving me off the e-mails to where I wasn't
11 privy to those staff meetings unless Terri told me
12 about them.
13    **Q.  Which she did every time, right?**
14    A.  Every time, yes.  But he left me off of
15 every single situation with the office aspect of
16 calendars, of scheduling jury trials.  They even
17 held a meeting, Teri Meador, the county attorney,
18 Judge Stockard, Judge Jack, Myra Freeman, due to
19 scheduling.
20    **Q.  Judge Johnson you mean?**
21    A.  Did I say Judge Jack.
22    **Q.  You did.**
23    A.  I'm sorry.
24    **Q.  That's okay.  I've done it several times**
25 **today.**



5111 SW 21st Street    6420 W. 95th Street    800 E. 1st Street
Topeka, KS 66604    Suite 101    Suite 305
785-273-3063    Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com    913-383-1131    316-201-1612

## SABRINA S. OVERFIELD

Page 169

1    A.  So I was left off that meeting and I'm
2  the one that does the scheduling with Judge
3  Stockard, and I had no information about this
4  meeting as even occurring and it was occurring
5  with the county attorney's office.
6    Q.  Sorry.
7    A.  So incidents like that, just constant.
8  And then the last straw was when I asked about the
9  machine.  And then they were in the process of
10  getting me a machine and I went in to work one
11  day -- and there was very little communication
12  with me to the point where I walk in my office
13  one day and there's a machine sitting there and I
14  had no idea I was receiving it.  And then when I
15  did give my resignation for my transfer, my new
16  chief judge purchased my new machine for me from
17  Labette because they would have no use for it, and
18  I received a case with it.  Well, I hadn't
19  received the case.  And the end of December -- my
20  last day was December 17th.  The end of December,
21  I went over to Parsons to have lunch with Terri
22  Thurman because -- for her retirement, and I'd
23  asked Teri Meador if she knew of any package that
24  had came to me, and she says, yes.  Judge Johnson
25  took it and put it in his office.  And there was

Page 170

1  a note on it that said do not open per Mac.
2  Well, it was my property.  It was my case to my
3  machine and no one had told me, no one conversed
4  with me they had it.
5    Q.  How did you get it?
6    A.  Teri Meador went in and got it from Judge
7  Johnson's office.
8    Q.  Okay.  And gave it to you?
9    A.  Yes.
10    (THEREUPON, Overfield Deposition Exhibit
11  No 20 was marked for identification by the
12  reporter.)
13    BY MS. MOCK:
14    Q.  Okay.  Exhibit 20.  This was in your
15  production in response to discovery.  What is this
16  document?
17    A.  It was an incident that I had with my new
18  judge where the communication had pretty much
19  stopped with having any guidance.  Because the
20  court reporter, the official court reporter, is
21  like the right hand to her judge, and Judge
22  Stockard and I, I didn't feel like we were having
23  that.  And I documented this to where Myra
24  Freeman, Judge Johnson's AA, was contacting him
25  directly, and that's not how the communication

Page 171

1  worked with the court reporter and AAs of the two
2  judges.  And I didn't know he had a second phone
3  for work.
4    Q.  So you authored this?
5    A.  Yes.
6    Q.  And you're complaining that Judge --
7  Freeman is going behind your back and talking to
8  your judge.  Is that what this is?
9    A.  No.  Myra Freeman, Judge Johnson's AA,
10  not that she was going behind my back, just that
11  she was going through Judge Stockard rather than
12  me to set his calendar, and that's not how we had
13  done it in the past.  And I was confused why that
14  was happening.
15    Q.  Did you give this note to anybody?
16    A.  No.  I documented it for myself.
17    Q.  Okay.  So this isn't a complaint you
18  handed off to Mac Young or anything like that?
19    A.  No.  No.
20    Q.  All right.
21    (THEREUPON, Overfield Deposition Exhibit
22  No 21 was marked for identification by the
23  reporter.)
24    BY MS. MOCK:
25    Q.  Okay.  Exhibit No. 21, this is an e-mail

Page 172

1  string that you provided in response to discovery
2  requests?
3    A.  Um-hum.
4    Q.  And these are just e-mails between you
5  and Terri Thurman, correct?
6    A.  Yes.
7    Q.  Okay.  On the second page you write I
8  just am getting aggravated at Stockard more and
9  more.  I asked him yesterday for some case notes
10  on someone he saw Friday and haven't received
11  them.  Went into Odessey just now and there they
12  were in the file of the defendant, exclamation
13  point, exclamation point, exclamation point.  His
14  communication skills suck, all caps, exclamation
15  point, exclamation point, exclamation point,
16  exclamation point, exclamation point.
17    A.  I don't have that.
18    Q.  You don't have that?
19    A.  No.
20    MR. JOHNSON:  What's the Bates stamp
21  number?
22    MS. MOCK:  Bates No. 42 and 43.
23    MS. MOE:  Hold on.  They're on the
24  bottom.  I'm sorry.
25    MS. MOCK:  Wrong order.  My apologies.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# SABRINA S. OVERFIELD

Page 173

1 Let me see if I can get it.
2    BY MS. MOCK:
3    Q.  Okay.  I'm handing you a new 21.  Okay.
4 Okay.  You should have plaintiff Bates Nos. 42, 43
5 and 44 on the document in front of you.  Is that
6 what you have?
7    A.  Yes.
8    Q.  All right.  I was reading to you off of
9 43, Bates No. 43.
10    A.  Yes.
11    Q.  So you were frustrated with Stockard's
12 communication skills.  That's fair to say?
13    A.  Very.
14    Q.  And is this something that you attribute
15 to discrimination based upon your gender and age?
16    A.  No.
17    Q.  Do you feel like he treated you poorly?
18    A.  No.
19    Q.  All right.  At the top of this e-mail,
20 it's a response from Terri.  And it says D03
21 didn't come to Parsons today.  Unknown about
22 tomorrow.  Ladies are frustrated both in office.
23 Sent one home and told the other to stay home
24 until we get a schedule.  What's D03?
25    A.  That would be Judge Johnson.

Page 174

1    Q.  What does that mean?
2    A.  District Judge No. 3.  They're assigned.
3 He was District Judge No. 3 and Stockard was DO
4 No. 6.
5    Q.  Is there some reason you referred to him
6 as D03?
7    A.  I didn't, Terri did.  That's Terri's e-
8 mail.
9    Q.  Right.  But you use it in the response?
10    A.  Not necessarily.  We did that even -- D03
11 and D06 we wrote on things because sometimes it
12 was shorter.  That's how we knew them.
13    Q.  So your e-mail to her March 9, 2021, you
14 say I'm so tired of D03 and his games.  A little
15 communication and a schedule is not too much to
16 ask.  I think we need to let Mac know.  What are
17 your thoughts on that, question mark.  I made a
18 note about Friday and Myra's shenanigans?
19    A.  I don't have that, again, Terelle.
20    Q.  It's the first page in that exhibit?
21    A.  42?
22    Q.  Um-hum.  It's the middle paragraph in the
23 middle of the page.
24    A.  Okay.  Yes.  Now, I see it.
25    Q.  So I'm wondering this note.  I made a

Page 175

1 note about Friday and Myra's shenanigans.  What
2 note is that in reference to?
3    A.  I have no idea.
4    Q.  You wrote that, correct?
5    A.  Correct.  It is this that I've sent you,
6 the March 5th, 2021 when she was communicating --
7 communicating with Judge Stockard and not myself?
8    Q.  Okay.
9    A.  That's what I meant by her shenanigans.
10    Q.  Okay.  All right.
11    (THEREUPON, Overfield Deposition Exhibit
12 No 22 was marked for identification by the
13 reporter.)
14    BY MS. MOCK:
15    Q.  Okay.  Exhibit 22 is plaintiff Bates No.
16 45 and 46.  All right.  So this is a e-mail that
17 you provided in response to discovery, and I'm not
18 quite sure what it shows.  Does it show you not
19 being included in something that you should have
20 been included in?
21    A.  These are the staff meetings that I
22 wasn't included in but every other staff member
23 was, and Terri would forward them on to me.
24    Q.  Okay.  So March 24th, 2021, March 10th,
25 2021.  Who is Lori Davis?

Page 176

1    A.  She was the clerk in Oswego.
2    Q.  Okay.
3    (THEREUPON, Overfield Deposition Exhibit
4 No 23 was marked for identification by the
5 reporter.)
6    BY MS. MOCK:
7    Q.  All right.  Exhibit 23.  Okay.  This is a
8 communication to -- from you regarding your last
9 day.  Is that correct?
10    A.  This is from Mac Young to me.
11    Q.  In response to your resignation letter?
12    A.  Yes.
13    Q.  And then you write at the bottom.  Will
14 you read what you wrote into the record, please?
15    A.  Never in the history of me working for
16 the 11th Judicial District had an employee been
17 treated with this procedure of leaving.  Terri
18 Thurman and myself were the only ones.
19    Q.  Okay.  What procedure are you talking
20 about?
21    A.  That he was coming over to check us out
22 to make sure that the building keys, our computers
23 and everything were intact.
24    Q.  Okay.  And so who do you recall leaving
25 that didn't have this done?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 177

1  A.  Everyone before us --

2  Q.  Can you give --

3  A.  -- and everyone after us.

4  Q.  Okay.  Can you tell me who?  Can you give

5  me some names?

6  A.  Vickie Barrett, the court reporter, Mary

7  Long, a clerk.

8  Q.  I'm going to pause you for a second.

9  With Vickie Barrett, was Mac Young in his position

10  at that point in time?

11  A.  Yes.

12  Q.  Okay.  Keep going.

13  A.  The judges, Judge Jack, Judge Fleming.

14  And then shortly after Terri and I left, Terry

15  Cizerle in Columbus was not treated like that.

16  Q.  Okay.  So what -- how were their keys and

17  such collected?

18  A.  He told them to either leave them in

19  their desk or they gave them to Terri, my clerk.

20  But he never came over and checked their office

21  and made sure everything was intact.

22  Q.  Okay.  So it was his physical presence

23  that was different?

24  A.  Yes.

25  Q.  Okay.

Page 178

1  (THEREUPON, Overfield Deposition Exhibit

2  No 24 was marked for identification by the

3  reporter; WHEREUPON, a recess was taken.)

4  BY MS. MOCK:

5  Q.  All right.  Exhibit 24.  All right.  So

6  this starts with plaintiffs 34 at the bottom, the

7  Bates number, correct?

8  A.  Yes.

9  Q.  Okay.  I want you to skip to plaintiffs

10  37.  So this is an e-mail that you -- again, an

11  exchange between you and Terri, and this would be

12  in February of 2021.  And I guess I have

13  questions.  You say after reading this e-mail to

14  Mac again, I think it sounds like they all involve

15  one thing right after the other, but I have found

16  with Mac I get a better response if I do a few at

17  a time.  Pick the most important to you and go

18  from there.  But you have worked directly with him

19  longer and I'm only suggesting for you.  Is this

20  -- so she's sending you a letter that she -- or

21  an e-mail that she intends to send to Mac.  Is

22  that's what happening here?

23  A.  Yes.

24  Q.  And you're giving her advice on how to

25  best approach Mac?

Page 179

1  A.  Yes.

2  Q.  Okay.  And then you say I keep thinking

3  about what he's up to while he's there this

4  morning.  And you know his little bodyguard is

5  right there with him.  Who is -- who is the -- is

6  that Judge Johnson or is that Mac?

7  A.  No.  That's the actual security guard

8  that is Judge Johnson's best friend.

9  Q.  Okay.  So he in this sentence is Judge

10  Johnson?

11  A.  Yes.

12  Q.  And his little body guard is who?

13  A.  The security guard for the courthouse is

14  Judge Johnson's best friend, one of them.

15  Q.  Who is that?

16  A.  His name is Tom Bringle.

17  Q.  Tom what?

18  A.  Bringle, B R I N G L E.

19  Q.  Okay.  So this was a time when he came

20  into the office, you guys learned he was coming

21  and you left.  Is that -- is that what happened

22  or you knew before and you didn't go in that

23  morning?

24  A.  It's got to be one of those two, but I

25  can't really recall which one it was.

Page 180

1  Q.  Okay.  All right.

2  A.  Sorry.

3  Q.  You say thank heavens we are not.  I'm

4  assuming you mean thank heavens we're not there?

5  A.  Yes.

6  Q.  I also thought if he is stupid enough to

7  schedule things when they are days he is not

8  supposed to be in Parsons and we are there, just

9  let him try something.  So what are you suggesting

10  here?

11  A.  He pushed and pushed Terri and I.  Like

12  there would be days that he was not supposed to be

13  there, and all of a sudden he'd change his mind

14  and be coming to Parsons.  And if he wanted -- I

15  mean it has been instilled in me that he's not

16  going to give up trying retaliation with me and to

17  torment me.  So I was telling her just let him to

18  keep pushing and I'll just file another complaint.

19  Somebody's going to listen eventually.

20  Q.  So what did he do that was retaliatory in

21  nature?

22  A.  Leaving me off e-mails, talking directly

23  about us that we had filed this complaint to other

24  people.

25  Q.  Like who is that?



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# SABRINA S. OVERFIELD

Page 181

1    A.   Shortly after we filed, there was a
2  county commission meeting.  Stephen Jones was
3  present for that, the county attorney, and one of
4  county commissioners said if Sabrina and Terri
5  would just quit, we wouldn't have this problem.
6  So how would we know -- he know what problem
7  unless Judge Johnson had not informed them.
8    Q.   Would that have to do with having to move
9  Judge Johnson to Oswego?
10   A.   Yes.
11   Q.   Could the chief judge have informed them
12 that we're having to do this?
13   A.   No.
14   Q.   No?
15   A.   It came out directly that the chief judge
16 did not tell them why we were moving him.
17   Q.   So Steve Jones told you that he had heard
18 another county commissioner say that if Sabrina
19 and Terri would just stop, we wouldn't have to do
20 this?
21   A.   Would just quit.
22   Q.   Quit.  Okay.  And from that you conclude
23 that Judge Johnson told the commissioners that you
24 were the reason why he had to move to Oswego?
25   A.   Yes.

Page 182

1    Q.   Okay.  And what else?
2    A.   Attorneys knew as well that were in front
3  of him.
4    Q.   And how do you conclude that?
5    A.   Sara Beezley and Sarah Mills were asking
6  for him to be recused from cases.
7    Q.   And they had to provide a basis?
8    A.   Yes.
9    Q.   So -- and that basis was you?
10   A.   Yes.
11   Q.   So he wasn't telling the other attorneys.
12 Sara Beezley and Sarah Mills were.
13   A.   I can't actually say that they were
14 telling them, but it was in --
15   Q.   Well, they had to file a motion?
16   A.   -- motions.  It was in motions.
17   Q.   Which they authored?
18   A.   Yes.
19   Q.   What else?
20   A.   I can't think of anything else.
21   Q.   Can you pull out your Interrogatory
22 responses out of that stack?  I'm going to -- I'll
23 give you a number if I can.
24   A.   3?
25      MR. JOHNSON:  Yes.

Page 183

1  BY MS. MOCK:
2    Q.   Okay.  And I think if you go back to we
3  were on question 5.  Here they were.  Way over
4  here.  Who knew.  Okay.  All right.  No. 7, it
5  says with respect each incident of alleged
6  retaliatory acts by defendant about which you
7  complain state the following.  Okay.  Asks you to
8  describe this.  Okay.  In here you have yearly job
9  evaluation was withheld for two full years for
10 2020 and 2021.  And then No. 2, after I filed a
11 complaint, I was left off monthly Zoom -- monthly
12 staff Zoom meetings and numerous meetings
13 concerning court proceedings and hearings and all
14 communications with staff unless through District
15 Court Clerk Terri Thurman.  And No. 3, after
16 decision was made regarding my complaint, Allyson
17 Christman, chief HR officer for the State of
18 Kansas, never communicated with me again nor was
19 the hostile working environment ever resolved by
20 the state.  Did I read those correctly?
21   A.   Yes.
22   Q.   Is that an accurate estimation of your
23 claim of retaliation?
24   A.   Yes.
25   Q.   All right.  So as to No. 1, your yearly

Page 184

1  job evaluation being withheld, let's look at
2  those.
3      (THEREUPON, Overfield Deposition Exhibit
4  No 25 was marked for identification by the
5  reporter.)
6  BY MS. MOCK:
7    Q.   Okay.  I'm going to hand you what was
8  marked as Exhibit 25.  Okay.  And there's several
9  here, so but let's start at page 1 of 5.  And
10 unfortunately, these are not Bates numbered.  But
11 the first page has an effective date of July 23rd,
12 2019.  Do you see where it says that at the top?
13   A.   Yes.
14   Q.   Left hand corner?  And this is for the
15 rating period of 6/23/2018 to 6/23/2019, correct?
16   A.   Correct.
17   Q.   So this one's not delayed in any way,
18 correct?
19   A.   Correct.
20   Q.   All right.  So let's flip past this one,
21 and we'll just stop at No. -- page 4 of 5 here.
22 Your overall performance being beyond
23 expectations, correct?
24   A.   Correct.
25   Q.   And then the next page, 5 of 5, your

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604               Suite 101                    Suite 305
785-273-3063              Overland Park, KS 66212        Wichita, KS 67202
www.appinobiggs.com          913-383-1131                316-201-1612

Page 185

1 signature on 5/17/19, correct?
2    A. Correct.
3    Q. All right. Okay. The next eval,
4 effective date is 7/23/2020, and the rating period
5 is 6/23/2019 to 6/23/2020. Did I read that
6 correctly?
7    A. Correct.
8    Q. All right. Now, if we go to the last
9 page, page 5 of 5, we see that this was signed by
10 you and received by you on 7/9/21. Did I read
11 that correctly?
12    A. Correct.
13    Q. So you effectively received this
14 evaluation a year after the evaluation period. Is
15 that correct?
16    A. Correct.
17    Q. Is that what you're talking about in your
18 claim of retaliation?
19    A. I believe so. There's an evaluation
20 missing I believe here.
21    Q. Okay. What's missing?
22    A. This one that you have here was done by
23 Chief Judge Fleming, but there should be one that
24 Mac did before her that was less than excellent
25 that was a year late that I did not agree with.

Page 186

1 And so then Judge Fleming reevaluated my
2 performances. And you don't have the one Mac did
3 attached.
4       (THEREUPON, Overfield Deposition Exhibit
5 No 26 was marked for identification by the
6 reporter.)
7 BY MS. MOCK:
8    Q. All right. I'm going to hand you what's
9 been marked Exhibit 26. Is this what you're
10 referencing?
11    A. It is.
12    Q. All right. So what you provided was
13 Exhibit 26. What's in your file with the state is
14 Exhibit 25?
15    A. Correct.
16    Q. Okay. So explain to me what Exhibit 26
17 is?
18    A. After continuously asking Mac Young when
19 my evaluation would be completed for two years
20 because I had not received one for two years, he
21 said Chief Judge Lynch would be doing my
22 evaluation. Well, that happened for six months.
23 And then finally Mac said, Sabrina, how do you
24 feel about me doing your evaluation. I said,
25 well, they're two years past due. I need my

Page 187

1 evaluations. I'd like my evaluations. So whoever
2 needs to do them, I guess do them. And so he did
3 this one, and that's why I did not agree with
4 that.
5    Q. Okay. So did you tell Judge Fleming that
6 you didn't agree with Mac's evaluation?
7    A. I did.
8    Q. And then she redid it?
9    A. Yes.
10    Q. Okay. And if we compare the two, was it
11 the -- the overall performance rating for both was
12 beyond expectations, correct?
13    A. Not on Mr. Young's it wasn't.
14    Q. Did he sign two of them?
15    A. He signs them as the court administrator.
16 So he signs all of them.
17    Q. Okay. Okay. So he put successful on
18 his?
19    A. Correct.
20    Q. And you signed I do not agree, Sabrina
21 Overfield. And so they took it back. They did a
22 new one that was done by Fleming which you agreed
23 with?
24    A. Correct.
25    Q. And you also received your evaluation for

Page 188

1 the rating period of 6/23/2020 to 6/23/2021 at
2 this same time. Is that correct?
3    A. Correct.
4    Q. So there was only one evaluation that was
5 a year late. The 2021 one was done at the
6 correct time, right?
7    A. Correct.
8    Q. Okay. I just wanted to make that clear.
9 And then also included in this exhibit is your
10 current evaluation by the 14th Judicial District,
11 correct?
12    A. Correct.
13    Q. And that one was ranked successful and
14 you didn't dispute anything about that, correct?
15    A. Judge Gettler and I had a discussion over
16 it, but I did not dispute it.
17    Q. Okay.
18    A. No.
19    Q. So when it says yearly job evaluation was
20 withheld for two full years, for 2020 and 2021, it
21 would be more accurate to say the yearly job
22 evaluation for 2020 was withheld for an additional
23 year, correct?
24    A. Correct.
25    Q. Okay. And then if we go back to your

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 189

1 Interrogatories, No. 3 says Allyson Christman,
2 Chief HR Officer for the State of Kansas never
3 communicated with me again, nor was the hostile
4 working environment ever resolved by the state.
5 So him moving to Oswego didn't resolve the hostile
6 work environment?
7    A.  No.
8    Q.  How is that?  Explain that to me.
9    A.  Terri and I were always looking over our
10 shoulder whether or not he would show up, when he
11 would show up.  It never changed.  And then all
12 the retaliation acts that he had caused.  And Myra
13 Freeman who was the clerk, he had promised her the
14 AA position with him and to go to court reporter
15 school.  So, of course, she was going to do what
16 he said.  And Teri Meador is now the clerk since
17 Terri's retired.
18    Q.  And these are retaliation acts against
19 you?
20    A.  They're not retaliation acts, but Myra
21 moving into his office, she was there when the
22 incident happened with Judge Johnson, when mine
23 happened on January 10th and the 13th, and so was
24 Teri Meador.  And just not communicating with us
25 about court procedures was a big -- it's tough to

Page 190

1 run a courthouse without communication with all
2 staff, and we did not receive communication from
3 them.
4    Q.  Did Judge Johnson ever say anything to
5 you about your age?
6    A.  No.
7    Q.  Did he ever say anything to you about
8 your gender?
9    A.  I can't recall.
10    Q.  Well, this is the only chance I get to
11 ask that question.  Give it a minute.
12    A.  In not so many words he would, with Shaun
13 being a male court reporter and me being a female,
14 in not so many words he would imply some things.
15    Q.  You have to explain to me what you mean
16 by that.
17    A.  Well, I don't think he's ever called
18 Shaun lazy.
19    Q.  Has Shaun ever worked in Parsons?
20    A.  Yes.
21    Q.  He was stationed there?
22    A.  No.  But he will cover when -- when we
23 needed coverage on jury trials and other hearings,
24 he has covered.  I'm sure he's covering a lot more
25 there now.

Page 191

1    Q.  Okay.  So he's never called Shaun lazy?
2    A.  Not that I'm aware of.  I don't think
3 he's ever called him -- I don't think he's ever
4 said he's not a very good court reporter and that
5 he didn't know what he was doing, those were all
6 directed towards me, and that I was a liar.
7    Q.  Did he say why he believed you were a
8 liar?
9    A.  No.
10    Q.  He didn't --
11    A.  Just what he has written, what I've seen
12 him write, that's all that I can go by in his
13 statement that happened on January 10th.
14    Q.  So you're not inferring that he's called
15 you a liar by those statements.  You're saying
16 he's verbally called you a liar, correct?
17    A.  Yes.  During that interaction with him on
18 the 10th --
19    Q.  Okay.
20    A.  -- he told me, Sabrina, you're lying.
21 That's not -- you sit right there on that couch.
22    Q.  Okay.
23    A.  With this incident with Judge Jack that I
24 have no idea what he's talking about.
25    Q.  Oh.  So you did talk about that on the

Page 192

1 10th.  Because you testified earlier that that
2 interaction didn't happen.
3    A.  That conversation I don't remember
4 happening.  Him saying that, I don't remember
5 saying that on the January 10th.  I don't remember
6 him saying that.
7    Q.  Yes, but you just said -- I'm sorry.  I
8 thought you just said that was the basis for him
9 calling you a liar?
10    A.  Well, what I read, he said I called -- he
11 called me a liar by what I read.
12    Q.  Did he speak the words out of his mouth
13 on January 10th, Sabrina, you're a liar?
14    A.  No.
15    Q.  Okay.
16    A.  Sorry.
17    Q.  Did he speak the words out of his mouth
18 January 10th, Sabrina, you're lying?
19    A.  Not that I recall, no.
20    Q.  Okay.  Okay.  So you're saying that he's
21 called you a liar because of what you read in the
22 exhibit I provided you here today?
23    A.  Yes, ma'am.
24    Q.  Okay.  And that's the first time you'd
25 ever seen that document?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 193

A. Yes, ma'am.

Q. Okay. So prior to today, you wouldn't have alleged that he called you a liar?

A. Right.

Q. Okay.

A. Correct.

Q. All right. You're alleging damages associated with this case, and in your Rule 26 Disclosures, you say past economic loss of $25,000. Where did you come up with that figure?

A. Where are we on this?

Q. Oh, I'm sorry. I'm in Rule 26 and I'll mark it. It's not a problem.

MS. MOCK: We're up to 27. I might set a record.

(THEREUPON, Overfield Deposition Exhibit No 27 was marked for identification by the reporter.)

BY MS. MOCK:

Q. All right. Exhibit No. 27 are Plaintiff's Rule 26 Disclosures. If you look on page 2, Section C, past economic loss, $25,000?

A. That's transcript money.

Q. How do you come up with that figure?

A. By comparing it to before the pandemic,

Page 194

my tax statement in 2016.

Q. So it's comparing your 2016 --

A. Yes.

Q. -- tax statement?

A. That's when I was working with two judges, Judge Fleming and Judge Jack constantly, and then 2018 when Judge Fleming retires, Judge Johnson comes on. Well, he gains a court reporter, so I didn't lose any money there. But during the pandemic, I did lose money due to the pandemic. But also, now that I'm not working with Judge Johnson come January 2020, I've lost that money, the transcript money.

Q. And you wouldn't have had that money when he was working with Terri?

A. Tammy.

Q. Tammy?

A. Right, I would not, correct.

Q. At any point in time, that position would be filled and you wouldn't have that money, correct?

A. If the position was filled, no, I would not.

Q. And obviously, the pandemic cut down on court cases and transcripts significantly, did it

Page 195

not?

A. Correct.

Q. Okay. So, again, this is a comparison between your 2016?

A. Correct.

Q. And your 2021?

A. Correct.

Q. Have you provided your 2017, 2018, 2019, and 2020 tax statements?

A. No.

MR. JOHNSON: But we will.

MS. MOCK: Okay.

(THEREUPON, Overfield Deposition Exhibit No 28 was marked for identification by the reporter.)

BY MS. MOCK:

Q. Exhibit 28, this is a document that you provided in response to our discovery request. What is this document?

A. This came out of my employee handbook on policy prohibiting sexual and other workplace harassment.

Q. Okay. And is this your highlighting here?

A. Yes.

Page 196

Q. Okay. So you filed the complaint, correct?

A. Correct.

Q. That complaint was investigated, correct?

A. Correct.

Q. And you were provided a letter with a conclusion of that complaint?

A. Correct.

Q. And you were provided an opportunity to grieve or appeal that complaint, correct?

A. Correct.

Q. That you did not take?

A. Correct.

Q. So is there anything in this policy that the state didn't do that they were supposed to do?

A. Yes.

Q. What?

A. I was still working in a hostile working environment.

Q. Okay. And as far as your damages from this, I think you also provided a bill or a receipt.

(THEREUPON, Overfield Deposition Exhibit No 29 was marked for identification by the reporter.)

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 197

BY MS. MOCK:

Q.  You were asked to provide documentation regarding out-of-pocket expenses incurred, and this is a document that you provided in response to that question.  What is this document, Exhibit No. 29?

A.  It's a medical statement, bill.

Q.  For what?

A.  Well, the day after the last incident with Judge Johnson, I went to the doctor due to not sleeping, not eating and visited with my doctor.

Q.  And your doctor is?

A.  Was Kathryn Cornell, a nurse practitioner.

Q.  Okay.  And did you receive any treatment?

A.  I did.

Q.  What treatment did you receive?

A.  She gave me a prescription and asked me to stay in contact with her.

Q.  What was the prescription for?

A.  Oh, gosh.  I don't recall the name of it, but it was a sleep sedative.

Q.  Did you use the prescription?

A.  I did.

Page 198

Q.  Until it was gone?

A.  Yes.

Q.  Did you get it refilled?

A.  No, ma'am.  COVID hit.

Q.  What does that mean?

A.  Well, COVID hit and I have elderly parents that I take care of, and I dealt with it on my own.  So I didn't go back to the doctor for it.  This was the only time I went to the doctor for this situation.

Q.  When COVID hit, the courthouse was closed for a period of time, correct?

A.  Correct.

Q.  How long was that?

A.  We still went in but the courthouse was closed?

Q.  Okay.  Did you go in -- I mean was there -- there was probably a period of time where you worked only from home, correct?

A.  Correct, probably a month.

Q.  Okay.  And then you might go in from time to time?

A.  Correct.

Q.  Was there a schedule?

A.  Yes.

Page 199

Q.  What was the schedule?

A.  I went in three -- two to three days a week.

Q.  What were those days, same every week?

A.  No, it varied.  Varied.

Q.  And how would you determine what days you would go in and what days you would stay home?

A.  If Judge Stockard needed me, I would go in if there were hearings that I needed to cover by Zoom.

Q.  You would go in?

A.  Some days, yes.

Q.  You could cover those hearings from home, though, right?

A.  Some of those, yes.

Q.  Did you ever follow up with any healthcare professional regarding your sleep or any type of mental health issue?

A.  No.

Q.  I have another question on your Interrogatories if you wouldn't mind pulling those back out.  On No. 9 on page 4, it asked you to describe employment held by you since separation from employment.  And your response here states I'm still employed by the State of Kansas, but I

Page 200

was transferred to the 14th Judicial District.  And I think we've established by testimony today that you requested that transfer and applied for that transfer?

A.  Correct.

Q.  You didn't -- you weren't involuntarily transferred, correct?

A.  No.

Q.  Did that make sense?  It didn't, did it?  Were you involuntarily transferred?

A.  No.

Q.  Thank you.  Oh, did you record your interviews with Ally Christman?

A.  I did.

Q.  Do you have those recordings?

A.  Not on me, no.  One was only recorded halfway.

Q.  Was -- did you record two conversations with Ally?

A.  One and a half.

Q.  All right.  And you have those still?

A.  I believe so, yes.

Q.  Can you provide those to Mr. Johnson for me?

A.  I have already, but I will again.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 201

1    MR. JOHNSON:  I believe we produced those
2  to you.
3    MS. MOCK:  My handy dandy associate says
4  no.
5    MR. JOHNSON:  Okay.  We'll be glad --
6    MS. MOE:  We only got the giant pdf with
7  everything Bates together.  There was no -- if
8  there was an attachment of a recording, it didn't
9  come threw.
10    MR. JOHNSON:  Okay.
11    MS. MOE:  So sorry about that.
12    MR. JOHNSON:  Will do.
13    MS. MOE:  Thank you.
14    MR. JOHNSON:  That was my fault.  You
15  guys want to take a break and visit?
16    MS. MOCK:  No, I don't want to take a
17  break.  I want to be done.
18  BY MS. MOCK:
19    Q.  Did you ever talk to Ally Christman again
20  after January 16th?
21    A.  Not that I'm aware of.
22    MS. MOCK:  And, Alan, did you get the
23  notes?
24    MR. JOHNSON:  Yes.
25    MS. MOCK:  Okay.  Let's just take a quick

Page 202

1  break.
2    MR. JOHNSON:  Let's take a break.
3    (THEREUPON, a recess was taken;
4  WHEREUPON, Overfield Deposition Exhibit No 30 was
5  marked for identification by the reporter.)
6  BY MS. MOCK:
7    Q.  All right.  We've marked here as Exhibit
8  No. 30 a copy of your notebook that you brought
9  here today.  And if it's okay with you I'm going
10  to look at the marked exhibit and you can look at
11  your notebook.  Okay?
12    A.  Okay.
13    Q.  All right.  So this first page, the
14  corner, does that say Sara?  Sara - comfortable
15  reaching out to judges - yes, absolutely?  What is
16  that about?
17    A.  Okay.  You see where Shane Adamson's name
18  is --
19    Q.  Yes.
20    A.  -- and then it's underlined really well,
21  this was his interview.  And if you see Sara
22  there, that is the nominating committee who asked
23  the question and his response?
24    Q.  Okay.  I gotcha.
25    A.  That's what all those are.

Page 203

1    Q.  So where it says Jim Cook, he was on the
2  -- he was on the commission.  He asked a question
3  regarding issues with other attorneys?
4    A.  Yes.
5    Q.  Fair?  Okay.
6    A.  Fair.
7    Q.  All right.  Okay.  The second page deals
8  with another applicant?
9    A.  Yes.
10    Q.  Oh, you indicated this first one Shane...
11    A.  Adamson.
12    Q.  Was he the third candidate that the
13  nominating commission selected to go up to Judge
14  -- to Governor Kelly?
15    A.  Yes.
16    Q.  Okay.  Thanks.  So then the second page
17  is notes about a Meredith Goodbrick?
18    A.  Frederick.
19    Q.  Frederick.  Okay.  And the next one
20  Nathan Coleman?
21    A.  Yes.
22    Q.  The next one Stephen Jones?
23    A.  Yes.
24    Q.  Valorie Lablanc?
25    A.  Yes.

Page 204

1    Q.  Samuel Marsh?
2    A.  Yes.
3    Q.  You have really written over several
4  times here does he rely on Lori.  Yes, and it
5  says I do.  Is that right?
6    A.  Yes.  Lori is his -- he was a magistrate
7  judge in Columbus.  Lori was his AA.  So he said,
8  yes, he relied on her a lot.
9    Q.  Okay.  Is that why you emphasized that
10  word in your notes?
11    A.  Yes, I do.  Yes.
12    Q.  Okay.  All right.  John?
13    A.  Mazurek.
14    Q.  Mazurek.  Can you spell that?
15    A.  M A Z U R E K.
16    Q.  Steve Stockard?
17    A.  Yes.
18    Q.  Okay.  What's the next one?
19    A.  I'm going to say it and spell it, Terro,
20  T E R R O, I'm just spelling it because I'll
21  mispronounce it, T E C C H I O.
22    Q.  Okay.  The next page on the top, it's
23  kind of cut off at the very top.  What does the
24  very top say, up here, above the margin -- in the
25  margin?



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 205

1   A. Where is that?
2   Q. Let me see. Did we miss a page?
3   A. Yes, I think so.
4   Q. Okay. No, this is right?
5   A. Is that the same one.
6   Q. Um-hum.
7   A. Okay. Told about myself.
8   Q. Okay.
9   A. And I don't know what this is from.
10  Q. Okay. So at the top it says told about
11  myself. 8 o'clock a.m. 9:28 a.m. Mac
12  underlined. Friday call?
13  A. Okay. This was more about Allyson's
14  conference with her, the first conversation. It
15  went from 8 to 9:28, and I started off by telling
16  about myself. And Mac, the Friday call, that he
17  just listened, not explaining and we will figure
18  this out. Just try to relax. I'm sorry, Sabrina.
19  And that was not from Mac. That was from, you
20  know, my feelings that I was telling Mac.
21  Q. Before January 10th, 2020, had Judge
22  Johnson or anybody with Mac Young or anybody else
23  ever come and talk to you guys about trying to get
24  along better in the office?
25  A. Not -- I'm trying to think maybe a month

Page 206

1   before that, maybe it was a week, I can't recall
2   now because this has been three years ago, Mac
3   came into my office one day and asked me how
4   things were going because I was in transition
5   between Judge Jack and the new judge. And I said
6   I really hope that when we find another judge that
7   we can get back to the wonderful communication we
8   had before back here. I really want that. And
9   Mac agreed that's what we need for this ship to
10  run a little better. And that was the only time
11  I remember him coming over and talking to me about
12  it.
13  Q. Did Judge Johnson ever say anything to
14  you about communication, trying to get along
15  better, anything like that?
16  A. Never.
17  Q. Never had any conversations with him
18  about your own work performance?
19  A. No.
20  Q. Okay. And then it says Monday's call.
21  More frustrated. He was dealing with this
22  situation to begin with. Who's more frustrated.
23  Is Mac more frustrated or you're more frustrated?
24  A. Mac is.
25  Q. Okay. Protecting Judge Johnson more than

Page 207

1   helping us, is that out?
2   A. Helping us out, yes.
3   Q. Seeking guidance and protection. It
4   wouldn't happen?
5   A. Again and again and again.
6   Q. T O?
7   A. I don't know why I wrote T O.
8   Q. Okay. So this is what you're relaying to
9   Ally?
10  A. This is -- no. This is actually just me
11  what I'm telling myself. Like a little journal.
12  I had jotted this down. It's probably something
13  you really didn't need.
14  Q. I thought when we started looking at this
15  sheet of paper you had the times up here, 8
16  o'clock to 9:28 a.m.?
17  A. For my own personal -- we started the
18  conversation at 8 o'clock and Ally finished
19  talking with me at 9:28.
20  Q. And are these notes about what you told
21  Ally during that time?
22  A. This possibly, yes. But it's a note that
23  I felt I wanted to write how I felt after these
24  conversations.
25  Q. Not the conversation with Ally but the

Page 208

1   conversations with Mac?
2   A. Right. Right. Exactly.
3   Q. Who is dthurman2@cox.net?
4   A. That was Terri Thurman's personal e-mail.
5   Q. Judicial Conduct. Allyson already
6   contacted. Not, what does that say, produced?
7   A. This was from Mac. Mac told me that --
8   this was after the fact Mac told me that Allyson
9   contacted, but he couldn't not -- I don't know
10  what that means, not precluded not actual
11  document. Unable to discuss with others. So Mac
12  told me that Allyson had informed him that she had
13  contacted Judicial, not Allyson herself.
14  Q. Mac relayed to you that Allyson had
15  contacted --
16  A. Yes.
17  Q. -- Judicial Qualifications?
18  A. Yes.
19  Q. All right. Okay. The next page. This
20  is home work hours?
21  A. Yes.
22  Q. So you were hired by the 14th Judicial
23  District on occasion to cover over there. Is that
24  correct?
25  A. Not really hired because I worked for


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 209

1 the...
2 **Q. State?**
3 A. Yes. So I -- when they needed me, I
4 would work over there, yes. And this was during
5 when they didn't know where Judge Johnson was
6 going to be. So I did Tuesday, Wednesday and
7 Thursday work up at that courthouse, but I also
8 had to, even if I wasn't covering court, I had to
9 work in a state location, not my home.
10 **Q. In any of Allyson's communications with**
11 **you, did she ever indicate to you or did you ever**
12 **get the impression she wasn't taking you**
13 **seriously?**
14 A. No. Our second phone call, though, I
15 felt like she was irritated with me.
16 **Q. Why did you feel that way?**
17 A. Her tone of voice and what she was
18 saying.
19 **Q. What was she saying?**
20 A. Just that when I told her that I really
21 wanted to go back to work and feel happy again and
22 to the point -- well, I may have to read it. But
23 I want to be a happy person. I wanted to
24 enjoying being there again and feel happy and
25 safe, and right now it was way too fresh and new

Page 210

1 for me. At times during this call, I didn't feel
2 Allyson was as sympathetic or compassionate about
3 this situation, and I heard irritation with me in
4 her tone of voice.
5 **Q. Did she do anything else to make you feel**
6 **like that she wasn't taking it seriously?**
7 A. Well, after January 16th, '20, I never
8 heard from her again so...
9 **Q. Well, you got the letter providing you a**
10 **report on her investigation into your complaint,**
11 **correct?**
12 A. Correct.
13 **Q. So that was after the 16th, wasn't it?**
14 A. Correct.
15 MS. MOCK: I don't think I have any other
16 questions. Thank you for your time.
17 THE WITNESS: Shoot.
18 MR. JOHNSON: But you're not done because
19 I have a few questions in follow up.
20 THE WITNESS: Okay. Great.
21 CROSS-EXAMINATION
22 BY MR. JOHNSON:
23 **Q. Miss Overfield, is one of your claims, if**
24 **I understand your testimony correctly, one of your**
25 **claims of retaliation has to do with a failure to**

Page 211

1 **provide you with a new reporting machine?**
2 A. Correct.
3 **Q. And who do you contend was responsible**
4 **for failing to provide you with a new reporting**
5 **machine in a timely manner?**
6 A. Mac Young and Judge Johnson keeping me
7 from that.
8 MR. JOHNSON: Let's mark this. What's
9 next?
10 MS. MOCK: Oh.
11 MR. JOHNSON: I didn't keep track of
12 them.
13 MS. MOCK: Oh, sorry.
14 MR. JOHNSON: And that's in our initial
15 -- this document's in our initial disclosures, but
16 I don't have the Bates stamp number.
17 (THEREUPON, Overfield Deposition Exhibit
18 No 31 was marked for identification by the
19 reporter.)
20 BY MR. JOHNSON:
21 **Q. So let me hand you what we've marked as**
22 **Exhibit...**
23 THE REPORTER: 31.
24 BY MR. JOHNSON:
25 **Q. 31. And would you tell us what that --**

Page 212

1 **first of all, did you take that picture or who**
2 **took that picture?**
3 A. Yes, I took this picture.
4 **Q. Okay. And would you explain to us what**
5 **this picture is about and how it relates to your**
6 **claim of retaliation in Judge Johnson's failure to**
7 **provide you with a new reporting machine?**
8 A. This was the machine that I previously
9 told Terelle about, the case that went to it. I
10 had had the machine, because Montgomery County
11 purchased the machine for me. Yet, the case was
12 in this box, and Mac and Judge Johnson, I assume,
13 thought this was the machine and we're keeping it
14 and not getting in contact with me. And when I
15 went over there three weeks later, that's when I
16 asked Teri Meador if she had seen a package for me
17 delivered here. And she said, well, I think Judge
18 Johnson took it. He found it outside. So...
19 **Q. So when did you first request from the**
20 **11th Judicial District being provided a new**
21 **reporting machine?**
22 A. 2018.
23 **Q. And you didn't receive it actually until**
24 **you moved to the 14th Judicial District. Is that**
25 **right?**



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 213

1    A.  Correct.  Correct.
2    Q.  So let's start with Mac Young.  When did
3 you discuss with him date-wise providing you with
4 a new reporting machine?
5    A.  2018.  And then when Tasha came on board,
6 I elected to surpass the machine and let her get
7 her equipment to be set up.  And then I was
8 supposed to receive it the next year.
9    Q.  And that would have been which year?
10   A.  2020.
11   Q.  2020.  Did you have any conversations in
12 2020 with Mac Young about providing -- you being
13 provided a new reporting machine?
14   A.  Yes.
15   Q.  And when did that occur?
16   A.  The summer of 2020.
17   Q.  And tell us about that conversation.
18   A.  And he told me that, Sabrina, we're not
19 going to get that started.  Because if we do it
20 for you, we'll have to do it for the others.  And
21 I told him that my machine had already been
22 purchased by this county once, and that's why it's
23 time to get another one because this one is
24 obsolete.  They don't even service it any longer.
25   Q.  And how did he respond to that comment by

Page 214

1 you?
2    A.  No comment.
3    Q.  Now, I want to ask you some questions
4 about your hostile work environment claim.  If I
5 understand your testimony correctly, that claim is
6 based on -- in part on your interactions with
7 Judge Johnson on January 10th and January 13th of
8 2020 that we've -- that you've testified about,
9 correct?
10   A.  Correct.
11   Q.  Is it also based upon Judge Johnson's
12 interactions with Tasha Thurman?
13   A.  Yes.
14      MS. MOCK:  Object, misstates prior
15 testimony.
16 BY MR. JOHNSON:
17   Q.  Is your claim for hostile work
18 environment -- well, tell us what your claim for
19 hostile work environment is based upon?
20      MS. MOCK:  Object to the form of the
21 question, asked and answered.  We've been over
22 this.
23 BY MR. JOHNSON:
24   Q.  You can go ahead and answer.
25   A.  It's based on my claims on the 10th and

Page 215

1 the 13th but also the working conditions.  Once
2 Terri had the interaction with him, it changed the
3 whole dynamics of our working environment.  And
4 also, when Tasha came on board, what she suffered
5 and what I went through with her.
6    Q.  And in the complaint that you filed in
7 this case, if you'll look at paragraph 38, do you
8 describe or does the complaint describe the basis
9 for your hostile work environment claim?
10   A.  Yes.
11   Q.  And it references Judge Johnson's
12 threatening, demeaning conduct towards Tasha
13 Thurman and Terri Thurman?
14   A.  Correct.
15   Q.  And I believe you've told us that you did
16 not yourself observe any of the interactions
17 between Judge Johnson and Tasha Thurman.  Did I
18 remember that correctly?
19   A.  Correct.  It was the after that it
20 happened.
21   Q.  And let me hand you what you've testified
22 about on Exhibit 6 which is the complaint filed by
23 Tasha Thurman.  Is that right?
24   A.  Yes.
25   Q.  And did you discuss with Tasha Thurman

Page 216

1 her perceptions of her interactions with Judge
2 Johnson?
3    A.  Yes.
4    Q.  And did -- are those interactions
5 described in what we've marked as Exhibit 6?
6    A.  Yes.
7    Q.  And did you believe Tasha Thurman when
8 she told you what had occurred in her interactions
9 with Judge Johnson?
10   A.  Most definitely.  As I also said, it was
11 the aftermath.  I could always tell as I was
12 walking down the back hallway towards the clerk's
13 office when she would be in his office when one of
14 those incidents were happening by the look on her
15 face, by his actions, and I could tell it was not
16 a good situation.
17   Q.  And what was your reaction when you
18 observed the aftermath of Tasha Thurman's
19 interactions with Judge Johnson?
20   A.  I wanted to protect her.  I wanted to
21 help her.  I wanted her to be successful at a
22 career that I love so much.
23   Q.  How did your perceptions of Tasha Thurman
24 affect your own working environment?
25   A.  It was stressful, very stressful and hard

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 217

1  to go to work at times knowing what she was
2  suffering and going through and also what her mom
3  had gone through.
4      Q.  And moving to her mother who is Terri
5  Thurman, I believe you told us that you -- did you
6  observe yourself any interactions with between
7  Judge Johnson and Terri Thurman that you perceived
8  to be abusive?
9      A.  He ignored her a lot and treated her like
10  she wasn't even there.  But then when it came time
11  for her to talk to him in court situations, he was
12  very abrupt, hateful and would turn his back
13  towards her.
14      Q.  Did you review Terri Thurman's complaint
15  against Judge Johnson?
16      A.  Yes.
17      MR. JOHNSON:  Let's mark that as an
18  exhibit.  It's in our initial disclosures, but I
19  apologize I don't have the Bates stamp version.
20      (THEREUPON, Overfield Deposition Exhibit
21  No 32 was marked for identification by the
22  reporter.)
23  BY MR. JOHNSON:
24      Q.  Have you previously reviewed Exhibit 32?
25      A.  I have.

Page 218

1      Q.  When would you have reviewed this do you
2  think first?
3      A.  Shortly after she wrote it.
4      Q.  Do you remember when she wrote it in
5  relationship to your own complaint that you filed
6  about January 13th, 2020?
7      A.  It was shortly after that.
8      Q.  And had you visited with, talked to Terri
9  Thurman prior to January of 2020 about incidents
10  that are included in Exhibit 32 that may have
11  occurred prior to her actually formally filing a
12  complaint?
13      A.  Yes.
14      Q.  And did you believe her descriptions or
15  at least her perceptions of her interactions with
16  Judge Johnson?
17      A.  Most definitely.
18      Q.  And how did that affect -- how did her
19  complaint affect your own work environment?
20      A.  It was very hostile, a very hostile
21  working relationship with them, not as in Terri
22  and I but with Judge Johnson.
23      MR. JOHNSON:  Thank you.  That's all the
24  questions I have.
25      REDIRECT-EXAMINATION

Page 219

1  BY MS. MOCK:
2      Q.  Did you ever file a complaint on behalf
3  of Tasha Thurman?
4      A.  Did I?
5      Q.  Yeah.
6      A.  No.
7      Q.  Did you tell anybody in HR or Mac Young
8  or anybody else about all this abuse she was
9  suffering?
10      A.  I did tell Mac.
11      Q.  When did you tell Mac Young?
12      A.  I can't recall the date or the month, but
13  it was the year she worked there.
14      Q.  Did you send him an e-mail?
15      A.  No.  He had came over in person.
16      Q.  Did you follow up with him?
17      A.  No.
18      Q.  Your new reporting machine was purchased
19  -- I thought you said it was purchased by the 11th
20  Judicial District and then the 14th Judicial
21  District bought it from the 11th Judicial
22  District?
23      A.  Three years after I requested one.
24      Q.  Well, that may be well and good, but is
25  this true?

Page 220

1      A.  Yes.
2      Q.  Okay.  So my statement that the 11th
3  District purchased it, correct?
4      A.  Correct.
5      Q.  Do you recall what year and month they
6  purchased it?
7      A.  I don't -- I know the year, 2021.
8      Q.  Okay.  You don't know the month?
9      A.  It was in my chair unbenounced to me it
10  was ordered December 2021.
11      Q.  The photograph in Exhibit 31, that's of a
12  case, correct?
13      A.  When I opened it, it was the case.
14      Q.  So it wasn't the actual machine?
15      A.  For all they knew, it could have been the
16  machine.
17      Q.  But was it?
18      A.  No.
19      Q.  You already had the machine?
20      A.  Correct.
21      Q.  At the time that this came, Exhibit 31,
22  correct?
23      A.  Actually, I don't know because that -- I
24  had the machine, correct, but that box was
25  missing.  It should have came when the machine

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# SABRINA S. OVERFIELD

Page 221

1 came, but for some reason it didn't.  Because I
2 even called UPS, FedEx and they said it had been
3 delivered the same time as the machine was.
4    Q.  And you've made a comment that Mac said
5 in the summer of 2020 you're not going to get a
6 new machine because if we do that with one we'll
7 have to do it with the others.  So what was the
8 procedure with court reporters?  Did they have to
9 purchase their own machines?
10    A.  When I first started, yes.  Every county
11 is different.
12    Q.  Okay.  Every county or every judicial
13 district?
14    A.  I believe it's every county.
15    Q.  All right.  So when you started at
16 Labette County, did you purchase your own?
17    A.  Yes.
18    Q.  Okay.  So I guess what led you to
19 conclude that they would be purchasing your
20 machine in 2018?
21    A.  We had gone -- Vickie Barrett and I had
22 gone to our judges at the time which was Judge
23 Fleming and Judge Jack.
24    Q.  Um-hum.
25    A.  And it's like anything else, a court

Page 222

1 reporter machine if you're working for somebody,
2 they provide the computer.  Why could they not
3 provide this machine for us as well.  Judge
4 Fleming and Judge Jack thought the same thing.
5 They presented it to the commissioners in the
6 budget, and they agreed to it.  And every year,
7 when we needed a new machine, the two judges felt
8 that was appropriate.
9    Q.  So who -- for who did Labette County
10 purchase a court reporter machine?
11    A.  Vickie Barrett and myself.
12    Q.  Anybody else?
13    A.  No.
14    Q.  And when did they purchase it for Vickie
15 Barrett?
16    A.  I think we received those in 2015.
17    Q.  Did you -- but you hadn't requested a
18 machine at that time or I'm confused?
19    A.  Terelle, it was before then.  I can't --
20 I shouldn't say that date because Vickie retired
21 in 2016, and we had our Diamante court reporting
22 machine quite a few years before she retired.  And
23 the Diamante machine is obsolete now.
24    Q.  Okay.  So let's go backwards.  At some
25 point in time, you and Vickie, right, Vickie?

Page 223

1    A.  Correct.
2    Q.  All right.  You and Vickie go to your
3 judges and you say we want the county to purchase
4 our court reporter machines?
5    A.  We would like them to, yes.
6    Q.  Okay.  And they say, yep, we agree with
7 that?
8    A.  Yes.
9    Q.  And so -- but they're not going to do two
10 in one year I'm assuming?
11    A.  Yes, they did.
12    Q.  Oh, they did?
13    A.  Yes.
14    Q.  So they bought you two?
15    A.  Her machine and myself a machine.
16    Q.  Okay.  And we don't know when this was?
17    A.  I can't give you the time, no.  I'm
18 sorry.
19    Q.  Okay.  So at some point -- and then in
20 2018, you want your one that the county had
21 previously purchased replaced?
22    A.  Yes.
23    Q.  And you go to Mac and you say -- so why
24 did you go to Mac?  Why didn't you go to your
25 judge?  I mean if the county purchased it the

Page 224

1 first time, why did you ask Mac Young for it?
2    A.  He had came to my office and the budget
3 was getting ready to -- and Terri had mentioned
4 mention it to Mac that you'd like to get your new
5 machine this year, Sabrina, so I did.
6    Q.  Is this like in December of 2018?
7    A.  No.  Because they do the budget like the
8 summer.
9    Q.  Okay.  So it's a physical year thing?
10    A.  Right.
11    Q.  All right.
12    A.  Yes.
13    Q.  Okay.  So you mention it to Mac in 2018
14 and he says what?
15    A.  He says I don't think we're going to get
16 that started, Sabrina, because if we do it for
17 you, we'll have to do it for everyone.
18    Q.  Okay.  So that's what you just testified
19 he told you in the summer of 2020?
20    A.  No.  It had to have been before then.
21    Q.  So I think what you testified earlier was
22 that you -- Tammy?
23    A.  Tammy.
24    Q.  Was coming on board, and so you agreed to
25 wait --



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## SABRINA S. OVERFIELD

Page 225

1    A.  Tasha.
2    **Q.  Tasha?**
3    A.  Tasha.
4    **Q.  Tasha was coming on board, so you agreed**
5  **to wait so that she could get a new machine.  Is**
6  **that right?**
7    A.  Correct.
8    **Q.  So did she get a new machine?**
9    A.  She got the equipment.  She needed a
10  computer and the software.  We already had the
11  going out of expiration machine Diamante she could
12  use as a student.
13    **Q.  All right.  So you have two Diamantes --**
14    A.  Correct.
15    **Q.  -- that were purchased sometime?**
16    A.  2005 maybe even.
17    **Q.  Okay.**
18    A.  It was a long time ago.
19    **Q.  And so they needed to purchase the**
20  **software to go along with that machine for her and**
21  **that's why you agreed to put it off a year?**
22    A.  She was learning another type of software
23  than I use.  I think it was Stenocat, and it was
24  that and the computer software and computer was
25  $10,000 --

Page 226

1    **Q.  All right.**
2    A.  -- to purchase for her.
3    **Q.  So you said, okay, we can skip me for**
4  **2018-2019 fiscal year --**
5    A.  Right.
6    **Q.  -- because you need to purchase that for**
7  **her?**
8    A.  Correct.
9    **Q.  So then fiscal year '19/'20, did you**
10  **renew your request?**
11    A.  That possibly was the time -- I should
12  not have said the date 2020 because it was before
13  -- I'm not quite sure what the date.  I don't
14  want to give you a date because I had that
15  conversation with Mac.  I should have written it
16  down and I didn't, but that was his comment to me,
17  not to get that started.
18    **Q.  So did you ever say anything to Judge**
19  **Jack about -- before he left about getting a new**
20  **machine?**
21    A.  Yes.
22    **Q.  And what did Judge Jack say?**
23    A.  That was the time Tasha was coming on
24  board that I said I'll skip my machine this year,
25  Judge, this year if we put it on next year's

Page 227

1  budget.
2    **Q.  So that wasn't a conversation that you**
3  **had with Mac Young?**
4    A.  Yes, I did.  I also told Judge Jack that
5  I'll skip it and I also told Mac.
6    **Q.  Okay.  So when Judge Stockard comes on**
7  **board in January of 2020, did you ever say**
8  **anything to him?**
9    A.  I never said -- no.  I never said
10  anything to him about any machine.
11    **Q.  Why not?**
12    A.  He was just coming on board.
13    **Q.  So who ultimately ordered you the**
14  **machine?**
15    A.  I believe Lori Fleming did or Mac, one of
16  the two, because it showed up in my chair.  I had
17  no idea.
18    **Q.  And so that would have had to have been**
19  **ordered sometime in the fall of '21?**
20    A.  Yes.
21    **Q.  Correct?**
22    A.  Probably.
23    **Q.  And you don't know who ordered it?**
24    A.  No, ma'am.
25    **Q.  Did -- and who was the other court**

Page 228

1  reporter -- were you the only one at that time in
2  2021 or was there a second one?
3    A.  No, I'm the only one.
4    **Q.  Okay.  And do you know whether or not the**
5  **court reporter in Montgomery County is using the**
6  **old machine or a new machine?**
7    A.  They purchased their court reporters'
8  machines every three years.
9    **Q.  Who does, Montgomery County?**
10    A.  Montgomery County, yes.
11    **Q.  Do you know whether or not the court**
12  **reporter in Labette County is utilizing an old**
13  **machine or a brand new machine?**
14    A.  There isn't a court reporter in Labette
15  County.  Myra Freeman is going to school, but that
16  is hearsay.  I don't know that for a fact.
17    **Q.  Okay.  All right.  Did you ever report to**
18  **the State of Kansas, OJA or the Judicial**
19  **Qualification that Judge Johnson's interactions**
20  **with Tasha Thurman were causing you to have a**
21  **hostile work environment?**
22    A.  No.
23    **Q.  Did you ever report to OJA or Judicial**
24  **Qualification that Judge Johnson's interactions**
25  **with Terri Thurman were causing you to have a**

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## SABRINA S. OVERFIELD

Page 229

1  hostile work environment?
2      A.  No.
3      Q.  Did you ever report to OJA or Judicial
4  Qualifications that Judge Johnson's interactions
5  with anybody else in the office was creating a
6  hostile work environment?
7      A.  Not until I contacted them about myself.
8      Q.  Right.
9      A.  That was the first time.
10         MS. MOCK:  I don't have any other
11  questions.
12         MR. JOHNSON:  I have no further
13  questions, and she will read and sign her
14  deposition and she actually knows what that means.
15         (THEREUPON, the deposition concluded at
16  4:14 p.m.)
17  .
18  .
19  .
20  .
21  .
22  .
23  .
24  .
25  .

Page 230

1          SIGNATURE
2  .
3         The deposition of SABRINA S. OVERFIELD
4  was taken in the matter, on the date, and at the
5  time and place set out on the title page hereof.
6  .
7         It was requested that the deposition be
8  taken by the reporter and that same be reduced to
9  typewritten form.
10  .
11         It was agreed by and between counsel and
12  the parties that the deponent will read and sign
13  the transcript of said deposition.
14  .
15  .
16  .
17  .
18  .
19  .
20  .
21  .
22  .
23  .
24  .
25  .

Page 231

1              AFFIDAVIT
2  .
3  STATE OF _____:
4  COUNTY/CITY OF _____:
5  .
6         Before me, this day, personally appeared,
7  SABRINA S. OVERFIELD, who, being duly sworn,
8  states that the foregoing transcript of his/her
9  Deposition, taken in the matter, on the date, and
10  at the time and place set out on the title page
11  hereof, constitutes a true and accurate transcript
12  of said deposition, along with the attached Errata
13  Sheet, if changes or corrections were made.
14  .
15         _____
16         SABRINA S. OVERFIELD
17  .
18     SUBSCRIBED and SWORN to before me this
19  _____ day of _____, 2022 in the
20  jurisdiction aforesaid.
21  .
22  _____     _____
23  My Commission Expires        Notary Public
24  .
25  .

Page 232

1        DEPOSITION ERRATA SHEET
2  .
3  RE:    APPINO & BIGGS REPORTING SERVICE, INC.
4  .
5  FILE NO.: 67098
6  .
7  CASE:   SABRINA S. OVERFIELD vs.
8        STATE OF KANSAS
9  .
10  DEPONENT: SABRINA S. OVERFIELD
11  .
12  DEPOSITION DATE: 10/03/2022
13  .
14  To the Reporter:
15  I have read the entire transcript of my Deposition
16  taken in the captioned matter or the same has been
17  read to me.  I request that the following changes
18  be entered upon the record for the reasons
19  indicated.  I have signed my name to the Errata
20  Sheet and the appropriate Certificate and
21  authorize you to attach both to the original
22  transcript.
23  .
24  .
25  .

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 233

1　PAGE:LINE FROM　TO　REASON
2　.
3　.
4　.
5　.
6　.
7　.
8　.
9　.
10　.
11　.
12　.
13　.
14　.
15　.
16　.
17　.
18　.
19　.
20　.
21　.
22　.
23　.
24　SIGNATURE:_____ DATE:_____
25　　SABRINA S. OVERFIELD

Page 234

1　　　CERTIFICATE
2　STATE OF KANSAS
3　COUNTY OF SHAWNEE
4　　I, Sandra S. Biggs, a Certified Court
5　Reporter, Commissioned as such by the
6　Supreme Court of the State of Kansas,
7　and authorized to take depositions and
8　administer oaths within said State
9　pursuant to K.S.A 60-228, certify that
10　the foregoing was reported by
11　stenographic means, which matter was
12　held on the date, and the time and place
13　set out on the title page hereof and
14　that the foregoing constitutes a true
15　and accurate transcript of the same.
16　　I further certify that I am not
17　related to any of the parties, nor am I
18　an employee of or related to any of the
19　attorneys representing the parties, and
20　I have no financial interest in the
21　outcome of this matter.
22　　Given under my hand and seal this
23　14th day of October, 2022.
24　　_____
25　　Sandra S. Biggs, C.C.R No. 0716

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612