**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

SABRINA S. OVERFIELD,
    Plaintiff,

vs.     Case No. 21-4093-JWB-KGG

STATE OF KANSAS,
    Defendant.

DEPOSITION OF
MAC YOUNG,

taken on behalf of the Plaintiff, pursuant to Notice to Take Deposition, beginning at 12:00 p.m. on the 6th day of October, 2022, via web conference, before Ksenija M. Zeltkalns, RPR, Kansas CCR No. 1461.

**Page 2**

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

Mr. Alan V. Johnson
Sloan, Eisenbarth, Glassman,
  McEntire & Jarboe, LLC
534 South Kansas Avenue, Suite 1000
Topeka, Kansas  66603
785.357.6311
ajohnson@sloanlawfirm.com

ON BEHALF OF THE DEFENDANT:

Ms. Terelle A. Mock
Ms. Crystal B. Moe
Fisher, Patterson, Sayler & Smith, LLP
3550 Southwest Fifth Street
Topeka, Kansas  66606
785.232.7761
tmock@fpsslaw.com
cmoe@fpsslaw.com

**Page 3**

ALSO PRESENT:

Mr. Tyler Toelkes, Video Tech
Ms. Sabrina Overfield

**Page 4**

INDEX

Certificate ----------------------------- 64

WITNESS
ON BEHALF OF PLAINTIFF:              PAGE
MAC YOUNG
Direct-Examination by Mr. Johnson       5

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street          6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604             Suite 101                 Suite 305
785-273-3063                 Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

Page 5

1  MAC YOUNG,
2  Called as a witness on behalf of the Plaintiff,
3  having been duly sworn, testified as follows:
4  DIRECT-EXAMINATION
5  BY MR. JOHNSON:
6   Q.  Mr. Young, would you state your name and
7  your home address for the record, please?
8   A.  Mac Young, 1704 West Fourth, Pittsburg,
9  66762.
10   Q.  And Mr. Young, are you -- I understand
11  you're employed as the district court
12  administrator for the 11th Judicial District.  Is
13  that right?
14   A.  That's correct.
15   Q.  And when did you first take that
16  position?
17   A.  That would have been 2013, I believe in
18  May.
19   Q.  Can you briefly describe for us what your
20  duties are as the district court administrator?
21   A.  I'm under the direction of the chief
22  judge.  I oversee most all court functions with
23  the assistance of mid-level supervisors.
24   Q.  What are your responsibilities in terms
25  of the nonjudicial employees of the judicial

Page 6

1  district?
2   A.  I don't ... I'm not sure what you mean by
3  nonjudicial.
4   Q.  Nonjudges, I'm sorry.  Well, let's start
5  there.  Let me ask you that.  What is -- what is
6  your working relationship with the judges in the
7  11th Judicial District?  In other words how do
8  you, if you do, how do you interact with them and
9  work on the same types of matters?
10   A.  Umm.  I can work with any or all judges
11  on, you know, technological needs, you know,
12  specific needs that are needed in courtrooms,
13  personnel --
14   Q.  What about -- go ahead.
15   A.  Personnel issues.
16   Q.  And let's focus on the personnel issues
17  because that's really what this case is about.
18  What is -- how do you and the judges deal with
19  personnel issues?  For example, with court
20  reporters, who would the supervisor of the court
21  reporter be?
22   A.  I think directly that would be a judge or
23  judges.
24   Q.  In hiring a court reporter or an
25  administrative assistant does the judge -- what

Page 7

1  part, role, does the judge play in that personnel
2  issue?
3   A.  Well, oftentimes judges are involved in
4  that interview process.
5   Q.  If a judge wants to hire a particular
6  court reporter, do they need your approval to do
7  that?
8   A.  Not necessarily.
9   Q.  Do they need any approval?  Does a judge
10  need approval from anyone to hire a particular
11  court reporter if the position is advertised and
12  available and there's budget for it?
13   A.  Right.  Again, they would be involved in
14  the interview process and have input on that
15  decision.
16   Q.  What about termination of employees?  Can
17  a judge terminate his or her administrative
18  assistant or court reporter on their own without
19  approval from you?
20   A.  The approval wouldn't come from me.  It
21  would -- I mean that would come from HR at the
22  Office of Judicial Administration.
23   Q.  I want to ask you some questions about
24  the Office of Judicial Administration.  Is that
25  the agency that you are an employee of, the state

Page 8

1  agency?
2   A.  Yeah.  That's correct.
3   Q.  And you mentioned HR at the OJA.  What --
4  can you elaborate on that?  Explain what that
5  department is, who that person is?
6   A.  The director of personnel is Allyson
7  Christman.  There is a deputy or assistant, I'm
8  not sure what her job title is.  Her name is Cris
9  Loomis.  Those are the two folks that I deal with
10  the most.
11   Q.  Who is the current judicial
12  administrator?
13   A.  Kind of caught me off guard on that one.
14   Q.  That's okay.  You said --
15   A.  I mean I can see her face, I just can't
16  think of her name.
17   Q.  Sure.  Sure.  And I believe you testified
18  most of your interaction is with the deputy
19  administrator, correct?
20   A.  Director of personnel.
21   Q.  Oh -- well, okay.  Who is Allyson
22  Christman, who was the other person you mentioned?
23   A.  Cris Loomis.
24   Q.  And her position is what again?
25   A.  I believe it would be the deputy directly



Page 9

1  under Allyson.
2  Q.  Okay. So -- okay. So Cris would report
3  to Allyson, correct?
4  A.  That's my understanding.
5  Q.  Who do you -- who do you consider to be
6  your supervisor within the agency?
7  A.  Well, that would be the chief judge.
8  Q.  Who does -- who performs your annual
9  evaluations?
10  A.  The chief judge.
11  Q.  Where is your office located?
12  A.  I am located in Pittsburg.
13  Q.  And the current chief judge is Judge Lori
14  Fleming, correct?
15  A.  That's correct.
16  Q.  And where is she located?
17  A.  She is also located in Pittsburg.
18  Q.  Okay. And the prior chief judge was
19  Judge Lynch and he was located where?
20  A.  In Cherokee County, Columbus.
21  Q.  Do you, as part of your duties do you
22  regularly go to each of the courthouses in the
23  11th Judicial District or is most of your work
24  done in Pittsburg?
25  A.  I -- yeah, I get out to other locations

Page 10

1  as much as I can.
2  Q.  How long generally would it take for you
3  to go from your office to, for example, the
4  courthouse in Parsons?
5  A.  Roughly 45 minutes.
6  Q.  I want to move to some events that
7  occurred in January of 2020, and do you recall
8  that on January 10th of 2020 that the nominating
9  committee to replace Judge Jack were meeting and
10  interviewing applicants?
11  A.  Yes.
12  Q.  Were you present for any part of that
13  interview process?
14  A.  I was not.
15  Q.  And were you located -- on that day were
16  you located -- were you at your office then in
17  Pittsburg?
18  A.  I was.
19  Q.  And do you recall receiving a telephone
20  call from Sabrina Overfield describing to you
21  interactions she'd had with Judge Johnson?
22  A.  Yes.
23  Q.  And let's first talk about the telephone
24  call. What do you recall about the telephone call
25  when she calls you and tells you about it?

Page 11

1  A.  Umm. I remember the phone call, that she
2  called, she was upset and said there had been a
3  negative interaction with Judge Johnson and at
4  that point I had asked her to reduce that to
5  writing.
6  Q.  And did you also on that date talk with
7  Judge Johnson?
8  A.  I did. He -- he also called me and
9  indicated there had been an altercation and I also
10  asked him to put that in writing.
11  Q.  And did Ms. Overfield or Judge Johnson
12  contact you first or do you remember?
13  A.  I believe that Judge Johnson contacted me
14  first.
15  Q.  And do you -- what -- can you tell us any
16  more detail about what he told you? Do you
17  remember anything else he -- did he describe
18  the --
19  A.  I think -- not specifically, no.
20  Q.  And then Ms. Overfield called you on the
21  telephone and do you remember any specifics of
22  what she told you?
23  A.  Not specifically other than, you know, I
24  had asked her to -- to, you know, describe the
25  interactions that she had had with Judge Johnson

Page 12

1  in writing.
2  Q.  Did you on -- go ahead. I didn't mean to
3  interrupt you.
4  A.  I wasn't trying to say anything else.
5  Q.  Oh, okay. Did you, on January 10th,
6  2020, call Ms. Christman to report what you'd
7  heard from both Judge Johnson and Ms. Overfield?
8  A.  I don't know. I don't know the exact
9  date of -- of contact with -- with Ms. Christman.
10  I don't remember that exact date.
11  Q.  Do you recall in your telephone
12  conversation with Ms. Overfield on January 10th
13  that she told you that she felt unsafe at the
14  courthouse and felt threatened by Judge Johnson?
15  A.  Not specifically other than there was
16  phone contact.
17  Q.  Did she tell you that she was going home,
18  leaving the office early?
19  A.  Possibly. I'm not real sure.
20  Q.  Is that something you would have needed
21  to approve of her leaving the office early?
22  A.  I mean, generally if somebody's going to
23  leave the office early it's, I mean, they would --
24  they would consult with their immediate
25  supervisor.


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 13

1  Q.  And at this point in time, that is,
2  January 10th, 2020, who would Ms. Overfield's
3  immediate supervisor be since the judge she worked
4  for, Judge Jack had retired and the new judge had
5  not yet been appointed?
6      A.  That could be me or it could be the chief
7  judge.
8      Q.  Did you talk to anyone else on January
9  10th, 2020, about the interaction, incident,
10 between Judge Johnson and Ms. Overfield?
11     A.  I don't remember specifically on that
12 particular date.
13     Q.  Do you remember talking to -- did you
14 talk to Terri Thurman on that day about the
15 incident?
16     A.  Possibly.
17     Q.  And do you have any memory of what she
18 may have told you, that is Terri Thurman, about
19 the incident?
20     A.  Not specifically.
21     Q.  Now, I'll represent to you that January
22 10th, 2020, was a Friday.  Is that consistent with
23 your memory of events?
24     A.  Yeah.  I suppose.  Yeah.
25     Q.  So do you recall having -- getting,

Page 14

1  receiving another telephone conversation with Ms.
2  Overfield on the following Monday, that is,
3  January 13th, 2020?
4      A.  Correct.
5      Q.  And tell us what you recall about that
6  telephone call.
7      A.  Specifics I -- I don't recall other than
8  she had reported to her -- her office that day.
9      Q.  Do you recall what she was calling you
10 about, what had happened on that day that caused
11 her to give you a call?
12     A.  On the 13th?
13     Q.  Yes.
14     A.  No, not specifically.
15     Q.  Do you recall having a telephone
16 conversation on January 13th with Judge Johnson
17 about an interaction that he and Ms. Overfield had
18 had on the 13th of January?
19     A.  No.
20     Q.  Do you recall receiving on or about
21 January 13th -- let me back up.
22     Do you recall receiving a statement written,
23 or written notes of Judge Johnson about the
24 incident that occurred -- that had occurred on
25 January 10th?  Do you remember him sending you

Page 15

1  something?
2      A.  Right.
3      Q.  And do you remember Ms. Overfield also
4  sending you something to describe her version of
5  what had occurred on January 10th?
6      A.  Yes.
7         MR. JOHNSON:  Tyler, could we -- could
8  you show the witness Exhibit 4, please?
9         BY MR. JOHNSON:
10     Q.  Can you see this document, Mr. Young?
11     A.  I can see it.
12     Q.  I should have asked you this before.  Did
13 you review any documents in preparation for your
14 deposition today?
15     A.  I did.
16     Q.  Was this one of the documents that you
17 reviewed?
18     A.  I remember seeing it, yes.
19     Q.  And did -- does -- do you recall that
20 this was a statement that Ms. Overfield sent to
21 you on January 13th?
22     A.  Yeah.  I don't remember what particular
23 day I received it, but I remember receiving it.
24        MR. JOHNSON:  Okay.  If you go to the --
25 Tyler, if you could go to the third page.  Yeah.

Page 16

1  Stop right there.
2         BY MR. JOHNSON:
3      Q.  You see that right at the top there it
4  relays the incident on January 13th, 2020.  Does
5  that refresh your memory that the e-mail that Ms.
6  Overfield sent to you described both the event on
7  January 10th and the event on January 13th, 2020?
8  Is that consistent with your memory?
9      A.  Yep.
10     Q.  In looking at the incident that Ms.
11 Overfield describes on January 13th, 2020, do you
12 recall if that involved Judge Johnson wanting into
13 Judge Jack's office and Ms. Overfield's office
14 that adjoined Judge Jack's old office, she had the
15 door locked.  Do you remember that being the
16 incident that had occurred on January 13th?
17     A.  Correct.
18     Q.  Do you recall telling Ms. -- talking to
19 Ms. Overfield when she called you and telling her
20 that she needed to unlock the door because he's a
21 judge and he can go anywhere he wants?
22     A.  Correct.
23     Q.  You agree that's what you said?
24     A.  I agree with that.
25     Q.  And why did -- why did you understand

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street   6420 W. 95th Street   800 E. 1st Street
Topeka, KS 66604      Suite 101              Suite 305
785-273-3063          Overland Park, KS 66212 Wichita, KS 67202
www.appinobiggs.com   913-383-1131           316-201-1612

Page 17

1 Judge Johnson needed to get in Judge Jack's
2 office?
3    A.  It was my understanding that he needed
4 some documents or he was going to leave some
5 documents in that -- in that office.
6    Q.  And Judge Jack's old office, nothing was
7 in there but furniture, was there, since Judge
8 Jack had retired and the new judge had not yet
9 been selected?
10    A.  I don't know that.  I don't know the --
11 what the content -- contents of the office were at
12 that time.
13    Q.  Now, after you received Exhibit 4 from
14 Ms. Overfield, what did you do with this document?
15    A.  I believe that I contacted Chief Judge
16 Lynch at the time.
17    Q.  And what did Judge Lynch tell you to do,
18 or what did you and he discuss?
19    A.  I think that -- at that time we scheduled
20 a meeting for he and I to meet.
21    Q.  And are you -- using the January 13th
22 date as the reference point, do you remember when
23 you and Judge Lynch met?
24    A.  No, not specifically.
25    Q.  Do you think it was within a few days, a

Page 18

1 week, or how long do you think it might have been?
2    A.  I would say it was within that same --
3 that same week of the 13th.
4    Q.  Okay.  And do you recall anything about
5 what was said during your meeting, what was -- did
6 you decide to do anything?
7    A.  It was decided that we would -- or he
8 would contact the Office of Judicial
9 Administration and turn -- turn that -- turn that
10 over to them.
11    Q.  During the week of January 13th, did you
12 yourself contact anyone in the Office of Judicial
13 Administration?
14    A.  Yes.
15    Q.  And who did you contact?
16    A.  I -- I contacted Allyson Christman.
17    Q.  And using January 13th, 2020, as a
18 reference point, do you know when you think you
19 would have contacted Ms. Christman?
20    A.  No.  I don't know the specific date.
21    Q.  Do you remember if it was before or after
22 you had your meeting with Judge Lynch?
23    A.  No, I don't remember.  No, I don't.
24    Q.  Do you recall that -- do you ever recall
25 discussing with Ms. Overfield the possibility of

Page 19

1 her filing a complaint with the Commission on
2 Judicial Conduct against Judge Johnson?  In other
3 words did you ever advise her or talk to her about
4 that possibility?
5    A.  I think that -- that she brought it up in
6 -- I don't know what my response was, but yeah, it
7 was mentioned.
8    Q.  Well, when you received the e-mail that
9 we marked as Exhibit 4 from Ms. Overfield, what
10 was your reaction?  What did you think about her
11 allegations?
12    A.  Again, when I read it that's when I, you
13 know, I reached out to the chief judge.
14    Q.  And did you send him a copy of what we've
15 marked as Exhibit 4, which are Ms. Overfield's
16 allegations?
17    A.  I'm not sure I -- I sent him a copy.  I
18 might have delivered it the day that -- that we
19 had our meeting.
20    Q.  Did you become aware of some time that
21 Ms. Overfield did file a complaint against Judge
22 Johnson with the Commission on Judicial Conduct?
23    A.  Yes.
24    Q.  And did you become aware that Allyson
25 Christman on Ms. Overfield's behalf also filed a

Page 20

1 complaint against Judge Johnson with the
2 Commission on Judicial Conduct?
3    A.  I was not aware of that.
4    Q.  Have you ever seen the complaint that Ms.
5 Christman filed with the Commission on Judicial
6 Conduct?
7    A.  I don't believe I have.
8    Q.  When did you -- well, let's --
9       MR. JOHNSON:  Tyler, would you show him
10 Exhibit 8?
11       BY MR. JOHNSON:
12    Q.  And I will represent to you, Mr. Young,
13 this is the complaint that Ms. Christman filed on
14 Ms. Overfield's behalf, and looking at that, does
15 that jog your -- is that consistent that you've
16 never seen this before and were not aware when it
17 was filed?
18    A.  I have not seen that document.
19    Q.  If you go -- I'll just tell you,
20 represent to you so we don't take time going
21 through it, but Ms. Christman signs this on
22 January 15th, 2020, and using that date as a
23 reference point, do you think you had met with
24 Judge Lynch by January 15th, 2020?
25    A.  Possibly.  I don't -- I don't recall

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street          6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604             Suite 101                   Suite 305
785-273-3063                 Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131                316-201-1612

Page 21

1 exactly what day I met with Judge Lynch.
2  Q.  Even though you have not seen the
3 complaint filed by Ms. Christman before, when do
4 you think you became aware that either Ms.
5 Christman or Ms. Overfield filed a complaint with
6 the Commission on Judicial Conduct?  Do you
7 remember the date, approximate date?
8  A.  No, not -- no.  I'm -- I remember hearing
9 about Sabrina's complaint, but when I heard about
10 it, I don't -- I don't recall.
11  Q.  Do you remember who you heard about the
12 complaint, about Ms. Overfield's complaint?  Who'd
13 you hear that from?
14  A.  I don't recall who told me.
15  Q.  And Ms. Christman never informed you that
16 she had filed a complaint with the Commission on
17 Judicial Conduct.  Did I understand that
18 correctly?
19  A.  I don't -- I don't believe so.
20  Q.  Now, do you recall that in the same time
21 frame within a few days, maybe around January
22 16th, 2020, that Tasha Thurman also filed a
23 complaint against Judge Johnson with the
24 Commission on Judicial Conduct?
25  A.  I was unaware of that.

Page 22

1  Q.  You were unaware of that before today or
2 you were unaware of that in January of 2020?
3  A.  I don't think I knew -- no, I didn't know
4 that Tasha filed a complaint.
5  Q.  Were you aware that around January 16th,
6 2020, that Terri Thurman filed a complaint against
7 Judge Johnson with the Commission on Judicial
8 Conduct?
9  A.  Possibly heard that.  Don't remember who
10 I heard it from, but possibly.
11  Q.  And at that point in time Terri Thurman
12 was the district court clerk of the 11th Judicial
13 District, correct?
14  A.  Correct.
15  Q.  And would you have been her supervisor at
16 that point in time?
17  A.  Yes.
18  Q.  And you don't recall her telling you that
19 she had also filed a complaint against Judge
20 Johnson with the Commission on Judicial Conduct?
21  A.  I don't -- I don't recall her telling me
22 specifically, no.
23  Q.  Do you recall her at this point in time
24 in mid-January of 2020 complaining to you about
25 Judge Johnson's conduct towards her?

Page 23

1  A.  Yes.
2  Q.  In other words even if you didn't know
3 she'd filed a judicial complaint, did she file a
4 complaint with you about Judge Johnson's
5 interactions with her?
6  A.  She -- she had some -- I don't -- yeah,
7 she had some concerns.
8  Q.  And do you recall what the nature of
9 those concerns were?
10  A.  Not specifically other than she felt like
11 she was being ignored by Judge Johnson is the best
12 way I can put it.
13  Q.  Do you recall a complaint by Terri
14 Thurman that Judge Johnson wanted her to resign or
15 was -- or retire and was pushing her to retire?
16 Does that ring a bell with you?
17  A.  I know that he -- he confronted her about
18 her retirement on -- back in -- it would have been
19 May of -- I believe 2019.
20  Q.  Were you present when Judge Johnson
21 confronted Terri Thurman about her retirement?
22  A.  I was.
23  Q.  In May?
24  A.  I was.
25  Q.  And describe that for us would you,

Page 24

1 please?
2  A.  That particular day we had come together
3 for a budget meeting for the next fiscal year, and
4 at the end of that meeting Judge Johnson went into
5 several questions regarding procedural issues in,
6 you know, retire -- when she was going to retire.
7  Q.  And did you think -- go ahead.
8  A.  I have nothing to add to that.
9  Q.  Do you think that Judge Johnson's
10 demeanor or behavior towards her on that occasion
11 was inappropriate?
12  A.  I don't know if inappropriate is the --
13 he was forceful.  He was -- I mean, that's the
14 best way I can put it.
15  Q.  Did he raise his voice to her?
16  A.  Again, he was -- he was -- he was
17 forceful.  That's just the best way I can put it.
18 Was he loud?  Possibly.  I don't -- not
19 necessarily in my opinion.
20  Q.  Did he slam his hand down on a table?
21  A.  I don't remember that.
22  Q.  When Ms. Thurman complained to you about
23 her interactions with Judge Johnson, what advice
24 if any did you give her?
25  A.  Are you talking -- which -- which

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 25

1  interaction are you referring to?
2     Q.  Any of them.  Pretty broad question.
3     A.  I'm not sure that I -- I don't remember
4  any particular advice.
5     Q.  Do you ever remember talking to Ms.
6  Christman about any of the complaints that Terri
7  Thurman had about her interactions with Judge
8  Johnson?
9     A.  Allyson and I, yeah, we did have -- we
10 did have a conversation.
11    Q.  Do you remember when that was
12 approximately?
13    A.  No, I don't.
14    Q.  Do you remember what the conversation or
15 the incident was about where you're talking to Ms.
16 Christman?
17    A.  We were talking about the -- the incident
18 that -- with Terri Thurman and basically how that
19 -- that went.
20    Q.  The incident in May of 2019 about her
21 retirement that you described for us?
22    A.  Right.
23    Q.  And what did Ms. Christman advise you, if
24 anything, after you described the incident to her?
25    A.  I think she had specific questions on

Page 26

1  whether -- whether it was appropriate or not and I
2  mean that -- specifics, I don't remember.
3     Q.  Did you yourself ever conduct any
4  investigation into, let's start with Terri
5  Thurman's allegations against Judge Johnson?  In
6  other words did you yourself investigate those in
7  any way?
8     A.  I'm not sure what allegation you're
9  referring to.
10    Q.  Well, how about the allegations regarding
11 her retirement.  Did you -- Terri Thurman's
12 retirement.  Did you investigate that?  Did you
13 talk to her about it?  Did you -- of course, you
14 were there present.  Did you talk to Terri Thurman
15 after the incident and find out how she reacted to
16 the situation?
17    A.  I did.  I met with her individually the
18 very next day.
19    Q.  Did you -- and tell us what -- what went
20 on in that meeting, what occurred when you met
21 with her, that is, Terri Thurman, the next day?
22    A.  I mean, we talked about -- we talked
23 about the incident the day before and, you know,
24 specifics of that.  I mean I don't recall
25 specifics of that day.

Page 27

1     Q.  During that meeting did Terri Thurman
2  tell you that she was upset and had been upset, or
3  continued to be upset, about that confrontation
4  with Judge Johnson?
5     A.  She did.
6     Q.  And what did you do when she told you
7  that she was upset about the confrontation?
8     A.  I think that, you know, that would have
9  been probably that day or the next day I would
10 have contacted chief judge about the issues.
11    Q.  Chief Judge Lynch?
12    A.  Yes.
13    Q.  And what did -- what advice, if anything,
14 did Judge Lynch give you?
15    A.  Well, like I said we -- chief judge and I
16 had come together sometime that week and it was
17 decided that the information be turned over to
18 judicial administration.
19    Q.  Okay.  This is then in January of 2020,
20 correct?
21    A.  Yeah.  Well, yeah, that would have been.
22 That's correct.
23    Q.  Okay.  So do I understand your testimony
24 correctly that in May of 2019 when you were
25 present at the confrontation, to use your words,

Page 28

1  of Judge Johnson and Terri Thurman about her
2  retirement, you did not report that to Judge Lynch
3  then did you?
4     A.  No, I -- no.
5     Q.  Now I want to move to an -- what
6  investigation you may have done in regards to the
7  complaint allegations that Ms. Overfield made in
8  January of 2020 that we looked at, Exhibit 4.
9  Once you got that statement of hers, what -- what
10 investigation, if any, did you conduct?
11    A.  I didn't at that time.  Like I said, I
12 then contacted chief judge.
13    Q.  Did you understand at this time period,
14 that is, around January 15th, 2020, that Ms.
15 Overfield had filed a complaint against you with
16 the -- with Allyson Christman or had made a
17 complaint against you?
18    A.  I'm not sure when I was made aware of it.
19    Q.  Do you remember talking to Ms. Christman
20 in the latter part of January of 2020 about how
21 you handled Ms. Overfield's complaint against
22 Judge Johnson?
23    A.  I do.
24    Q.  And what do you recall about that topic?
25 What do you recall your discussions with her were?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street    6420 W. 95th Street    800 E. 1st Street
Topeka, KS 66604       Suite 101              Suite 305
785-273-3063           Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com    913-383-1131           316-201-1612

Page 29

1  A.  She had indicated that, you know, we just
2 kind of went through the process of how it -- how
3 I handle it, how it should have been handled and
4 -- and what could have been done differently.
5  Q.  What do you recall her telling you as to
6 how it should have been handled?
7  A.  I mean specifically I don't -- I'm not
8 sure other than she may have asked me why I didn't
9 intervene.
10  Q.  And what did you tell her when she asked
11 you why you had not intervened?
12  A.  Well, in -- in -- I told her that when I
13 started with the judicial branch in 1992 or '93,
14 whenever it was, that I was taught that it was
15 inappropriate to contradict or confront a judge.
16  Q.  I probably should have asked you this at
17 the beginning.  I asked you when you started as a
18 district court administrator for the 11th Judicial
19 District, but do I understand your -- what you
20 just told us that you'd worked for the judicial
21 branch since 1992 or '93?
22  A.  Correct.
23  Q.  And was that -- were you working with the
24 OJA agency or what were you doing?  Can you give
25 us a brief history of your work in the judicial

Page 30

1 branch?
2  A.  I started as a court services officer in
3 -- out of -- I think it was '93, actually, and
4 yeah, I was -- yeah, a State of Kansas employee
5 through the Office of Judicial Administration.
6  Q.  And so was your understanding, or your
7 training, that as a district court administrator
8 you should not disagree with or confront a judge
9 about their conduct or decisions in personnel
10 matters?
11  A.  Well, I mean that's -- I mean that's --
12 that's what I learned when I started in '93.  Now,
13 training after I became a court administrator, not
14 -- no.
15  Q.  And when Ms. -- now we're moving back to
16 again January of 2020.  When you're having this
17 conversation with Ms. Christman and she asks you
18 why you had not intervened, did you explain to her
19 that that's how -- what you'd been taught?
20  A.  Yes.
21  Q.  And what was her response?
22  A.  I don't remember exactly her response but
23 I think she probably told me that that's not
24 right.  That wasn't correct.
25  Q.  And what did she tell -- go ahead.

Page 31

1 Didn't mean to cut you off.
2  A.  I wasn't trying -- that's -- I wasn't
3 trying to elaborate any more.
4  Q.  Okay.  What did she tell you then you
5 should have done?
6  A.  Specifically, again, I'm not sure other
7 than that was inappropriate and I should have
8 intervened.
9  Q.  And did she elaborate on how she thought
10 you should have intervened?  In other words, what
11 she thought you should have done?
12  A.  Not necessarily, I don't think.
13     MR. JOHNSON:  Tyler, let's look at
14 Exhibit 7.  I'd like to ask the witness about
15 that.
16     BY MR. JOHNSON:
17  Q.  Now, Mr. Young, I'll represent to you
18 this is a letter from Ms. Christman to Judge Lynch
19 and to Ms. Overfield about her investigation
20 regarding you.  Have you seen this letter
21 before --
22  A.  I have.
23  Q.  -- today?  Okay.  Did you review this in
24 preparation for your deposition today?
25  A.  Briefly.

Page 32

1  Q.  Would you have seen this letter around
2 the date of the letter in February of 2020?
3  A.  No, I hadn't seen it actually prior to --
4 until yesterday.
5  Q.  And did you understand that in January
6 and February of 2020 that Ms. Christman was
7 investigating a complaint that Ms. Overfield had
8 made against you?
9  A.  I knew that Allyson had been in the area
10 in the district but what her specific -- what she
11 was specifically doing, I didn't know.
12     MR. JOHNSON:  Let me ask you, Tyler, if
13 you can move that up so we can see the bottom of
14 the page.
15     BY MR. JOHNSON:
16  Q.  Mr. Young, if you would read the bottom
17 of that last paragraph it says: I spoke at length
18 with witnesses provided by Ms. Overfield and with
19 Mr. Young.
20     Would you read that to yourself and then I
21 want to ask you some questions about it.  In fact,
22 once you get to the bottom if Tyler can -- yeah.
23 Okay.
24     MR. JOHNSON:  Tyler, if you can move that
25 up just a little bit more so that he can read

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 33

1 that paragraph right above Conclusions?
2     BY MR. JOHNSON:
3     Q.  Are you with me, Mr. Young?  You see the
4 paragraph at the bottom of the first page and the
5 top of the second page?
6     A.  I see it.
7     Q.  Okay.  Read that to yourself and then I'm
8 going to ask you some questions about it.
9     A.  Okay.
10     Q.  And my first question is in this letter
11 Ms. Christman states that you had begun an
12 investigation based on the negative exchange
13 between Ms. Overfield and Judge Johnson on January
14 10th.  You see that statement?
15     A.  Yes.
16     Q.  And had you begun an investigation into
17 that exchange?
18     A.  The exchange with Ms. Overfield?
19     Q.  And Judge Johnson, uh-huh.
20     A.  No.
21     Q.  Okay.  And you see the next sentence Ms.
22 Christman says, quote: I found Mr. Young was
23 seeking to find resolutions prior to being advised
24 to stop due to being named in Ms. Overfield's
25 complaint dated Tuesday, January 14, 2020.  Do you

Page 34

1 see that?
2     A.  I see it.
3     Q.  And do you agree that you were advised to
4 stop any investigation that you'd been conducting?
5     A.  Yes.
6     Q.  And who advised you to stop your
7 investigation?
8     A.  I believe that would have been probably
9 chief judge.  I'm not sure.  Which would -- I'm
10 not sure.
11     Q.  When -- when did you come -- become aware
12 that Ms. Overfield had filed a complaint against
13 you personally dated January 14th, 2020?  In other
14 words, using that as a date, can you tell us when
15 you became aware that Ms. Overfield had a
16 complaint against you?
17     A.  Not specifically, no.
18     Q.  Now, if you go to the top of the next
19 page and Ms. Christman finds that you responded to
20 others' complaints in a manner you believed to be
21 appropriate scope of authority for his position.
22 You see that?
23     A.  I see it.
24     Q.  And I believe you've told us that you
25 told her that you thought that you did not have

Page 35

1 the authority to intervene or disagree with a
2 district court judge.  Did I get that right?
3     A.  Right.
4     Q.  And is there anything else that -- well,
5 let me ask you this.  Did you believe that you --
6 let me rephrase that.
7     What scope of authority for your position did
8 you think you had in terms of investigating Ms.
9 Overfield's complaints against Judge Johnson?
10     A.  Well, again, because I was named, you
11 know, in the complaint or in a complaint, I'm -- I
12 mean I -- at that point I shouldn't have been
13 involved.
14     Q.  So at some point in time you became aware
15 of the complaint by Ms. Overfield against you, and
16 then you didn't think it was appropriate to
17 proceed forward with an investigation of her
18 complaint against Judge Johnson.  Would that be
19 fair?
20     A.  That's fair.
21     Q.  You see the last sentence right above the
22 Conclusion Ms. Christman says: I also found a lack
23 of training for court administrators on how to
24 address such complex employment situations, end of
25 quote.  Do you see that?

Page 36

1     A.  I do.
2     Q.  And do you agree with that statement,
3 that you lacked training on how to address complex
4 employment situations?
5     A.  That's a fair statement.
6     Q.  And that's -- well, let me ask -- did you
7 tell Ms. Christman that when you were talking to
8 her, that you just hadn't received any training on
9 how to deal with employment situations such as Ms.
10 Overfield's allegations against Judge Johnson?
11     A.  No.  I don't remember that.
12     Q.  Do you recall in this same time frame in
13 February of 2020 talking to Chief Judge Lynch
14 about limiting Judge Johnson to court matter --
15 hearing court matters only in Oswego and not in
16 Parsons?
17     A.  Correct.
18     Q.  And do you recall that Judge Lynch
19 entered such an order, administrative order?
20     A.  Yes.  I -- yeah, I do believe there was
21 an administrative order.
22     MR. JOHNSON:  And Tyler, would you show
23 Mr. Young Exhibit 9?
24     BY MR. JOHNSON:
25     Q.  And Mr. Young, do you recognize this is



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 37

1  the order that said that Judge Johnson will be
2  sitting in Oswego for office hours and court until
3  further order?
4      A.  Yes.
5      Q.  And did you talk with Judge Lynch about
6  this?  Did he seek your advice and input before he
7  entered this order?
8      A.  I don't recall specifically him seeking
9  my advice.
10     Q.  Did he seek your input or did he advise
11 you of this -- that he was thinking about it
12 before he entered the order?
13     A.  I don't remember that.
14     Q.  You see this order is dated January 21st
15 of 2020.  Do you think by that date that you had
16 learned that Ms. Overfield had filed a complaint
17 with the OJA against you?  In other words, does
18 that help you remember the date you may have
19 learned about Ms. Overfield's complaint against
20 you?
21     A.  Again, I don't remember when the exact
22 date I learned of that.
23     Q.  Did you, around this January 21st, 2020,
24 time frame, talk to Judge Johnson about this order
25 and what he thought about it and how it would go

Page 38

1  into effect?
2      A.  No.
3      Q.  Now, as you understood this order, did
4  this mean that Judge Johnson was not to conduct
5  any business or be present in the Parsons
6  courthouse?
7      A.  I mean, yeah, to me it -- to me it is
8  exactly what it says, that he's to conduct all
9  court business in Oswego.
10     Q.  And after -- that's beginning on January
11 27th, 2020, correct?
12     A.  January 27th?  Oh, yeah.  Okay.  Yeah.
13 You're right.
14     Q.  Yeah.  The order is dated January 21st
15 but its effective date is January 27th if I'm
16 reading that correctly.
17     A.  Right.
18     Q.  Do you agree?
19     A.  Right.
20     Q.  So after January 27th, 2020, do you
21 recall either Ms. Overfield or Terri Thurman
22 advising you that Judge Johnson was in fact
23 conducting business in the Parsons courthouse?
24     A.  Yes.
25     Q.  And what did you do when you received

Page 39

1  that information from -- well, let me back up.
2      Do you remember both -- who told you that or
3  both Ms. Overfield and Terri Thurman told you that
4  Judge Johnson was doing business in the Parsons
5  courthouse?
6      A.  I don't remember who told us
7  specifically.
8      Q.  Do you recall them telling you that
9  several times?
10     A.  Yeah.
11     Q.  And when they told you that, what if
12 anything did you do?
13     A.  I would have relayed that information to
14 chief judge.
15     Q.  And did the chief judge tell you what --
16 or when you told it to him what did he say or do,
17 that is Judge Lynch?
18     A.  I don't remember specifically, nor did he
19 discuss his thoughts or what his actions were
20 going to be.
21     Q.  After you received information from Ms.
22 Overfield and Terri Thurman that Judge Johnson was
23 conducting business in the Parsons courthouse, did
24 you report that to Allyson Christman?
25     A.  Not that I recall.  I don't know why I

Page 40

1  would have called her.  No, I don't recall that.
2      Q.  So you didn't think that was important
3  information that you should report to her?
4      A.  Not necessarily.  Like I said I reported
5  -- I was given that information to chief judge.
6      Q.  Did you take any steps to verify the
7  complaints by that -- that Judge Johnson was
8  conducting business in the Parsons courthouse?  In
9  other words did you look at the calendar of where
10 he was or ask him where he was or ask anybody
11 when Judge Johnson came to the Parsons courthouse
12 and for what reason?
13     A.  No.
14     Q.  Why not?
15     A.  At that point I -- I'm part of the
16 complaint so any decision making on my part or
17 investigative action would not have been
18 appropriate.
19         MR. JOHNSON:  Tyler, let's go to Exhibit
20 19.
21     BY MR. JOHNSON:
22     Q.  And Mr. Young, do you recall that about a
23 year after Judge Lynch had entered the order we
24 just looked at, that he rescinded that order and
25 issued an order saying Judge Johnson at his

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street  6420 W. 95th Street  800 E. 1st Street
Topeka, KS 66604    Suite 101            Suite 305
785-273-3063        Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com 913-383-1131         316-201-1612

Page 41

1 discretion may schedule and hold court in either
2 Oswego or Parsons?
3    A.  Yes.  I've seen that order.
4    Q.  And did you, prior to this order being
5 entered by Judge Lynch on February 10th, 2021, did
6 you have a discussion with Judge Lynch about that?
7    A.  I don't -- I don't recall discussing it
8 specifically with him, no.
9    Q.  Prior to February 10th, 2021, do you
10 recall discussing the possible rescission of the
11 earlier order with Ms. Overfield?
12    A.  No.
13    Q.  Do you remember Ms. Overfield expressing
14 concerns to you at the end of January of 2021 that
15 she had heard rumors that Judge Johnson was going
16 to be allowed to go back to the Parsons
17 courthouse?
18    A.  I had heard that; specifically who it
19 came from, I don't know.
20        MR. JOHNSON:  Tyler, let's -- if you can
21 find Exhibit 24 and show it to Mr. Young.
22        BY MR. JOHNSON:
23    Q.  Mr. Young, if you look at the bottom part
24 of the first page of Exhibit 24, can you see that
25 okay?

Page 42

1    A.  Yeah.  You might --
2        MR. JOHNSON:  Tyler, can you enlarge that
3 a little bit?  Can you see that, Mr. Young?  It's
4 kind of small print.  I apologize.  Can you go to
5 the bottom of that first page, Tyler?  Thank you.
6 Yeah.
7        BY MR. JOHNSON:
8    Q.  Can you see, Mr. Young, that e-mail dated
9 January 29th, 2021, from Ms. Overfield to you?
10    A.  I can see it.
11    Q.  And would you read that -- you haven't
12 reviewed this e-mail prior to your deposition
13 today have you, in preparation for your
14 deposition?
15    A.  I'm not sure I reviewed this one.
16    Q.  Okay.  Well, read that first page and go
17 on to the second page if you want to and then I
18 want to ask you some questions about this e-mail
19 that Ms. Overfield sent to you on January 29,
20 2021.  Okay?
21    A.  Okay.
22    Q.  Now, does this jog your memory that you
23 received this e-mail from Ms. Overfield and that
24 she expressed concerns about what she'd heard
25 about Judge Johnson returning to the Parsons

Page 43

1 courthouse?
2    A.  I vaguely remember the e-mail.
3    Q.  And is it accurate that she had not
4 received any notification of that action from you
5 as of January 29, 2021?
6    A.  Yeah.  It's possible.
7    Q.  And as of January 29th, 2021, had you had
8 a conversation with Ms. Christman by that point in
9 time that Judge Lynch was considering allowing
10 Judge Johnson to return to hear cases in the
11 Parsons courthouse?
12    A.  I don't recall that specific conversation
13 with -- with Ms. Christman, no.
14    Q.  Now, after Judge Lynch rescinded his
15 earlier order and allowed Judge Johnson to
16 schedule and hold court in either Oswego or
17 Parsons, you recall that around that period of
18 time that he retired from being a judge?
19    A.  Judge Lynch retiring?
20    Q.  Yes.
21    A.  Yes.
22    Q.  Around this time frame do you recall
23 Judge Lori Bolton Fleming being appointed as the
24 chief judge for the 11th Judicial District?
25    A.  Right.

Page 44

1    Q.  And do you remember approximately what
2 time frame that was?  Was that in the spring of
3 2021, early spring, late spring, do you remember?
4    A.  No.  I -- no, I don't.  I don't remember
5 when that took place.
6    Q.  In any event do you recall that Judge
7 Lori Fleming was the chief judge by the summer of
8 2021?
9    A.  Right.
10    Q.  And do you recall, once Judge Lori Bolton
11 Fleming became the chief judge, you ever talking
12 with her about Ms. Overfield's and Terri Thurman's
13 concerns about Judge Johnson working at the
14 Parsons courthouse where they were also located?
15 You ever remember that topic coming up with her
16 when you met with her as the chief judge?
17    A.  I think that the only thing that I said
18 to her or asked her was that if she was fully
19 aware of that situation.
20    Q.  And what did Judge Fleming say in
21 response to that?
22    A.  I believe she said that she was aware.
23    Q.  And did she tell you -- did she ask you
24 any questions about it, about any of the prior
25 history of what had gone on between Terri Thurman

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

Page 45

1  and Ms. Overfield and Judge Johnson?
2     A.  I don't know -- not specifically.
3     Q.  And did she tell you that she -- did she
4  tell you how she intended or wanted to deal with
5  that situation, that is, Judge Fleming told you
6  what she intended to do?
7     A.  I don't.  I don't remember if she did or
8  not.
9     Q.  Do you remember her telling you, or Ms.
10 Overfield telling you that Judge Johnson was
11 supposed to let Ms. Overfield and Terri Thurman
12 know when on dates, times, when he was coming to
13 the Parsons courthouse so they could work
14 remotely?
15    A.  Right.
16    Q.  So you had -- did you have that
17 discussion with them?  I'm sorry.  Tell me what
18 you recall about that?
19    A.  Other than I think -- the understanding
20 was that he was to notify or make -- make it
21 known when he was going to work in Parsons.
22    Q.  And was that procedure before or after
23 Judge Lynch's earlier decision order limiting him,
24 Judge Johnson, to the Oswego courthouse, did that
25 apply both periods of time or only after the

Page 46

1  rescission of the first order?
2     A.  I don't -- I don't remember specifically
3  when.  I don't know.
4     Q.  What did you understand was the procedure
5  or how Ms. Overfield and Terri Thurman were to be
6  notified that Judge Johnson was going to be in the
7  Parsons courthouse so they could work remotely?
8     A.  I believe that he was to put it on -- on
9  his Google calendar when he was going to be or
10 where he was going to be on a particular day.
11    Q.  And do you recall either -- well, let's
12 start with: Do you recall Ms. Overfield informing
13 you that Judge Johnson would show up at the
14 Parsons courthouse at a date and time that were
15 not on his Google calendar --
16    A.  Right.
17    Q.  -- do you remember that topic?  Pardon?
18    A.  I do.  I do.
19    Q.  And did you conduct any investigation
20 into that to find out whether or not that was
21 true?
22    A.  Again, I would have turned that over to
23 chief judge because, you know, I'm part of the
24 complaint so I wouldn't have gotten involved in
25 that.

Page 47

1     Q.  And which chief judge are you referring
2  to that you turned that -- would have turned that
3  over to?
4     A.  It would have been both.
5     Q.  Now, do you recall in the summer of 2020
6  an issue, or being told or asked by Ms. Overfield
7  why her annual evaluation for the time period of
8  19, or excuse me, 2019 to 2020 had not been ever
9  completed?  Do you remember that topic coming up?
10    A.  I do.
11    Q.  And what do you recall your discussions
12 with Ms. Overfield were about that topic?
13    A.  I don't know specifically what we talked
14 about other than, again, I was part of the
15 complaint and should, you know, shouldn't be a
16 part of that process.
17    Q.  Do you recall completing in the summer of
18 2021 Ms. Overfield's annual evaluation for the
19 2019 to 2020 time period?
20    A.  I did.
21       MR. JOHNSON:  And Tyler, if you could
22 bring up Exhibit 26 so the witness can look at it.
23       BY MR. JOHNSON:
24    Q.  Now, at the -- can you read that very
25 well, Mr. Young?

Page 48

1        MR. JOHNSON:  Can you enlarge that just a
2  little bit, Tyler?
3        BY MR. JOHNSON:
4     Q.  As a background, Mr. Young, do you
5  complete annual evaluations for other -- for
6  various employees in the 11th Judicial District?
7     A.  I do.
8     Q.  So you're familiar with this evaluation
9  form?
10    A.  I am.
11    Q.  And am I reading this correctly in the --
12 at the top, not quite the top, but that the rating
13 period is from 6/23/2019 to 6/23/20?
14    A.  Correct.
15    Q.  And were you the person then who filled
16 out this evaluation of Ms. Overfield for that
17 rating period?
18    A.  I did complete one.
19    Q.  And did you review this document in
20 preparation for your deposition today?
21    A.  No.
22    Q.  Do you want to look at that or are you --
23 you agree that you completed this evaluation for
24 Ms. Overfield?
25    A.  No.  I agree that I completed it.



Page 49

1  Q. And do you agree, let's go to page -- do
2  you recall that the overall -- maybe to speed this
3  up, do you recall the overall performance rating
4  that you gave to Ms. Overfield was a successful
5  overall rating?
6  A. I believe that's correct.
7  Q. And do you recall that prior to this
8  performance evaluation that Ms. Overfield had
9  consistently been given beyond expectation overall
10 ratings?
11 A. Right.
12 Q. So my question is why did you rate Ms.
13 Overfield for the 2019 to 2020 time period as only
14 successful? What was the reason for that overall
15 rating, in other words?
16 A. I don't have a specific reason for it. I
17 mean, you know, in my opinion successful is good.
18 Q. Had you supervised Ms. Overfield during
19 that rating period, that is, from June 2019 to
20 June of 2020?
21 A. I'm not sure. I would have -- I would
22 have -- I mean normally her judge or a judge would
23 have done this but because we, you know, Judge
24 Jack retired and the lapse in time and so that's
25 why I ended up doing it.

Page 50

1  Q. Now, you told us previously, I believe,
2  that you had not investigated certain complaints
3  that Ms. Overfield had brought to your attention
4  because she had also filed a complaint against you
5  and you didn't think that was appropriate. Did I
6  understand that testimony correctly?
7  A. Correct.
8  Q. So why did you feel it was appropriate
9  for you to perform or complete Ms. Overfield's
10 evaluation that we marked as Exhibit 26?
11 A. Actually I had given that evaluation to
12 at the time Chief Judge Lynch to complete, and it
13 never got completed.
14    MR. JOHNSON: Tyler, if we can go to the
15 back page, last page of this exhibit, I'm going to
16 show Mr. Young something.
17    BY MR. JOHNSON:
18 Q. And do you see on this last page, Mr.
19 Young, that Ms. Overfield says she does not agree
20 with it and dates it June 24th, 2021? You see
21 that?
22 A. I see it.
23 Q. And do you agree that this is about the
24 time that you gave this evaluation to Ms.
25 Overfield?

Page 51

1  A. Yes.
2  Q. And when you gave this evaluation to Ms.
3  Overfield, did you have a discussion with her
4  about it?
5  A. I did. In fact I, if I remember
6  correctly, I asked her if she was okay with me
7  completing it prior to doing it, and she indicated
8  that that was fine.
9  Q. And then when you met with -- go ahead.
10 A. When I got this -- this particular form
11 back I asked her if she wanted to have a
12 discussion in relation to -- to what she had --
13 the way she had signed it.
14 Q. And tell us what you recall about that
15 discussion.
16 A. I -- I think she -- she said yeah, that
17 we could sit down and discuss it.
18 Q. Did she tell you why she disagreed with
19 it?
20 A. Umm. Yes.
21 Q. And what did -- what do you recall she
22 told you were the reasons she disagreed with it?
23 A. Just as previously mentioned, that it did
24 not meet or -- or coincide, if you will, with
25 previous evaluations.

Page 52

1  Q. And when she made that statement do you,
2  how did you respond?
3  A. That I don't remember.
4  Q. And since Ms. Overfield had received in
5  her previous evaluations an overall rating of
6  beyond expectations, did you think it was fair to
7  give her an overall rating of only satisfactory?
8  A. Again, in my opinion satisfactory is a
9  good evaluation.
10 Q. Prior to completing this evaluation did
11 you discuss that topic with Judge Lori Fleming and
12 tell her you were going to complete this
13 evaluation for Ms. Overfield?
14 A. I think that it was discussed who should
15 do it. Initially -- I believe initially when the
16 evaluation time frame when it was due, I had a
17 discussion with Allyson Christman and she agreed
18 that I should not be involved in that process, and
19 that's why it was never done initially.
20 Q. So did you have a discussion with Ms.
21 Christman in June of 2020 advising her that you
22 were going to go ahead and do the evaluation at
23 that point in time?
24 A. I don't remember. I don't remember if I
25 had that specific conversation with Allyson or


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 53

1  not. Like I previously said, it was given to
2  Judge Lynch to do and it was never done, and
3  obviously it ended up back in my lap at some
4  point. I do believe that I asked Chief Judge
5  Fleming at one point if she would be willing to do
6  it and she -- she wouldn't, or felt like that she
7  couldn't.
8      Q. Do you recall after what happened after
9  Ms. Overfield signed the evaluation saying I do
10 not agree with it?
11     A. I'm sorry, say that again.
12     Q. Well, let me ask it a different way. Do
13 you recall that after Ms. Overfield disagreed with
14 this evaluation which she signs there on June
15 24th, 2021, that Judge Lori Fleming did complete
16 another evaluation for the same time period?
17     A. Yeah. I don't know who completed it.
18     Q. Do you recall seeing that evaluation that
19 Judge Fleming completed?
20     A. Not necessarily.
21     Q. Do you recall that the evaluation that
22 Judge Fleming completed changed Ms. Overfield's
23 overall performance rating from a successful that
24 you had given her to a beyond expectation?
25 Remember that?

Page 54

1      A. No, I don't remember.
2      Q. Did Judge Lori Fleming ever consult with
3  you about her own evaluation that differed from
4  your evaluation of Ms. Overfield for the same
5  period of time?
6      A. No, not that I remember. I don't
7  remember seeing -- I just don't remember seeing
8  what that -- Judge Fleming supposedly done.
9      Q. Now, the evaluation that -- that you did
10 that we're looking at, you didn't sign that as the
11 rater. Is that correct?
12     A. Right.
13     Q. And would you have been the rater then?
14 Would that have been the role you were playing?
15     A. Correct.
16     Q. And the appointing authority signature,
17 that would be the chief judge, correct?
18     A. It could -- it could be either the chief
19 judge or myself. Usually those evaluation forms
20 come to me once they're completed and I review
21 them for -- for -- to make sure they're complete
22 and accurate.
23     Q. And do you remember then the review that
24 Judge Fleming conducted or completed after June
25 24th, 2021, for Ms. Overfield, do you remember

Page 55

1  that one coming to your attention?
2      A. No. Again, I don't remember seeing that
3  particular document.
4      Q. Now, do you recall at the end of 2021
5  learning that Ms. Overfield was resigning from her
6  position with the 11th Judicial District and was
7  transferring to the 14th Judicial District?
8      A. I remember getting that information.
9      Q. And do you recall sending her an e-mail
10 about her resignation and how it would be
11 accomplished?
12     A. I don't remember that e-mail.
13        MR. JOHNSON: Tyler, would you show Mr.
14 Young Exhibit 23?
15     BY MR. JOHNSON:
16     Q. Can you see this one okay, Mr. Young?
17 It's kind of small.
18     A. I see it.
19     Q. Okay. Do you recognize this then as an
20 e-mail that you sent to Ms. Overfield on December
21 15th, 2021, about her last day?
22     A. I see that.
23     Q. And you ask her that on her last -- you
24 understood her last day would be December 17th.
25 Am I reading that correctly?

Page 56

1      A. That was my understanding.
2      Q. And that you wanted a time when she would
3  be leaving that day so that you could be there to
4  secure her building keys and computer?
5      A. Correct.
6      Q. You see that?
7      A. Right.
8      Q. And did you do that?
9      A. Yes. I -- I -- yes, I went and got those
10 items from her, whether it be -- I don't remember
11 if it was the 17th or not, but I remember securing
12 those items.
13     Q. And was that your common practice was to
14 -- that this was the procedure of leaving?
15     A. Any time somebody is leaving employment I
16 go through a process in getting keys and whatever
17 -- whatever else an employee might have that
18 belongs to the court.
19     Q. Do you recall when you met with Ms.
20 Overfield, or when you sent this e-mail to Ms.
21 Overfield, that she requested of you permission to
22 take her laptop with her to the 14th Judicial
23 District? Do you remember that topic or request?
24     A. Not specifically. I know we talked about
25 a -- there was a steno machine that went to the

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 57

1  14th but I mean that was -- that was paid for.
2  It ended up being paid for by the 14th Judicial
3  District.
4      Q.  Well, I'm talking about her laptop.  Do
5  you remember her asking you if she could take her
6  laptop with her because she would still be doing
7  some work for the 11th Judicial District preparing
8  transcripts and that those were on her laptop and
9  she wanted to take it with her?
10     A.  Maybe.  I vaguely remember a conversation
11 about that.
12     Q.  And during that conversation do you
13 recall telling her that she could not take her
14 laptop with her?  In other words you didn't give
15 her permission to do that?
16     A.  I don't remember that.
17     Q.  Now, when previous employees of the
18 judicial -- 11th Judicial District had retired,
19 had you allowed them to take equipment with them
20 when they left?
21     A.  That has been allowed.
22     Q.  And do you recall that when Judge Jack
23 retired he was allowed to take his iPad with him?
24 Do you remember that?
25     A.  Yeah, I can remember that.

Page 58

1      Q.  If Ms. Overfield were to testify that you
2  did allow Judge Jack to take his iPad, would you
3  dispute her testimony?
4      A.  No.  I would dispute that.  I'm not sure
5  -- I don't think I would have allowed that.
6      Q.  Do you recall when Judge Fleming, not
7  Lori Fleming but her father-in-law, when he
8  retired that he was allowed -- that you allowed
9  him to take his computer system with him?
10     A.  Yeah.  It has been -- there have been
11 occasions where judges will take their CPU with
12 them.
13     Q.  And back to Ms. Overfield.  Do you recall
14 her asking you, since you wouldn't let her take
15 her laptop with her, if she could purchase it from
16 the 11th Judicial District and pay for it herself?
17 Do you remember that request from her?
18     A.  Not specifically.
19     Q.  Do you recall when Vickie Barrett left
20 the 11th Judicial District that you allowed her to
21 take her laser printer with her?
22     A.  I do not remember that.
23     Q.  If Ms. Overfield were to testify that
24 Vickie Barrett was allowed to take her laser
25 printer with her when she left the 11th Judicial

Page 59

1  District, would you dispute that testimony?
2      A.  I would dispute my authorization.
3      Q.  So you don't recall ever authorizing
4  Vickie Barrett to take her laser printer with her
5  when she transferred to the 14th Judicial
6  District.  Is that right?
7      A.  When Vickie Barrett transferred?
8      Q.  Yes, or retired?
9      A.  No, I don't recall that.
10         MR. JOHNSON:  Let's take a break for
11 about ten minutes.  I need to consult with my
12 client but we may be getting close to the end.
13 Okay?
14         (THEREUPON, a recess was taken)
15         MR. JOHNSON:  All right.  Let's go back
16 on the record.  Mr. Young, I don't have any
17 questions for you and thank you for your time, but
18 your attorneys may have some for you.
19         MS. MOCK:  I don't have any questions at
20 this time.  Thank you.  Mac, I'm going to go
21 ahead and have her transcribe this and then send
22 it to you and you'll have a chance to look at it
23 and sign it.  Okay?
24         THE WITNESS:  Okay.
25         (THEREUPON, the deposition concluded at

Page 60

1  1:45 p.m.)
2  .
3  .
4  .
5  .
6  .
7           SIGNATURE
8  .
9      The deposition of MAC YOUNG was taken in
10 the matter, on the date, and at the time and place
11 set out on the title page hereof.
12 .
13     It was requested that the deposition be
14 taken by the reporter and that same be reduced to
15 typewritten form.
16 .
17     It was agreed by and between counsel and
18 the parties that the deponent will read and sign
19 the transcript of said deposition.
20 .
21 .
22 .
23 .
24 .
25 .

Page 61

1 AFFIDAVIT
2 .
3 STATE OF _____:
4 COUNTY/CITY OF _____:
5 .
6      Before me, this day, personally appeared,
7 MAC YOUNG, who, being duly sworn, states that the
8 foregoing transcript of his/her Deposition, taken
9 in the matter, on the date, and at the time and
10 place set out on the title page hereof,
11 constitutes a true and accurate transcript of said
12 deposition, along with the attached Errata Sheet,
13 if changes or corrections were made.
14 .
15      _____
16           MAC YOUNG
17 .
18    SUBSCRIBED and SWORN to before me this
19 _____ day of _____, 2022 in the
20 jurisdiction aforesaid.
21 .
22 _____    _____
23 My Commission Expires     Notary Public
24 .
25 .

Page 62

1      DEPOSITION ERRATA SHEET
2 .
3 RE:    APPINO & BIGGS REPORTING SERVICE, INC.
4 .
5 FILE NO.: 67122
6 .
7 CASE:   SABRINA S. OVERFIELD vs.
8         STATE OF KANSAS
9 .
10 DEPONENT: MAC YOUNG
11 .
12 DEPOSITION DATE: 10/6/2022
13 .
14 To the Reporter:
15 I have read the entire transcript of my Deposition
16 taken in the captioned matter or the same has been
17 read to me.  I request that the following changes
18 be entered upon the record for the reasons
19 indicated.  I have signed my name to the Errata
20 Sheet and the appropriate Certificate and
21 authorize you to attach both to the original
22 transcript.
23 .
24 .
25 .

Page 63

1 PAGE:LINE FROM    TO         REASON
2 .
3 .
4 .
5 .
6 .
7 .
8 .
9 .
10 .
11 .
12 .
13 .
14 .
15 .
16 .
17 .
18 .
19 .
20 .
21 .
22 .
23 .
24 SIGNATURE:_____ DATE:_____
25         MAC YOUNG

Page 64

1         CERTIFICATE
2 STATE OF KANSAS
3 COUNTY OF SHAWNEE
4    I, Ksenija M. Zeltkalns, a Certified
5 Court Reporter, Commissioned as such by
6 the Supreme Court of the State of
7 Kansas, and authorized to take
8 depositions and administer oaths within
9 said State pursuant to K.S.A 60-228,
10 certify that the foregoing was reported
11 by stenographic means, which matter was
12 held on the date, and the time and place
13 set out on the title page hereof and
14 that the foregoing constitutes a true
15 and accurate transcript of the same.
16    I further certify that I am not
17 related to any of the parties, nor am I
18 an employee of or related to any of the
19 attorneys representing the parties, and
20 I have no financial interest in the
21 outcome of this matter.
22    Given under my hand and seal this
23 21st day of October, 2022.
24    _____
25    Ksenija M. Zeltkalns, C.C.R. No. 1461

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street   6420 W. 95th Street   800 E. 1st Street
Topeka, KS 66604      Suite 101             Suite 305
785-273-3063          Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com   913-383-1131          316-201-1612