# IN THE UNITED STATES DISTRICT COURT OF THE DISTRICT OF KANSAS

|                              |     |                              |
| ---------------------------- | --- | ---------------------------- |
| SABRINA S. OVERFIELD,        | )   |                              |
|     Plaintiff, | )   |                              |
|                              | )   |                              |
| vs.                          | )   | Case No. 21-4093-JWB-KGG     |
|                              | )   |                              |
| STATE OF KANSAS              | )   |                              |
|     Defendant. | )   |                              |
| _____ | )   |                              |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

The plaintiff, Sabrina Overfield, is employed as a district court reporter for the defendant, the State of Kansas ("the State"). Ms. Overfield asserts two claims against the State under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq: (1) hostile work environment based on her sex; and (2) retaliation for engaging in protected activities. The State has filed a motion for summary judgment as to both of these claims.

For the reasons discussed below, genuine factual issues exist as to both of Ms. Overfield's claims. In other words, when the record is viewed in the light most favorable to Ms. Overfield, a reasonable jury could return a verdict in her favor on both of her claims. Consequently, the State's motion for summary judgment must be denied in its entirety.

## STATEMENT OF FACTS

Pursuant to D. Kan. Rule 56.1, Ms. Overfield will first respond to the facts set forth in the State's memorandum in support of summary judgment. (Doc. #38) Ms. Overfield will then set forth additional facts which, together with the disputed facts set forth by the State, raise genuine issues of material fact which preclude summary judgment.

## A. **Facts Set Forth By The State**

1.-2.    Uncontroverted.

3.-8.    Uncontroverted but must be supplemented. See Statement of Facts below at no. 80.

9.    Uncontroverted but must be supplemented. See Statement of Facts below at nos. 77-79.

10.-11. Uncontroverted.

12.    Uncontroverted but must be supplemented. See Statement of Facts below at nos. 74-76.

13.-18. Uncontroverted.

19.    Uncontroverted but must be supplemented. Ms. Overfield's report of her confrontation with Judge Johnson on January 10, 2020, additionally stated:

> My name is Sabrina Overfield and I am an official court reporter for the 11th Judicial District. I have held that position for 21 plus years. Through all those years, I have had the privilege to work with several district court judges, and today was the first time where I felt a district court judge's offensive behavior and verbal abuse and intimidation towards me was very disrespectful and hostile. Judge Fred Johnson and I have had a working relationship these last two short years, but Friday I believe Judge Johnson crossed the line and I do not believe I can continue to work in the environment in which it caused.
>
> ....
>
> ... I was beginning to fear what Judge Johnson might do next, and I exited his office and walked up into the clerk's office, and proceeded into Terri [Thurman's] office our district court clerk .... At this time, I was pretty upset and shook up and feared what would happen and told Terri I was going to go home for the day. She informed me I should immediately call Mac Young, our court administrator. I would not walk down the back hallway back to my office, so I went out the back door, and completely around the building to go in the back door to

gather my things and go home. After I gathered my things, I left and called my court administrator, Mac Young, from my car and he told me to write the incident down.

In conclusion, I love my profession and what it stands for and this affected me emotionally and physically to my core. I left work immediately after this incident because I was so shaken and crying, I couldn't perform my duties to my professional ability, I consider myself a very strong woman, not prone to histrionics or emotional outbursts, but I have never been treated like that ever. The people I visited with immediately after this encounter could tell that I was extremely upset and shaken. I am not sleeping well and I am continually thinking of this incident and I'm a nervous wreck realizing I will be going back to my job on Monday having to face Judge Fred Johnson. (As I type this statement, I am shaking and nervous just reliving it and what is has done to me.) I have been verbally abused, intimidated, threatened, brow beat, and disrespected from the highest officer in the district court and now fear what he might do and is capable of doing, mentally and physically, and this isn't his first incident with a State employee. I am the third State employee, that I know of, Judge Fred Johnson has treated like this, and I feel I am now working in a hostile environment.

(Defendant's appendix in support of summary judgment ["Def. append."], doc. #38-12 at pp. 1-3)

20.     Controverted in part. Ms. Overfield testified that Judge Johnson would "[k]ind of rise" when he slammed his hand on his desk, and that he stood up as she was leaving. (Def. append., doc. #38-11 at p. 19)

21.     Uncontroverted.

22.     Uncontroverted but must be supplemented. Ms. Overfield's report of her confrontation with Judge Johnson on January 13, 2020, further stated:

I proceeded to come into work today still very upset and shaken of the events that happened on Friday the 10th of January. When I arrived at 9:30 a.m., I went to my office and closed and locked the door behind me. I left for lunch at approximately 12:25 p.m. When I returned from lunch, before

> I exited my car, I called our court administrator, Mac Young, to let him know I had come to work and was working with my door shut and locked, knowing I had told him on Friday that I was now working in a hostile working environment. He didn't respond and I also told him I had my incident report about Friday completed and how did he want to send it to him. Mac Young responded, 'Either scan it or e-mail it. No, just e-mail it,' and I told him I would. I also told him I would be filing a judicial complaint with the State of Kansas for Judge Johnson's actions towards me and Mac Young's response was 'Okay.'

(Def. append., doc. #38-12 at p. 3)

23.     Controverted. Ms. Overfield testified that Judge Robert Fleming was not scheduled to be the visiting judge until sometime in February of 2020. (Declar. of S. Overfield at ¶ 4, included in plaintiff's appendix in opposition to summary judgment ["plt. append."])

24.     Uncontroverted.

25.-30.Uncontroverted but must be supplemented. Ms. Overfield's report of her confrontation with Judge Johnson on January 13, 2020, additionally stated:

> The conversation [with Mac Young] ended, and I went back into my office through Judge Jack's office, because I had left my door closed and locked, and I decided to lock Judge Jack's office door for my peace of mind, and I am very thankful I did. I returned to my desk and made a few phone calls to attorneys conducting court business. I happened to be on the phone with Sara Beezley and I hear a faint knock I thought on Judge Jack's door. I didn't say anything and continued my conversation with Sara and then I hear a knock on my door and it was Judge Fred Johnson and he says, "Why is this door locked?" I said, "I am in here in my office working and on the phone." Judge Johnson responds, " Unlock the door. I need in Judge Jack's office." I did not respond and did not unlock either door feeling he just wanted to threaten and torment me further. Since Judge Jack retired on December 18th, Judge Johnson has never gone into the office of Judge Jack, to my knowledge, unless a senior judge had been in there and just to visit with that senior judge. Today, I had no senior judge

here and there is nothing in that office for Judge Johnson and for him to have to be in there. Judge Johnson then responds back, 'I'll just call Mac,' and he leaves my door. Needless to say, I was upset and shaken again and Sara Beezley remained on the phone with me the whole time and she said just leave your doors locked and get out of there. I called Terri Thurman, our district court clerk, through our intercom system, to let her know what had just transpired and I was leaving again for the day. I also asked her to make sure my door stayed locked because it was my office and there was no reason for anyone to be in there when I wasn't there. I then gathered my belongings and went to my car and called our court administrator, Mac Young, once again. He answered and said, 'Hello. What now?' I responded, "Mac, I am leaving. He (Judge Johnson) came down to my office and knocked on my door and told me I needed to unlock my door and told me I needed to unlock this door. I would not unlock my door because I told you (Mac) I was working in a hostile environment on Friday. Mac responded, 'You need to unlock that door, He is a judge and he can go anywhere he wants.' I said, 'Mac, no he cannot. I am leaving and I'm not going back in there.' Mac said, 'Well, who has keys to unlock that door?' I said, 'I don't know. maybe Terri, but I am not going back in there. I'm leaving.' The phone call then ended with Mac.

In conclusion, on this second day of bullying, harassing, and torment, by Judge Fred Johnson, I feel it is a very hostile environment to work in, and I feel no guidance or protection from the Court Administrator, Mac Young, I plan to fulfill my job duties from home working on transcripts and various AA duties and filling in for the area districts as my role of an official court reporter until something is done.

(Def. append., doc. #38-12 at pp. 3-4)

31.     Controverted. See Statement of Facts below at no. 33.

32.     Uncontroverted.

33.     Controverted. Judge Fleming was not scheduled to be the visiting judge until February of 2020. Furthermore, the janitorial staff did not go into the offices in the Parsons courthouse during regular business hours. (Declar. of S. Overfield at ¶ 3, included in plt. append.)

34.-39. Uncontroverted.

40. Controverted. Chief Judge Lynch testified that it was "within his authority" to enter the administrative order dated January 27, 2020. That order stated Judge Johnson would "be sitting in Oswego for office hours and court until further order." (Def. append., doc. #38-10 at p. 3) Likewise, Judge Johnson testified that he understood the order of January 27, 2020, to mean that he was not to conduct any business in the Parsons courthouse, and he abided by the order. (Def. append., doc. #38-9 at p. 8)

41. Uncontroverted but must be supplemented. The Kansas Commission on Judicial Conduct also considered the complaints filed against Judge Johnson by Tasha Thurman and Terri Thurman. The commission concluded "that the complaints contained issues that are personnel matters which should be handled administratively through human resources…." (Def. append., doc. #38-5 at p.2) See also Statement of Facts below at nos. 74-79.

42. Controverted. Ms. Overfield testified that she had a conversation with Chief Judge Lynch before he entered the order of February 20, 2021, which rescinded his earlier order restricting Judge Johnson to the Oswego courthouse. During this conversation, Judge Lynch explained that he did not have the authority to enter the earlier order. (Def. append., doc. #38-11 at pp. 41-42)

43. Uncontroverted but must be supplemented. See Statement of Facts below at nos. 83-84.

44.-73. Uncontroverted.

## B.    Additional Facts

74.    Sometime in January of 2020, Tasha Thurman filed a complaint against Judge Johnson with the Kansas Commission on Judicial Conduct. (Depo. of A. Christman at pp. 23-24, included in plt. append.) Tasha Thurman was employed as Judge Johnson's administrative assistant from December of 2017 to December of 2018. See Statement of Facts above at no. 10.

75.    Tasha Thurman's complaint against Judge Johnson reported abusive acts against her by him, including the following:

> During 2018, to say I was working in a hostile work environment would be an understatement. While working for… Judge Johnson, my self-confidence and self-worth crumbled. I felt threatened, degraded, and belittled. I was constantly walking on eggshells, wondering if the next word out my mouth was going to set him off, or result in an interrogation about what I was doing or where I was on my schooling.

> At some point in April, I started to wonder if he had an anger problem because when he got irritated, his entire face was beet red, his eyes twitched, and he would sneer. I started becoming leery of my surroundings and had an uneasy feeling in my stomach. I wasn't sleeping.

(Depo. exh. 6 at p.1, included in plt. append.)

76.    Ms. Overfield testified that Tasha Thurman told her about how Judge Johnson had threatened and belittled Tasha, and that she had observed Tasha crying because of Judge Johnson's conduct towards Tasha. (Def. append., doc. #38-11 at pp. 24-26)

77.    Sometime in January of 2020, Terri Thurman also filed a complaint against Judge Johnson with the Kansas Commission on Judicial Conduct. (Depo. of A. Christman at pp. 23-25, included in plt. append.) Terri Thurman was employed as the District Court

Clerk of the Eleventh Judicial District for many years. See Statement of Facts above at no. 6.

78.     Terri Thurman's complaint against Judge Johnson also reported abusive acts against her by him, including a confrontation which occurred at the end of a budget meeting on May 9, 2019. Terri's complaint described this confrontation in part as follows:

> Judge Johnson said, 'I want to know your retirement date.' I replied, 'I don't have a date.' Judge Johnson continued and said, 'You told Judge Jack and I that you are retiring in July.' I said, 'I can't....' [H]e cut me off, slammed his hand down on the table, and screaming at me pointing his finger saying, 'You told us you were retiring at Christmas and I want to know a date.' … Judge Johnson proceeds to tell me I am toxic, you are a problem, you need to go, you are rude, you are evil, and disrespectful!...
>
> … He threw his hands in the air and said, 'I'm done with you!' Screaming at the top of his voice. I walked out. This entire screaming episode lasted between 5-10 minutes.

(Depo. exh. 32 at pp. 1-2, included in plt. append.)

79.     Ms. Overfield testified that she overheard some of the confrontation between Terri Thurman and Judge Johnson on May 9, 2019, particularly "the noise of the hand,… and screaming and yelling." Ms. Overfield further testified that she talked to Terri about the confrontation shortly after it had occurred. (Def. append., doc. #38-11 at pp. 21-22, 55; declar. of S. Overfield at ¶ 2, included in plt. append.)

80.     Ms. Overfield also testified that she observed Judge Johnson interact with male employees in the workplace, and that he always treated male employees with respect. She further testified that she never observed Judge Johnson treat any male employees in the same harassing and abusive manner which he treated herself, Terri Thurman, and Tasha Thurman. (Declar. of S. Overfield at ¶ 3, included in plt. append.)

81.     Ms. Overfield testified that she felt physically threatened and humiliated during her confrontation with Judge Johnson on January 10, 2020. She explained:

> And he kept hitting his fist on his desk and telling me to sit down, telling me I was a liar, a terrible court reporter. I didn't know what I was doing and I was lazy…. [I]t just escalated and kept escalating and to the point where… I was fearful for what he was going to do and get up and come after me. I'm five three. He is six foot two and a pretty good sized guy. And he had done it previously, and I had witnessed it, to the court clerk Terri Thurman.

(Def. append., doc. #38-11 at p. 19. Emphasis added.)

82.     Early in the last week of January of 2021, Ms. Overfield sent an email to both Judge Lynch and Mr. Young, voicing her concerns that Judge Johnson was planning to work in the Parsons courthouse during the first week of February, and stating that she did not feel safe working in the Parsons courthouse when he would be there. (Declar. of S. Overfield at ¶ 5, included in plt. append.) Later in the same week on January 29, 2021, Ms. Overfield sent an email to Mr. Young, which stated in relevant part:

> I apologize off the bat but am concerned that I have not heard back from you or Judge Lynch concerning the email I sent you earlier in the week. As of today, Friday afternoon, I have learned through other sources that Judge Johnson plans to be working in this courthouse on next Wednesday and Thursday and the 30th of March. As I stated in my pervious email, I feel very uneasy about this and not having any notifications from you or Judge lynch or OJA for that matter. Terri [Thurman] and I were planning to work in the office Thursday together but I don't think that is wise for either of us. I definitely do not feel comfortable back here alone with him here, even though Judge Stockard will be here.

(Depo. exh. 24, included in plt. append. Emphasis added.)

83.     After Judge Fleming entered the administrative order on February 20, 2021, Ms. Overfield was allowed to work remotely on any days Judge Johnson held court in the

Parsons courthouse. However, working remotely substantially interfered with Ms. Overfield's work performance. Specifically, she wore "two hats" working for Judge Stockard: one as his court reporter, and the other as his administrative assistant. When she had to work remotely, she had to use her own personal cell phone to schedule hearings, and to communicate with attorneys and pro se litigants. Ms. Overfield was particularly uncomfortable using her personal cell phone to communicate with pro se litigants. Furthermore, when she had to work remotely, she did not have Judge Stockard, the district court clerks, or the County Attorney's office in the same building with her, so she could not ask them questions, or work with them in performing her day-to-day tasks as the administrative assistant. (Declar. of S. Overfield at ¶ 6, included in plt. append.)

84.     In addition, when Ms. Overfield had to work remotely, it was difficult to perform her tasks as the court reporter because the courtroom sound system was not very good. As a result, she had difficulty hearing what was said by the attorneys, the witnesses, and the court, and she could not stop the proceedings to ask for clarification. (Declar. of S. Overfield at ¶ 7, included in plt. append.)

85.     After Judge Johnson returned to holding court in the Parsons courthouse in March of 2021, he refused to communicate with Ms. Overfield in regard to monthly staff Zoom meetings and numerous other meetings concerning the court proceedings and hearings. Judge Johnson's conduct substantially interfered with Ms. Overfield's work performance because it is hard to run a courthouse without communication with all staff. (Declar. of S. Overfield at ¶ 8, included in plt. append.)

## ARGUMENTS AND AUTHORITIES

In deciding a motion for summary judgment, the court must determine whether there is a genuine issue as to any material fact, and whether the moving party is entitled to judgment as a matter of law. *Garrett v. Hewlett-Packard Company*, 305 F.3d 1210, 1216 (10th Cir. 2012). In considering whether there are any genuine issues of material fact, "the court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party." *Gullickson v. Southwest Airlines Pilots' Ass'n*, 87 F.3d 1176, 1183 (10th Cir. 1996). See also *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013).

In analyzing a summary judgment motion, the court "may not make credibility determinations or weigh the evidence," and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). The nonmoving party must be given "wide berth to prove a factual controversy exists." *Jefferies v. State of Kansas*, 147 F.3d 1220, 1228 (10th Cir. 1998).

Here, a reasonable jury, faced with the evidence presented, could return a verdict in favor of Ms. Overfield as to both of her claims. Therefore, the State's motion for summary judgment must be denied in its entirety.

## I.    A REASONABLE JURY, FACED WITH THE EVIDENCE PRESENTED, COULD RETURN A VERDICT IN FAVOR OF MS. OVERFIELD ON HER HOSTILE WORK ENVIRONMENT CLAIM

### A.    Legal Standards Applicable To The Hostile Work Environment Claim Under Title VII

To establish a hostile work environment claim under Title VII, "a plaintiff must show (1) that she was discriminated against because of her sex; and (2) that the discrimination

was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." *Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1174 (10th Cir. 2020), quoting *Medina v. Income Support Div.*, 413 F.3d 1131, 1134 (10th Cir. 2005). See also *Ford v. Jackson National Life Ins. Co.*, 45 F.4th 1202, 1227 (10th Cir. 2022); *Throupe v. University of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021). A hostile work environment claim is "composed of a series of separate acts that collectively constitute one unlawful employment practice." *Nat. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)

### (1.) Discrimination Based On Sex

In regard to showing discrimination based on sex, the Tenth Circuit recently explained:

> The plaintiff's sex need only be a 'motivating factor' in the unlawful employment practice. 42 U.S.C. § 2000e – 2(m). To show the defendant was motivated by the plaintiff's sex, a plaintiff may point to acts of harassment that are 'facially sex based.'

*Throupe*, 988 F.3d at 1251, citing *Sanderson*, 976 F.3d at 1174.

However, showing acts of harassment that are "facially sex based" is not the only way to establish a hostile work environment. A plaintiff may also establish a hostile work environment based on sex by showing "that the harasser treats men and women differently in the workplace." *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007), citing *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1263-64 (10th Cir. 2005). As the Tenth Circuit explained in *Chavez v. Thomas & Betts Corporation*, 396 F.3d 1088 (10th Cir. 2005):

> To determine whether discrimination occurred because of sex, evidence must exist from which the fact finder could infer

the plaintiff was harassed because she is a woman. [Citation omitted.] 'The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'

396 F.3d at 1096, quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). "If a jury could reasonably infer the conduct was related to the plaintiff's sex, 'then it is for the fact finder to decide whether such an inference should be drawn.'" *Throupe*, 988 F.3d at 1251, quoting *Sanderson*, 976 F.3d at 1174.

### (2.) <u>Severe Or Pervasive Harassment</u>

The Tenth Circuit has pointed out that severity and pervasiveness "are <u>independent and equal grounds</u>" upon which a plaintiff may establish a hostile work environment. *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1145 (10th Cir. 2008), quoting *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998.) Emphasis added. The Tenth Circuit has also identified several factors which should be considered in assessing the severity and/or pervasiveness of the harassment to which the plaintiff was subjected, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Sanderson*, 976 F.3d at 1176-77, quoting *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005). See also *Ford*, 45 F.4th at 1227.

The Tenth Circuit has further emphasized that in assessing the severity and/or pervasiveness of the harassment, the evidence must be viewed in context and in its totality, stating:

'[T]he existence of sexual harassment must be determined in light of the record as a whole, and the trier of fact must

> examine the totality of the circumstances, including the context in which the alleged incidents occurred.' [Citation omitted.] Such a thorough examination of the record is required because the very term "environment" indicates that allegedly discriminatory incidents should not be examined in isolation.'

*Sanderson*, 976 F.3d at 1174, quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999). See also *Lounds v, Lincare, Inc.*, 812 F.3d 1208, 1223-24 (10th Cir. 2015).

Because the evidence must be viewed in context and in its totality, facially neutral abusive conduct must also be considered in assessing the severity and/or pervasiveness of the harassment to which the plaintiff was subjected. As the Tenth Circuit explained in *Sanderson*:

> 'Facially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct it viewed in the context of other, overtly gender-discriminatory conduct.' [Citation omitted.] 'If it reasonably can be inferred that the conduct was related to gender or arose out of a context in which admittedly sex and gender-related conduct occurred, then it is for the fact finder to decide whether such an inference should be drawn.' In other words, it is ordinarily the province of the jury to decide whether facially sex-neutral conduct constitutes harassment based on sex.

976 F.3d at 1176, quoting *O'Shea*, 185 F.3d at 1097. See also *Lounds*, 812 F.3d at 1224.

Facially neutral conduct also includes acts of retaliation against the plaintiff. As the Tenth Circuit held in *Chavez v. New Mexico:*

> Finally, plaintiffs point to two additional incidents of harassment which they allege occurred in retaliation for filing this lawsuit. Although their retaliation claim ultimately fails…, these incidents are relevant to the hostile work environment claims.

397 F.3d at 835. Emphasis added.

Because the evidence must be viewed in context and in its totality, abusive conduct toward other women in the same work environment must also be considered in assessing the severity and/or the pervasiveness of the harassment to which the plaintiff was subjected. The Tenth Circuit held in *Hernandez*;

> '[E]vidence of a general work atmosphere, including harassment of other… minorities may be considered in evaluating a claim, as long as [the plaintiff] presents evidence that [she] knew about the offending behavior.'

684 F.3d at 959, quoting *Tademy*, 614 F.3d at 1146. See also Ford, 45 F.4th at 1232 ("we've held that evidence directed at others—who are not the plaintiff—is relevant in this analysis").

Finally, because a hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice, abusive acts which occur both before and after the 300-day statutory time period must also be considered in assessing the severity and/or the pervasiveness of the harassment to which the plaintiff was subjected. As the Tenth Circuit stated in *Ford*:

> [T]he Supreme Court has explained that '[i]t does not matter… that some of the component acts of the hostile work environment fall outside the statutory time period.' [Citation omitted.] What matters is that there is an act contributing to the claim [that] occurs within the filing period.'…
>
> An event is part of the same hostile work environment when 'the pre- and past- limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetuated by the same managers.'

45 Fed. 4th at 1228-29, quoting *Nat'l R:R. Passenger Corp. v. Morgan*, 536 U.S. at 117, 120. See also *Sanderson*, 976, F.3d at 1175; *Hansen v. SkyWest Airlines*, 844 F.3d 914, 924 (10th Cir. 2016).

**(3.)** **Hostile Work Environment Claims Unsuited For Summary Judgment**

The Tenth Circuit has emphasized multiple times that "whether conduct qualifies as severe or pervasive is 'particularly unsuited for summary judgment because it is quintessentially a question of fact.'" _Ford_, 45 F.4th at 1228.

The Tenth Circuit has reinforced this admonition by reversing summary judgments in a number of cases entered in favor of employers on hostile work environment claims. See, e.g., _Ford_, 45 F.4th at 1235; _Sanderson_, 976 F.3d at 1177; _Hansen_, 844 F.3d at 924; _Lounds_, 812 F.3d at 1232; _Hernandez_, 684 F.3d at 960; _Semsroth v. City of Wichita_, 304 F. Appx. 707, 727 (10th Cir. 2008); _Tademy_, 614 F.3d at 1146; _EEOC v. PVNF, LLC_, 457 F.3d 790, 798 (10th Cir. 2007); _Herrera v. Lufkin Industries, Inc._, 474 F.3d 675, 683 (10th Cir. 2007); _Dick_, 397 F.3d at 1267; _Chavez_, 397 F.3d at 831-38.

**B.    Ms. Overfield's Hostile Work Environment Claim Raises**
**Genuine Issues of Fact**

Like most hostile work environment claims, Ms. Overfield's hostile work environment claim cannot be decided on summary judgment because it raises genuine issues of fact.

**(1.)    Discrimination Based on Sex**

One fact question is whether Ms. Overfield was subjected to a hostile work environment because of her sex. Ms. Overfield has presented evidence that she and two other women – Tasha Thurman and Terri Thurman – were subjected to acts of harassment by Judge Johnson in the same workplace. (Statement of Facts at nos. 19-30, 74-79)

In addition, Ms. Overfield testified that she has never observed Judge Johnson treating any male employee in the same harassing and abusive manner which he treated

Ms. Overfield and the other women. (Statement of Facts at no. 80) Furthermore, there is no evidence in the record that Judge Johnson treated any male employee in a harassing and abusive manner.

Based on the above evidence, a reasonable jury could find that Judge Johnson "treats men and women differently in the workplace." *Harsco Corp.*, 475 F.3d at 1186. In other words, "a jury could reasonably infer the [harassing] conduct was related to the plaintiff's sex." *Throupe*, 988 F.3d at 1252.

### (2.)    Severe or Pervasive Harassment

Another fact questions is whether the harassment of Ms. Overfield was sufficiently severe and/or pervasive such that it altered the terms and conditions of her employment. This question "is quintessentially a question of fact." *Ford*, 45 F.4th at 1228. When the evidence here is viewed in context and in its totality, a reasonably jury could find that Ms. Overfield was subjected to severe and/or pervasive harassment for a number of reasons.

First, in terms of context, Ms. Overfield was harassed by a district court judge in a courthouse. (Statement of Facts at nos. 19-30) Unlike a factory, for example, a courthouse is a workplace where employees can expect a high degree of decorum. As the Kansas Supreme Court pointed out in *In re Matter of Cullins*, 312 Kan. 798, 481 P.3d 774 (2021), the Kansas Code of Judicial Conduct requires that "a judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials and others with whom the judge deals in an official capacity." 312 Kan. at 804, quoting Rule 2.8. Emphasis added.

Second, Judge Johnson's abusive conduct toward Ms. Overfield on January 10, 2020, was physically threatening and humiliating. Judge Johnson yelled at Ms. Overfield;

pounded his hand on his desk; called her a liar; and became very angry. (Statement of Facts at nos. 19, 81) As Ms. Overfield explained, "I was fearful for what he was going to do and get up and come after me. I'm five three. He is six foot two and a pretty good sized guy." (Statement of Facts at no. 81) Because she felt physically threatened, Ms. Overfield refused to unlock the door on January 13, 2020, when Judge Johnson harassed her again. (Statement of Facts at nos. 22-30)

Third, Judge Johnson's harassment of Ms. Overfield interfered with her work performance. From January 13, 2020, to January 21, 2020, Ms. Overfield did not work at all at the Parsons courthouse. (Statement of Facts at no. 38) In addition, after March of 2021, Ms. Overfield had to work remotely on any days Judge Johnson held court in the Parsons courthouse, and working remotely substantially  interfered with her work performance. (Statement of Facts at nos. 83-84)

Fourth, Ms. Overfield was subjected to facially sex-neutral abusive conduct by Judge Johnson after he returned to the Parsons courthouse in March of 2021. Specifically, Judge Johnson refused to communicate with Ms. Overfield in regard to monthly staff Zoom meetings and numerous other meetings concerning the court proceedings and hearings. Again, this abusive conduct inferred with Ms. Overfield's work performance. (Statement of Facts at no. 85)

Fifth, Ms. Overfield was also subjected to facially sex-neutral abusive conduct by Mr. Young. This abusive conduct consisted of acts of retaliation, which "are relevant to the hostile work environment claim." _Chavez_, 397 F.3d at 835. The retaliatory acts by Mr. Young involved a verbal and written reprimand on January 13, 2020; and an untimely

annual performance evaluation in the summer of 2021, resulting in a lower rating than her previous evaluations. (Statement of Facts at nos. 32-33, 46, 47, 54-59)

Sixth, Ms. Overfield was also subjected to facially sex-neutral abusive conduct by Judge Lynch. This abusive conduct likewise consisted of an act of retaliation, namely, entering the order of February 20, 2021, which rescinded his earlier order restricting Judge Johnson to the Oswego courthouse. (Statement of Facts at no. 42) The order of February 20, 2021, was entered only about three weeks after Ms. Overfield had voiced her substantial concerns about Judge Johnson's plans to work in the Parsons courthouse. (Statement of Facts at no. 82)

Seventh, two other women in the same work environment – Tasha Thurman and Terri Thurman – were also subjected to abusive conduct by Judge Johnson similar to the abusive conduct to which Ms. Overfield was subjected. (Statement of Facts at nos. 75, 78) Evidence of the harassment of other women in the same workplace must be considered in evaluating a hostile work environment claim, "as long as [the plaintiff] presents evidence that [she] knew about the offending behavior." _Hernandez_, 684 F.3d at 959. It is uncontroverted that Ms. Overfield was fully aware of Judge Johnson's abusive conduct toward Tasha Thurman and Terri Thurman. (Statement of Facts at nos. 76, 79)

For the reasons discussed above, what the Tenth Circuit has emphasized in multiple cases applies here: "whether conduct qualifies as severe or pervasive is 'particularly unsuited for summary judgment because it is quintessentially a question of fact.'" _Ford_, 45 F.4th at 1228.

**II.    A REASONABLE JURY, FACED WITH THE EVIDENCE PRESENTED, COULD RETURN A VERDICT IN FAVOR OF MS. OVERFIELD ON HER RETALIATION CLAIM**

**A.    Legal Standards Applicable To The Retaliation Claim Under Title VII**

Where, as here, a plaintiff does not have direct evidence of retaliation, the three-stage, burden-shifting framework set forth in _McDonnell Douglas Corp. v. Green_, 411 U.S. 792 (1973) is applicable. _Lounds_, 812 F.3d at 1233.

**A.    The Plaintiff's Prima Facie Case**

Under _McDonnell Douglas'_ burden-shifting rubric, the plaintiff must first establish a prima facie case of retaliation by proving '(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.'

_Lounds_, 812 F.3d at 1233-34, quoting _Argo v. Blue Cross & Blue Shield of Kansas, Inc._, 452 F.3d 1193, 1202 (10th Cir. 2006).

In regard to the first element of the plaintiff's prima facie case, protected activities under Title VII "can range from filing formal charges to voicing informal complaints to supervisors." _Fye v. Okla. Corp. Comm'n_, 516 F.3d 1217, 1228 (10th Cir. 2008), quoting _Hertz v. Luzenac Am., Inc._, 370 F.3d 1014, 1015 (10th Cir. 2004).

Here, Ms. Overfield engaged in four protected activities: (1) she verbally complained to Mr. Young on January 10 and January 13, 2020, about Judge Johnson's abusive conduct toward her on those dates (Statement of Facts at nos. 21, 30); (2) she filed a formal complaint with the Kansas Commission on Judicial Conduct against Judge Johnson at the end of January of 2020 (Statement of Facts at no. 37); (3) she filed a formal complaint with the Kansas Human Rights Commission against the State of Kansas

in May of 2020, naming Judge Johnson and Mr. Young as the responsible parties (Statement of Facts at nos. 48, 52); and (4) she informally voiced her concerns to Judge Lynch and Mr. Young during the last week of January of 2021 regarding Judge Johnson's plans to work in the Parsons courthouse during the first week of February. (Statement of Facts at no. 82)

In regard to the second element of the plaintiff's prima facie case, the Tenth Circuit "liberally defines the phrase adverse employment action…. Such actions are not simply limited to monetary losses in the form of wages or benefits. Instead, we take a case-by-case approach, examining the unique factors relevant to the situation at hand." _Payan v. United Parcel Services, Inc._, 905 F.3d 1162, 1172 (10th Cir. 2018), quoting _Hillig v. Rumsfeld_, 381 F.3d 1028, 1031 (10th Cir. 2004).

Here, Ms. Overfield was subjected to three adverse employment actions: (1) Mr. Young reprimanded her verbally and in writing on January 13, 2020 (Statement of Facts at nos. 30-32); (2) Mr. Young gave her an untimely annual performance evaluation in the summer of 2021, resulting in a lower rating than her previous evaluations (Statement of Facts at nos. 47-59; and (3) Judge Lynch entered the order of February 20, 2021, which rescinded his earlier order restricting Judge Johnson to the Oswego courthouse (Statement of Facts at no. 42).

The first two adverse employment actions against Ms. Overfield, taken by Mr. Young, are not part of Ms. Overfield's stand-alone retaliation claim. Rather, these acts of retaliation form part of Ms. Overfield's hostile work environment claim. See _Chavez_, 397 F.3d at 835.

The third adverse employment action against Ms. Overfield, taken by Judge Lynch, forms the basis of Ms. Overfield's stand-alone retaliation claim. Ms. Overfield testified that the order of February 20, 2021, substantially interfered with her work performance. (Statement of Facts at nos. 83-84) Based on this testimony, a reasonable jury could find that "a reasonable employee would have found the challenged action materially adverse." *Lounds*, 812 F.3d at 1233.

In regard to the third element of the plaintiff's prima facie case, a causal connection between the plaintiff's protected conduct and the employer's adverse employment action may be established by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Lounds*, 812 F.3d at 1234, quoting *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004).

Here, Ms. Overfield's protected activity during the last week of January of 2021 was "closely followed" by Judge Lynch's adverse action on February 20, 2021. (Statement of Facts at nos. 42, 82) At the prima facie stage, "if the adverse action occurs in a brief period up to one and a half months after the protected activity, temporal proximity alone will be sufficient to establish the requisite causal inference." *Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013).

### B. The Defendant's Proffered Legitimate Explanation

At the second stage of the *McDonnell Douglas* burden-shifting framework, the defendant/employer must "come forward with a legitimate, … nonretaliatory rationale for the adverse employment action." *Lounds*, 812 F.3d at 1234, quoting *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1195 (10th Cir. 2011). In other words, the employer must

shoulder the burden of rebutting the plaintiff's prima facie case "by justifying on legitimate grounds the employment action at issue." *Lounds*, 812 F.3d at 1234.

Here, the State asserts that Judge Lynch entered the order of February 20, 2021, for the following legitimate reason:

> We had been over a year of having [Plaintiff and Judge Johnson] totally isolated from each other, and in order for orderly functioning of the Court to proceed I felt like it was no longer advisable to direct [Judge Johnson] to be in Oswego all the time.

(Doc. #38 at p. 23)

## C.    Evidence of Pretext

At the third stage of the *McDonnell Douglas* analysis, the plaintiff must show that "the defendant's explanation is a pretext intended to conceal an impermissible retaliatory motive." *Lounds*, 812 F.3d at 1234. "Pretext can be shown in a variety of ways," and "there is no one specific mode of evidence required to establish the [retaliatory] inference." *Conroy v. Vilsack*, 707 F.3d 1163, 1172 (10th Cir. 2013), quoting *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158 (10th Cir. 2008).

One way to establish pretext is to "show that the employer's explanation is so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather a subterfuge for [retaliation]." *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1092 (10th Cir. 2007), quoting *Young v. Dillon Cos.*, 468 F.3d 1243, 1249 (10th Cir. 2006). See also *Lounds*, 812 F.3d at 1234.

Here, Ms. Overfield testified that she had a conversation with Judge Lynch before he entered the order of February 20, 2021, and that he explained to her then that he did not have the authority to enter the earlier order of January 27, 2020, restricting Judge Johnson to the Oswego courthouse. (Statement of Facts at no. 42) However, this

explanation is "inconsistent" with Judge Lynch's deposition testimony that it was "within his authority" to enter the order of January 27, 2020. (Statement of Facts at no. 40) Judge Lynch's explanation to Ms. Overfield is also "implausible" because the order of January 27, 2020, was in effect for over one year, and Judge Johnson testified that he abided by the order. (Statement of Facts at no. 40)

Based on the above evidence, a reasonable jury could find that Judge Lynch's explanation to Ms. Overfield "was not an honestly held belief but rather a subterfuge for [retaliation]." *Williams*, 497 F.3d at 1092.

### III.    THE STATE IS MS. OVERFIELD'S EMPLOYER

The State argues alternatively that "the State is not liable because it is not Plaintiff's employer." (Doc. #38 at p. 23) This argument must be rejected in light of the Tenth Circuit's decision in *Arbogast v. Kansas Department of Labor*, 686 F. Appx. 556 (2017), where the plaintiff sued only the Kansas Department of Labor on claims under the Rehabilitation Act of 1973. The Tenth Circuit affirmed the dismissal of the case, holding:

> For a party such as KDOL, its capacity to sue or be sued is determined 'by the law of the state where the court is located.' Fed. R. Civ. P. 17(b)(3). Under Kansas law, 'subordinate government agencies do not have the capacity to sue or be sued in the absence of statute.' *Hopkins v. State*, 237 Kan. 601, 702 P.2d 311, 316 (1985). Nonetheless, while an agency such as KDOL 'may not be able to be sued alone, it may be sued in conjunction with the State.'

686 F. Appx. at 556.

Here, Ms. Overfield properly sued the State of Kansas, because the 11th Judicial District and the Kansas Judicial Branch are "subordinate government agencies [which] do not have the capacity to sue or be sued." *Arbogast*, 686 F. Appx. at 556.

## CONCLUSION

For the reasons discussed above, the State's motion for summary judgment must be denied in its entirety.

Respectfully Submitted By
SLOAN, EISENBARTH, GLASSMAN
McENTIRE & JARBOE, L.L.C.
534 South Kansas Avenue, Suite 1000
Topeka, Kansas 66603-3456
(785) 357-6311
(785) 357-0152 fax

BY: /s/Alan V. Johnson
      Alan V. Johnson #09992
      ajohnson@sloanlawfirm.com
      **ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of January, 2023, I delivered a copy of the foregoing document via electronic mail to the following parties:

FISHER, PATTERSON, SAYLER & SMITH L.L.P.
Terelle A. Mock    #21465
Brian C. Mauldin   #28636
Crystal B. Moe     #29168
3550 S.W. 5th Street
Topeka, KS 66606
tmock@fpsslaw.com
bmauldin@fpsslaw.com
cmoe@fpsslaw.com
**ATTORNEYS FOR DEFENDANT**

/s/ Alan V. Johnson
Alan V. Johnson, KS #9992
Sloan, Eisenbarth, Glassman,
 McEntire & Jarboe, L.L.C.
534 S. Kansas Ave, Suite 1000
Topeka, Kansas 66603
Telephone   (785) 357-6311
Fax          (785) 357-0152
ajohnson@sloanlawfirm.com